21

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
-BROWNSVILLE DIVISION-

United States District Court
Southern District of Texas
FILED

JUL 2 7 2001

Michael N. Milby
Clerk of Court

KOPY KAT SERVICES, INC. & PATRICK MARK DESANTOS *
*
*
VS *
* C.A. NO. B-01-019
*
TOWN OF SOUTH PADRE ISLAND, TEXAS & ROBERT RODRIGUEZ *

**SOUTH PADRE DEFENDANTS' MOTION TO DISMISS AND/OR NO EVIDENCE MOTION FOR SUMMARY JUDGMENT**

May it Please the Court:

COMES NOW DEFENDANTS, the TOWN OF SOUTH PADRE ISLAND, TEXAS, (hereafter "TOWN" or "SOUTH PADRE ISLAND") and POLICE CHIEF ROBERT RODRIGUEZ in his official capacity (hereafter "CHIEF RODRIGUEZ") (hereafter collectively referred to as the "SOUTH PADRE DEFENDANTS") in this lawsuit and file this Motion to Dismiss pursuant to Rule 12 and Rule 56 of the Federal Rules of Civil Procedure.

## NATURE OF THE CASE

Plaintiff attempted to operate a motor scooter rental business in a zoning district (C-2) where such use was not permitted. Without issuing Plaintiff a citation for the violation, code enforcement for the TOWN advised Plaintiff that such business was not a permitted use in the C-2 district. Plaintiff, in turn, willingly closed his business.

ClibPDF - www.fastio.com

Plaintiffs, Patrick Mark Desantos and his business, Kopy Kat Services, Inc. (hereafter "Plaintiff"), now bring this civil rights lawsuit complaining of the TOWN'S enforcement of its ordinance. Plaintiff has sued the TOWN and CHIEF ROBERT RODRIGUEZ, in his official capacity, asserting violations under 42 U.S.C. §1983. Plaintiff also seeks declaratory relief and a temporary injunction.

**LAWSUIT AGAINST INDIVIDUAL IN OFFICIAL CAPACITY AMOUNTS TO SUIT AGAINST MUNICIPALITY**

SOUTH PADRE DEFENDANTS ask that the Court take judicial notice that Plaintiff, in his First Amended Complaint and "live pleading," has sued CHIEF ROBERT RODRIGUEZ, in his official capacity, and consequently, said lawsuit is in actuality against the TOWN OF SOUTH PADRE ISLAND. *See Kentucky vs. Graham*, 473 U.S. 159, 166 (1985); *see also Brandon v. Holt*, 469 U.S. 464 (1985).

**PROCEDURAL HISTORY**

Prior to the filing of this matter, the parties had previously engaged in discovery proceedings in an original state court matter brought by Plaintiff pursuant to under Tex. R. Civ. Proc. 202, as more fully explained below.

On or about May 22, 2000, Petitioner Mark Desantos filed his petition authorizing the taking of oral depositions pursuant to Rule 202 of the Texas Rules of Civil Procedure. In his petition, Mr. Desantos requested that the Town of South Padre Island, Texas, produce its agents and/or employees of the Town including, Chief

ClibPDF - www.fastio.com

Robert Rodriguez, former Police Officer Charles Morrison, Mr. Leopoldo Garcia, Jr., and Officer Jose Valdez. See Exhibit C.

On or about June 1, 2000, the Town of South Padre filed its response in opposition to Petitioner's Rule 202 request as Plaintiff did not want to be deposed, and also filed its counter-request to take the deposition of Petitioner, Patrick Desantos. See Exhibit D.

On or about June 5, 2000, 197th State District Court Judge Migdalia Lopez granted both Petitioner Desantos' request and the Town's request, authorizing the depositions of Patrick M. Desantos and the Town of South Padre Island's agents and/or employees mentioned above. See Exhibit E.

On October 09, 2000, the Town of South Padre Island produced all four of its agents and/or employees which were deposed by Plaintiff's attorney, Mr. Scott Hayes, at the South Padre Island Training Center, South Padre Island, Texas. The depositions were recorded orally and videotaped as well.

On October 10, 2000, at the Offices of Bryant & Stingley Court Reporters, Harlingen, Texas, Plaintiff, was deposed by counsel for the Town of South Padre Island, Texas. See Exhibit A.

Several months later, on or about January 30, 2001, Plaintiff filed his Original Complaint and Application for Temporary Injunction. On February 26, 2001, Plaintiff filed his Application for Temporary Restraining Order and Brief in Support.

ClibPDF - www.fastio.com

Citing to Plaintiff's failure to exhaust administrative remedies, and specifically, his failure to secure a building permit as per Chapter 20 of the TOWN's ordinance, the Court denied Plaintiff's requested temporary injunctive relief on February 28, 2001. See Exhibit G.

On June 4, 2001, the parties filed their Rule 26(f) discovery plan. At the initial pre-trial conference, the Court allowed Plaintiff to file an amended complaint by no later than June 25, 2001, requiring that Plaintiff identify the capacity in which DEFENDANT CHIEF ROBERT RODRIGUEZ was being sued. The Court allowed TOWN DEFENDANTS to file a dispositive motion by no later than July 31, 2001.

Plaintiff amended his complaint on June 25, 2001, where he asserts claims under 42 U.S.C. § 1983 (via the 14th Amendment), and seeks declaratory relief and a temporary injunction.

**EXHIBITS IN SUPPORT OF MOTION**

| | |
|---|---|
| Exhibit A | Deposition of Plaintiff; |
| Exhibit B | Copy of TOWN'S C-2 District Zoning Ordinance; |
| Exhibit C | Plaintiff's 202 Petition-State Court Case; |
| Exhibit D | Defendant's Response and Request to Depose Plaintiff; |
| Exhibit E | State Court Order allowing for depositions to proceed; |
| Exhibit F | Notice of Deposition of Patrick de Santos With Duces Tecum Request; |

ClibPDF - www.fastio.com

Exhibit G Federal Court Order;

Exhibit H Memorandums Concerning TEXDOT motor scooter regulations.

**DEFENSES AND AFFIRMATIVE DEFENSES**

SOUTH PADRE DEFENDANTS deny that Plaintiff has a constitutionally protected right so as to assert 42 U.S.C. §1983, the Declaratory Judgment Act, and to request injunctive relief.

**STATEMENT OF THE ISSUE FOR COURT**

The issue before the Court is 1) Whether Plaintiff has a constitutionally protected right so as to assert claims under 42 U.S.C. § 1983 and the Declaratory Judgment Act, and to further seek injunctive relief.

**UNDISPUTED MATERIAL FACTS**

Plaintiff is an Austin businessman with numerous businesses throughout Texas. See Exhibit A, pp. 11-12, 14, 16. Plaintiff admits that the corporate headquarters for his motor scooter business is in Dallas, Texas. See Exhibit A, p. 16. Although headquartered in Dallas, Texas, Kopy Kat's scooter rental business operated out of South Padre Island, Texas. See Exhibit A, Page 16. Plaintiff operated his business out of the Gulf Coast Beachwear (hereafter "Gulf Coast") located at 2013 Padre Boulevard, South Padre Island, Texas. See Exhibit A, pp. 42, 100.

When requested to produce documents evincing a lease with the property owners, however, Plaintiff represented that there are no

ClibPDF - www.fastio.com

lease agreements between him and the owner of Gulf Coast. See Exhibit A, p. 8. Plaintiff admits that he never had more than one employee working out of the South Padre Island business. See Exhibit A, p. 46. According to Plaintiff, he opened his motor scooter rental in April, 2000, during Spring Break. See Exhibit A, p. 88. Plaintiff admitted that he did not participate in a September, 1999, meeting sponsored by the Texas Department of Transportation and the TOWN for local South Padre Island business pertaining to new TEXDOT regulation of mopeds. See Exhibit A, p. 91; See Memos, Exhibits H. Despite opening the business, Plaintiff further admits that there was nothing on the Gulf Coast locale showing that he operated a motor scooter rental business, not even the name of the business. See Exhibit A, p. 99. He simply had scooters located on Gulf Coast's parking lot. See Exhibit A, p. 99.

Plaintiff admits that on April 15, 2000, Code Enforcement Officer, Leo Garcia, approached him regarding the Code violations concerning the placement of signs on motor scooters and the location of the motor scooters on the Gulf Coast parking lot. See Exhibit A, p. 93. See Plaintiff's First Amended Complaint, p. 2. Although the owner (Ms. Ester Levy) of Gulf Coast was cited, the citation was never prosecuted by the TOWN. See Exhibit A, p. 96. Plaintiff admits that was not cited or paid any fines as a result of this incident. See Exhibit A, p. 98. According to Plaintiff,

ClibPDF - www.fastio.com

after the April 15th incident referenced above and a South Padre Island police officer spoke to him for renting mopeds to out-of-state kids without driver's licenses, Plaintiff stopped operating his moped rental business in late April or on May 1, 2000. See Exhibit A, p. 107-109. Plaintiff states he was forced to shut down. See Exhibit A, p. 108-109. Plaintiff admits that outside the code enforcement officers, he never discussed the closing of his business with other members of the City or South Padre Island City Staff. See Exhibit A, Page 75. Plaintiff admits that during 2000 his moped business was in operation for only one day, a Saturday. See Exhibit A, p. 113.

Plaintiff admits that because he is a business person and has opened up businesses before, he knows that there are zoning requirements. See Exhibit A, p. 81. Despite knowing that zoning would be an issue in starting a business, Plaintiff admitted that he did not make an inquiry as to whether he needed a building permit to operate a business on South Padre Island, See Exhibit A, p. 48. In fact, Plaintiff explained that the reason that he did not make an inquiry was because the building already occupied by Gulf Coast. See Exhibit A, p. 48. Moreover and despite his representations in his live pleading, Plaintiff admits that he never spoke about zoning compliance with respect to a motor scooter rental business during a brief discussion with Chief Robert Rodriguez in February, 2000. See Exhibit A, pp. 80-81. See also

ClibPDF - www.fastio.com

Plaintiff's First Amended Complaint, p. 5. Plaintiff testified that he never went to TOWN officials to make sure whether the motor scooter business was a permissible use within the City's zoning scheme at that time. See Exhibit A, p. 82. Plaintiff admitted that he never did any investigation with respect to the zoning laws of the Town of South Padre Island. See Exhibit A, p. 83. Plaintiff further admitted that he never sought the approval of the Board of Adjustments of the Town of South Padre Island, Texas to conduct his motor scooter rental business. See Exhibit A, Page 83. Plaintiff also admitted that he never pursued a special exception or variance from the South Padre Island Board of Adjustments to conduct his use. See Exhibit A, Pg. 103-104.

Plaintiff further admits that the rental of mopeds is not a permitted use in the C-2 business district of the town. See Exhibit A, Pg. 102. Despite his violation of the TOWN's ordinance, Plaintiff further admits that he was not cited for any problems concerning the rental of motor scooters. See Exhibit A, Page 93. Plaintiff further admits that he was never prosecuted in an enforcement proceedings as a result of the citation. See Exhibit A. Pg. 98. Nor did he pay any fines, See Exhibit A, Pg. 98, 104-105. Plaintiff further admitted that the Gulf Coast was never shut down by the Town of South Padre Island, just his motor scooter rental business. See Exhibit A. Pg. 108-110.

**NO EVIDENCE POINT AND SUMMARY OF ARGUMENT BELOW**

ClibPDF - www.fastio.com

There is no genuine issues of material fact, and therefore, SOUTH PADRE DEFENDANTS are entitled to summary judgment on the following grounds:

**I. There is no evidence that Plaintiff has a constitutionally protected right so as to raise claims against SOUTH PADRE DEFENDANTS based on 42 U.S.C. § 1983, the Declaratory Judgment Act, and request injunctive relief.**

**LEGAL ARGUMENT & ANALYSIS**

**I. There is no evidence that Plaintiff has a constitutionally protected right, and consequently, the Court need not reach the merits of Plaintiff's claims under 42 U.S.C. § 1983, the Declaratory Judgment Act, and request injunctive relief.**

To recover a judgment against a local governmental entity under 42 U.S.C. § 1983, a Plaintiff must allege and establish that he sustained a deprivation of constitutional or other federally protected rights. *See Monell v. Department of Social Services,* 436 U.S. 658 (1978). Similarly, to assert the Declaratory Judgment Act and seek injunctive relief, Plaintiff has to have a right as well. Here, Plaintiff has none, and therefore, the Court need not reach the merits of Plaintiff's claims as more fully explained below.

**I. Plaintiff has no constitutionally or federally protected right.**

Deprivation by the state of a protected interest in life, liberty, or property is prerequisite to pursue claims of constitutional dimensions under § 1983. *See Ruckelshaus vs. Monsanto Company*, 467 U.S. 986, 1001-004 (1984).

ClibPDF - www.fastio.com

Under § 1983, Plaintiff must first show that he has a legally recognized property interest at stake. See *State of Texas v. Walker*, 142 F.3d 813 (5th Cir. 1998). Property interests are not created by the U.S. Constitution, rather they are necessarily creatures of state law. See *Schaper v. City of Huntsville*, 813 F.2d 709 (5th Cir. 1987) citing to *Board of Regents vs. Roth*, 408 U.S. 564, 577 (1972).

Here and as more fully explained below, Plaintiff has failed to invoke the protections of state property law so as to be able to assert the protection of § 1983. Plaintiff has not suffered a constitutional violation because he has no constitutionally-protected right. Moreover, Plaintiff has no "right" or "legal relation" of an interested party as he can point to no vested property right or interest in support of his Declaratory judgment, and consequently, there is no "justiciable controversy" for the Court to decide under the Declaratory Judgment Act either. Plaintiff simply wants this Court to unilaterally "create" an additional permissible use or category in the TOWN's C-2 district.

Plaintiff admitted that the rental of mopeds is not a permitted use in the C-2 business district of the TOWN. See Exhibit A, Pg. 102. The evidence further establishes that Plaintiff he knew that there are zoning requirements to follow. See Exhibit A, p. 81. Despite knowing that zoning would be an issue in starting a business, Plaintiff admitted that he did not make an inquiry as to whether he needed a building permit to operate a business on South

ClibPDF - www.fastio.com

Padre Island, See Exhibit A, p. 48. In fact, Plaintiff explained that the reason that he did not make an inquiry was because the building already occupied by Gulf Coast. See Exhibit A, p. 48. Moreover and despite his representations in his live pleading, Plaintiff admits that he never spoke about zoning compliance with respect to a motor scooter rental business during a brief discussion with Chief Robert Rodriguez in February, 2000. See Exhibit A, pp. 80-81. See also Plaintiff's First Amended Complaint, p. 5. Plaintiff testified that he never went to TOWN officials to make sure whether the motor scooter business was a permissible use within the City's zoning scheme at that time. See Exhibit A, p. 82. Plaintiff admitted that he never did any investigation with respect to the zoning laws of the Town of South Padre Island. See Exhibit A, p. 83. Plaintiff further admitted that he never sought the approval of the Board of Adjustments of the Town of South Padre Island, Texas to conduct his motor scooter rental business. See Exhibit A, Page 83. Plaintiff also admitted that he never pursued a special exception or variance from the South Padre Island Board of Adjustments to conduct his use. See Exhibit A, Pg. 103-104.

Finally, because Plaintiff has no constitutionally-protected right, he consequently, has no likelihood of success on the merits as required for a Court to order injunctive relief. See *Sugar Busters L.L.C. v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1998).

**CONCLUSION**

ClibPDF - www.fastio.com

THEREFORE, based on any one or more of the foregoing reasons, the SOUTH PADRE DEFENDANTS hereby request that the Court order the following relief:

1. That the Court grant SOUTH PADRE DEFENDANTS' Motion to Dismiss and/or for Summary Judgment with respect to Plaintiff's claims against ROBERT RODRIGUEZ, in his official capacity, and the TOWN OF SOUTH PADRE ISLAND, TEXAS.

SOUTH PADRE DEFENDANTS further requests that upon final hearing of this case, that all relief sought by Plaintiff be denied, that a take nothing judgment against Plaintiff be entered. CITY DEFENDANTS further request any other additional and further relief, at law or in equity, to which they may be entitled.

SIGNED on the 27th day of July, 2001.

Respectfully submitted,

**DENTON, NAVARRO & BERNAL**
A Professional Corporation
Bank of America Building
222 East Van Buren, Suite 405
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

By: ______________________
RICARDO J. NAVARRO
Attorney in Charge
State Bar No. 14829100
So. Dist. ID No. 5953
MAURO F. RUIZ
State Bar No. 24007960
So. Dist. ID No. 23774

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this document has been sent by regular U.S. Mail unless otherwise indicated, to the person(s) listed below on this 27th day of July 2001.

Mr. Scott E. Hayes **Via Fax & CMMRRR 7000 1670 0013 4633 9204**
VIAL, HAMILTON, KOCH & KNOX, L.L.P.
1717 Main St., Suite 400
Dallas, Texas 75201

RICARDO J. NAVARRO
MAURO F. RUIZ

ClibPDF - www.fastio.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**-BROWNSVILLE DIVISION-**

| | | |
|---|---|---|
| **KOPY KAT SERVICES, INC. &** | * | |
| **PATRICK MARK DESANTOS** | * | |
| | * | |
| **VS** | * | |
| | * | **C.A. NO. B-01-019** |
| | * | |
| **TOWN OF SOUTH PADRE ISLAND, TEXAS** | * | |
| **& ROBERT RODRIGUEZ** | | |

**ORDER ON SOUTH PADRE DEFENDANTS' MOTION**
**TO DISMISS AND/OR NO EVIDENCE MOTION FOR SUMMARY JUDGMENT**

---

On this day came to be considered the TOWN OF SOUTH PADRE ISLAND, TEXAS and POLICE CHIEF ROBERT RODRIGUEZ in his official capacity Motion to Dismiss and/or No Evidence Motion For Summary Judgment (hereafter "Motion").

The Court, after consideration of the Motion the record and the arguments of counsel, is of the opinion that said Motion should in all things be _______.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that South Padre Defendants' Motion to Dismiss and/or No Evidence Motion For Summary Judgment is hereby __________.

It is also further ORDERED that any relief not expressly granted is hereby DENIED.

SIGNED this ____ day of _____________ 2001.

______________________________
HON. HILDA G. TAGLE
U.S. DISTRICT JUDGE

ClibPDF - www.fastio.com

EXHIBIT " A "

ClibPDF - www.fastio.com

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 16 of 125

CAUSE NO. 2000-050-1961-C

| | | |
|---|---|---|
| IN RE: | )( | IN THE DISTRICT COURT |
| | )( | |
| PATRICK DeSANTOS, ET AL | )( | CAMERON COUNTY, TEXAS |
| | )( | |
| | )( | 197TH JUDICIAL DISTRICT |

ORAL AND VIDEOTAPED DEPOSITION OF

PATRICK DeSANTOS

OCTOBER 10, 2000

ORAL AND VIDEOTAPED DEPOSITION OF PATRICK DeSANTOS, produced as a witness at the instance of the THE TOWN OF SOUTH PADRE ISLAND, TEXAS, taken in the above styled and numbered cause on OCTOBER 10, 2000, reported by SHELLEY STINGLEY, Certified Court Reporter No. 5725, in and for the State of Texas, at the offices of Bryant & Stingley, Inc , 2010 East Harrison Street, Harlingen, Texas, pursuant to the Texas Rules of Civil Procedure.

APPEARANCES

COUNSEL FOR PATRICK DeSANTOS:

SCOTT HAYES
VIAL, HAMILTON, KOCH & KNOX
1717 Main Street, Suite 4400
Dallas, Texas 75201-7388

COUNSEL FOR THE TOWN OF SOUTH PADRE ISLAND, TEXAS:

MAURO F RUIZ
DENTON, McKAMIE & NAVARRO
222 East Van Buren, Suite 405
Harlingen, Texas 78550

ALSO PRESENT: Rene Ortiz, Videographer

INDEX

| | PAGE |
|---|---|
| Appearances ........ .......................... | 2 |
| PATRICK DeSANTOS | |
| Examination by Mr Ruiz ..... .. . ....... ... . | 4 |
| Examination by Mr. Hayes . .. ...... ... .. | 117 |
| Errata Sheet/Signature Page . .. .. . . . | 122 |
| Reporter's Certificate ... ......... .... ... | 123 |
| Attached to the end of the transcript: Stipulations | |

EXHIb..s

| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | South Padre Island, Texas' First Amended Notice of Intent to Take Oral/Video Deposition of Patrick Mark DeSantos With Subpoena Duces Tecum ............. | 4 |
| 2 | Corporate documents regarding Digital Imaging Associates, Inc ... ........... | 5 |
| 3 | Corporate documents regarding Kopy Kat Services, Inc. .......................... | 5 |
| 4 | Series of letters to Robert Rodriguez from Patrick DeSantos . ................. | 6 |
| 5 | Series of letters to the City of South Padre Island, Texas, from Scott Hayes ... | -- |
| 6 | Letter to Patrick DeSantos from South Padre Island Police Department dated 4-25-00 ... .... ........................ | 6 |
| 7 | Assumed Name Certificate ................ | 7 |
| 8 | Notices to Appear ....................... | 9 |
| 9 | Records from South Padre Island Police Department ............. ............... | 10 |
| 10 | Memorandum to Ray Kendall from Chief Eunice dated 9-20-99 ............. | 91 |
| 11 | South Padre Island Police Department Offense/Incident Report ................ | 95 |
| 12 | Notice to Appear ........ ............... | -- |
| 13 | Map ....................... .. .... ... | 99 |
| 14 | Excerpt of Town of South Padre Island Code of Ordinances ... ...... .. . ..... | -- |

PATRICK DeSANTOS,
having been duly sworn, testified as follows:

EXAMINATION

BY MR. RUIZ:

Q. Good morning, Mr. DeSantos.

A. Good morning.

Q. My name is Mauro Ruiz, and I represent the City -- the Town of South Padre Island, Texas, in this deposition. We are taking this deposition pursuant to a court order, and, in doing so, I would like to review with Mr. Hayes, your attorney, your duces tecum -- the duces tecum requests which we attached to your notice before beginning. Is that all right with you?

A. Sure.

Q. Thank you. Mr. Hayes has produced some documents in response to our duces tecum requests. Are these in any particular order, Mr. Hayes, or do we go down No. 1 regarding -- oh, and by the way I would like to mark the deposition notice as Exhibit No. 1 for this depo.

MR. HAYES: Okay. I think the only order is -- I think more toward the top is corporate documents.

MR. RUIZ: Okay.

MR. HAYES: And there's some -- there's a

ClibPDF - www.fastio.com

Page 5

stack, also, of correspondence from Mr. DeSantos.

MR. RUIZ: Okay.

MR. HAYES: Then toward the end there's a bunch of correspondence that I sent off.

MR. RUIZ: Right. These are the corporate documents towards the top?

MR. HAYES: Yeah.

MR. RUIZ: Okay. That's correspondence, like you said. That's a packet --

MR. HAYES: Yeah.

MR. RUIZ: Okay. So I guess --

MR. HAYES: That's a big -- here's -- well, I think they're in there, the two citations that have been issued.

MR. RUIZ: Okay. Two citations that have been issued.

MR. HAYES: One for the card shop, and one for --

MR. RUIZ: Correct. So then we can mark these corporate documents as Exhibit No. -- we'll mark these as Exhibit No. 2.

And we'll mark this as Exhibit No. 3. These are -- this is documents with the front cover page is the State of Texas Secretary of State incorporating Kopy Kat Services and other related

Page 6

documents as well. I'll mark that Exhibit No. 2 so we can refer to that.

THE REPORTER: 3.

MR. RUIZ: I'm sorry, 3. You're right. We'll mark a series of correspondence from Mr. DeSantos to the City of -- to the Town of South Padre Island, Texas, dated July 3rd, July 6th -- and that's it. We'll mark these as Exhibit No. 4.

We've got a series of letters commencing May 17th by Attorney Scott Hayes for Mr. Patrick DeSantos, as well as May 5th. We'll mark this group of documents as Exhibit No. --

MR. HAYES: And just for you to know, Mauro, there -- I think there's probably some duplicates.

MR. RUIZ: I was going to say, there were some duplicates, and we can pull them out as we get into it and --

MR. HAYES: Yeah, however, yeah.

MR. RUIZ: And then we have got correspondence from the City -- the Town of South Padre Island Police Department to Patrick DeSantos. It's a packet with a cover letter dated April 25th, 2000 which contains several state traffic laws and ordinances. We'll mark that Exhibit No. 6.

Page 7

MR. HAYES: I think that was intended to be with the corporate information.

MR. RUIZ: Okay. And then we'll have the certificate of assumed name for Kopy Kat Scooter Rental filed April 12th, 2000, as Exhibit No. 7.

To the best of your knowledge, Mr. Hayes, did you provide any documents in response to Duces Tecum No. 1 concerning the authority to operate Kopy Kat Services, Inc. and Digital Imaging, Inc., including any and all licenses issued by the Town of South Padre Island, Texas --

MR. HAYES: If there are any documents, they would be in the corporate stack.

MR RUIZ: -- or the County of Cameron? Okay. "Any and all documents evincing" -- Duces Tecum No. 2, "Any and all documents evincing authority to operate Kopy Kat Services and Digital Imaging, Inc., including any and all licenses and permits issued by the State of Texas and its agencies."

MR. HAYES: Again, that would be in the stack that I think we marked with the corporate documents.

MR. RUIZ: Okay. "Any and all documents indicating registration of Kopy Kat Services, Inc. and Digital Imaging, Inc. with the Texas Secretary of

Page 8

State's Office."

MR. HAYES: I think that would be the same.

MR. RUIZ: "Any and all documents reflecting Patrick Mark DeSantos's federal tax ID number with respect to Kopy Kat Services and Digital Imaging, Inc. and any other businesses operated by Patrick Mark DeSantos."

MR. HAYES: That would be the same.

MR. RUIZ: Okay.

MR. HAYES: The corporate stack we gave to you.

MR. RUIZ: Okay, did you provide any lease agreements and other documents between Patrick Mark DeSantos and the owner of Gulf Coast Beachwear?

MR. HAYES: I don't believe any exist.

MR. RUIZ: Okay.

MR. HAYES: So the answer is, today, no.

MR. RUIZ: The -- okay. Is it that you have none or that there are some but you just didn't produce them?

MR. HAYES: As I understand, there are none that can -- is that right, Mark?

THE WITNESS: There are none.

MR. RUIZ: Okay, so there are no documents

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 18 of 125

concerning the lease of any of the property at Gulf Coast Beachwear?

THE WITNESS: Correct.

MR. RUIZ: Okay. "Any and all citations issued to Patrick Mark DeSantos and any agent or employee of Patrick Mark DeSantos by any agent or employee of the Town of South Padre Island, Texas."

MR. HAYES: Again, those would be the two --

MR. RUIZ: The --

MR. HAYES: -- the two I just last handed to you.

MR. RUIZ: Okay, we'll mark these Exhibit 8. These are -- this is a citation issued to Ester Levy and a citation issued to Jason Eric Alexander.

No. 7, Duces Tecum Request No. 7, "Any and all documents" --

MR. HAYES: Just a second. No. 7.

MR. RUIZ: This one concerns any and all charges brought against Patrick Mark DeSantos by the Cameron County District Attorney's Office.

MR. HAYES: Yeah, I can give you that right there.

MR. RUIZ: Okay, we'll mark this as

Exhibit No. 9 in response to Duces Tecum Request No. 7. And I believe -- Duces Tecum 8 -- you have produced correspondence between Mr. DeSantos's counsel and the Town of South Padre Island.

Item No. 9, "Any and all copies of all relevant ordinances and/or statutes on which Patrick Mark DeSantos relied upon to support his claim regarding the reciprocal licensing between the State of Texas and any other state of the United States."

MR. HAYES: He didn't bring any. I can get a copy. I think it's primarily -- it's that 521.030 we marked yesterday and discussed. I can --

MR. RUIZ: We can agree that the packet that the City provided you --

MR. HAYES: Okay, sure.

MR. RUIZ: -- contains those ordinances, those relevant ordinances.

MR. HAYES: Yeah.

MR. RUIZ: And, No. 10, finally, a copy of Mr. DeSantos's driver's license and social security card.

MR. HAYES: He can give the social security number, and you can just have them make a copy of your driver's license today.

MR. RUIZ: Okay, fine. That's quite all

right.

Q. Can you please state your full name for the record, sir?

A. Patrick Mark DeSantos.

Q. Yeah, and your date of birth?

A. February the 8th, 1952.

Q. Where were you born, Mr. DeSantos?

A. Houston, Texas.

Q. Were you also raised in Houston?

A. Yes, sir.

Q. Okay. How long have you been a resident of Houston, Texas?

A. I'm a resident of several cities, actually. I'm not just a resident of Houston.

Q. Okay, which cities are those, sir?

A. Dallas, Austin, Houston, and Padre Island.

Q. Okay. Where would you say your primary residence is?

A. I have my -- my homestead is in Austin.

Q. Okay. Can you provide us with your address in Austin, sir?

A. Yes, it's 306 Sailmaster, S-a-i-l-m-a-s-t-e-r, Austin, Texas 78734.

Q. Can you provide us with your phone number there, sir?

A. Area code 512-261 -- I have not been there in a while. 261 -- I swear I just --

Q. Well, if it comes to you later --

A. I have got more phone numbers than you can imagine.

Q. It sounds like you do.

A. It's like 8535, I think.

Q. 8535. Well, we can -- once you review your deposition, you will have the --

A. Yeah.

Q. -- opportunity to correct that.

A. Yeah.

Q. Fine. And do you own --

A. Yes, I do.

Q. -- businesses in the other cities?

A. In -- yes.

Q. Okay. Do you own a business in Austin, as well?

A. No, I do not.

Q. Okay. Does your family reside with you in Austin?

A. I don't have a family. I'm single.

Q. Okay. How long have you lived -- has your homestead been in Austin, Texas, Mr. DeSantos?

A. About '80, '81.

Page 13

Q. Since '81?
A. About.
Q. And the rest of the -- and how many months out of the year do you spend your time in Austin?
A. I don't know exactly. I -- it's several months out of the year. I'm not sure.
Q. Okay. Would you say --
A. Back --
Q. -- six months out of the year or --
A. I'm back and forth between all of them.
Q. Okay.
A. So I can't really put a --
Q. Do you -- would you say that you spend your time evenly between these four cities throughout the year?
A. I try -- I try to.
Q. Okay. And why is that?
A. Austin is a resort. I like to get away, just to get away. I have a place on Padre Island where I get away and also have business, and my -- I have business interests in Dallas, and so I have a residence there.
Q. Okay.
A. And I have a home in Houston where I also have a business, and, of course, that's my, you know, birth

Page 14

place.
Q. Right. Okay, so Austin is the only city where you really don't have a business, then?
A. Right.
Q. Okay.
A. But I'm there quite a bit.
Q. You're there quite a bit?
A. Oh, yeah.
Q. Next to Austin -- well, let's just say, in Dallas, what businesses do you own in Dallas, sir?
A. The businesses that we have listed here with Digital Imaging -- yeah, Digital Imaging Associates.
Q. Okay, so there is a -- would that be the --
A. Corporate headquarters?
Q. -- the corporate headquarters?
A. Yes, yes.
Q. Okay. And what does Digital Imaging in Dallas do?
A. It's a photo identification company where we sell identification cards and software and equipment.
Q. Okay. Do you also have a Digital Imaging company in Houston?
A. Yes, I do.
Q. Okay. And then you also have that Digital Imaging company in South Padre Island?

Page 15

A. Yes.
Q. How long have you had these -- this business open, Mr. DeSantos?
A. I don't know. Quite a few years.
Q. Okay, is it -- would you say about from the 1990s on?
A. Yes.
Q. Okay. So ten years?
A. At least.
Q. At least ten years.
A. Not that much for the Padre Island location. That's just been two years, maybe.
Q. And the Houston --
A. Something about the same.
Q. Two years, as well?
A. No.
Q. About ten years?
A. From '90s on.
Q. Okay. So your most recent branch, I guess, business is in --
A. South Padre Island.
Q. -- South Padre Island, Texas?
A. Yes, sir.
Q. Which has been open for approximately two years?

Page 16

A. Two years, right.
Q. Okay.
A. Off and on.
Q. Okay. Do you have any other businesses -- business interests in Dallas, Houston, or South Padre Island?
A. That's our corporate headquarters for Kopy Kat Scooter Rental.
Q. Okay. And where is that, sir?
A. It's the same location.
Q. Okay. Is the -- okay, and what is the address of the Digital Imaging?
A. 381 Casa Linda, Dallas, 75218.
Q. And that also serves as the corporate headquarters for Kopy Kat Scooter Rental --
A. Yes.
Q. -- in Dallas? Is Kopy Kat Scooter Rental also one of your businesses in Houston, sir?
A. No.
Q. No. So the scooter rental would be limited to Dallas and to South Padre Island?
A. It's limited to South Padre Island. Our offices are in Dallas.
Q. In Dallas.
A. Right.

ClibPDF - www.fastio.com

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 20 of 125

Q. Okay, I understand. Do you have any other business interests other than these, sir, in Dallas or any of these respective cities?
A. No.
Q. Okay. What is the highest level of education that you attained in school?
A. I need to revise that. I do have another business interest.
Q. Okay.
A. It's at the same location as one of our Digital Imaging shops we have.
Q. Okay.
A. A suntan shop, also. It's called Fast Hand.
Q. And would the corporate headquarters for that be --
A. Would be there, the same place.
Q. -- 381 Casa Linda?
A. Right.
Q. And how many of those do you -- how many of those --
A. One.
Q. -- branches do you have?
A. Just one.
THE REPORTER: Sorry. I'm losing you-all both.

A. Just one in Dallas.
MR. HAYES: Try to let him finish, Mark.
THE WITNESS: I'll let him finish and --
MR. HAYES: And Mauro will do the same.
THE WITNESS: Okay.
MR. HAYES: It's hard on the court reporter.
THE WITNESS: Okay. Sorry.
Q. Do you have any Fast Hands in Houston?
A. No.
Q. Okay. And you don't have any of these on the island?
A. No.
Q. Okay. How long has that business been around?
A. A few years.
Q. Few years. I think the last question before that, Mr. DeSantos, was what was the highest level of education you obtained in school.
A. I just have -- I don't know how many hours of college I have, but it's not completed.
Q. Would you -- would it be fair to say that you obtained an associate's degree, two-year --
A. I would say it's pretty close to an associate's degree, yeah.
Q. Okay. And what college did you attend?

A. Houston Community College, Austin Community College, and Dallas Community College.
Q. Was there any concentration that you were looking to graduate in in particular?
A. No, it was just the basics I was taking.
Q. Okay. And when was the last time you attended any of these colleges?
A. It's been a couple of years.
Q. Okay. Did you attend them in -- during the '90s?
A. Oh, yeah.
Q. Okay.
A. It was like one -- yeah, '90s.
Q. Okay. Have you dedicated much of your life to the photo ID card and software and equipment business?
A. Pretty much so, yeah.
Q. Since when did you start the -- did you engage in that business, Mr. DeSantos?
A. Since I was a young man, about in the '70s.
Q. '70s, okay. I would like to trace back a little bit from this point your past employment history. It seems to me that you're an entrepreneur, but I just want to know what your past employment history has been.
A. Well, I worked at Jack in the Box when I

was 17.
Q. Okay.
A. I worked at the equivalent of a Waffle House, so I could probably go in and run one of those.
Q. Right.
A. I have fond memories of that. I worked for Houston Community College System. That was when I was, like, in my 20s, early 20s, and the Houston Independent School District, worked as a mail clerk.
Q. At the HISD?
A. Right. I wasn't fired or anything, terminated. I quit on my own.
Q. Okay. And when was -- was that in your 20s?
A. 20s, yeah.
Q. 20s.
A. And then I started doing this.
Q. Okay.
A. I worked shortly as a plant maintenance person with a lady, and I also worked for Teas Nursery in Bellaire and learned all about the landscaping business.
Q. How do you spell that, sir?
A. T-e-a-s Nursery Company.
Q. Would that take us to the 1980s or late '70s or --

ClibPDF - www.fastio.com

A. Probably late -- probably in the '70s because I started working in the '70s in this business.
Q. Okay, okay, and how did you first get involved with this business --
A. Worked with a gentleman, started working with another guy.
Q. Doing --
A. I don't remember his name, but --
Q. Doing what?
A. Same thing, selling photo ID cards.
Q. Okay.
A. At the corner of Main and Walker in downtown Houston.
Q. You don't remember his name?
A. No.
Q. Where did that job -- what -- how long were you at that job with that gentleman?
A. For several years, and I eventually bought him out.
Q. Okay.
A. I just don't remember his name. It's Buzz somebody. I can't --
Q. Okay. You bought him out, and then were you employed by anybody else after that?
A. No, I was self-employed then.

Q. Self-employed. And what was the name of the business you bought out?
A. It was a DBA.
Q. Okay, what was the -- do you know the --
A. Just, it was just me doing business as Mark DeSantos.
Q. Okay. And that was in Houston, correct?
A. Yes.
Q. Okay, and how long did you have that business?
A. I don't know. Probably up until we incorporated and got bigger in Dallas. That's the only thing I can remember.
Q. Okay. How many -- would that -- did that -- your DBA at some point changed, correct?
A. Right, but I don't know what -- the date or anything like that.
Q. Okay. And it changed to what, though?
A. To Digital Imaging, I believe.
Q. Okay. And, at that time, this business was out of Houston, correct, or did you move into Dallas?
A. We were all over by then.
Q. Okay. So Digital Imaging, would it be fair to say, has been around since, let's say, the '80s?
A. No, it hasn't, because actually we incorporated into Kopy Kat. We owned -- we -- it went to Kopy Kat,

and then we did -- we formed the corporation Digital Imaging. I just don't know when the two started to mesh or --
Q. Okay.
A. That can all be gotten from the Secretary of State's office. I don't -- just don't know.
Q. Is there like a holding company that kind of owns --
A. No.
Q. -- both of them or --
A. Yeah, me.
Q. Okay. Now, do you have managers at the other -- at the offices --
A. Yes, I do.
Q. -- in Dallas, Houston --
A. Yes, I do.
Q. How many offices -- how many, I guess --
A. Locations?
Q. -- locations do you have in Dallas?
A. I have two locations in Dallas and two locations in Houston.
Q. And these locations would be -- these businesses are Digital Imaging?
A. Yes.
Q. Okay. And then you have another one in Dallas

called the suntan --
A. Right, that's there at the ID shop, as well.
Q. Okay. So would it be fair to say you have two, four -- like approximately six businesses throughout the state?
A. Well --
Q. Under the names of Digital Imaging or branches, I guess, of Digital Imaging?
A. Right, similar, yeah.
Q. Any more than --
A. Or Kopy Kat.
Q. Kopy Kat, right.
A. Right.
Q. Do you have any more than that?
A. No.
Q. Okay. So you have been in the photo ID business since --
A. For most of my life.
Q. Most of your life. Since the -- can you approximate? Since the '70s -- what year?
A. Probably '75.
Q. '75, okay, 25 years. What prompted you to open up a business on South Padre Island?
A. I had never been here before, didn't even know where it was located, had heard about the crowds during

ClibPDF - www.fastio.com

spring break and the tourism, just decided to go for it. We had some extra time on our hands and decided to come down and explore it.

Q. Okay. Who was the primary person in charge of opening up the office on South Padre Island?

A. Myself.

Q. Okay. And, during this time, who was handling your affairs in Dallas and Houston?

A. I don't know who was work -- probably Jason Alexander. I just -- I don't know who the --

Q. Is that the same Jason Alexander, I think, who was --

A. Right, he eventually came down and worked with me.

Q. Okay. And what happened to your businesses in Dallas?

A. Oh, they ran. We just had employees running things.

Q. Okay. How many employees do you have total, would you say?

A. Right now probably maybe -- it's hard to tell. I'm not sure. I want to say eight, maybe.

Q. Eight?

A. Yeah.

Q. Eight employees. Now, the scooter business in

Dallas --

A. That's the corporate office only.

Q. I'm sorry, the corporate office. The only scooter business you have, then, is the one in --

A. Yes, Active Scooters was right here.

Q. In South Padre Island?

A. Yes.

Q. Okay. Had you ever been involved in the scooter business before opening up this one on South Padre Island?

A. No.

Q. Did the tourism and spring break crowds and that also prompt you to open up that business down here, or what was your motivation?

A. I had been to Key West -- I had been to Key West, Florida and had seen -- you know, that's a big spring break town, also, and I had seen similar things there.

And I thought this would be, you know, ideal for this place since it's -- you know, it's isolated, it's an island similar to Key West. There's a big causeway, so you can't take these things off the island, and it's -- you know, it was just ideal.

Q. All right.

A. And still believe to this day it's an ideal

location for it.

Q. For the scooter business?

A. Oh, absolutely.

Q. And the photo ID business?

A. Yes, I think it's a very good place for those, the ID business.

Q. Okay. Now, would it be fair to say that you're looking at different markets --

A. No, not really.

Q. So in Dallas, do you -- is the majority of your business dedicated also to the production of IDs or --

A. Yes, a big part of it is to identification cards.

Q. Okay, what's --

A. Some of it is to software and equipment and supplies.

Q. What percentage of it do you think can you attribute to your photo ID card business?

A. Oh, I would say the photo IDs are the most, without a doubt.

Q. Okay. And that photo ID card business, what kind of clients do you have that --

A. Everything.

Q. -- purchase those --

A. Everything.

Q. Okay, can you give us some examples?

A. Sure. I can have everything from someone wanting to take a small child on a cruise to a student wanting to go into a club or whatever, for whatever reason, to an adult that wants to cash a check.

Q. Okay.

A. I like to look at this ID business -- we're an information-gathering business.

Q. Okay.

A. We keep very strict records, and we are in constant contact with authorities. We work with the Texas Rangers. We work with the postal service. We work with the Federal Bureau of Investigation. We work with numerous local police agencies.

We have had -- been in contact -- or the McAllen Police Department has recently been in contact with us and are interested in some documents pertaining to some check-cashing. So we're information-gathering. It's not just a fake ID shop, as we have been branded.

Q. Okay.

A. You know, it's a novelty ID shop where we obtain all physical information and, in many instances, thumbprints and signatures, and, you know, that's the way it's done.

Q. Okay.

A. And we have a lot of check investigation people. We're associated -- we do -- I don't want to say I'm necessarily associated, but we -- I work with a gentleman who is over the American Association of Financial Crimes Investigators and -- which consists of all of those agencies and many, many, many more, and we provide a great service to them.

Q. Okay, and what is your role in providing, let's say --

A. We provide anything. If they want any of the records or any of the information as far as the photographs, the fingerprints, identification numbers, anything, that is all rolled right back into them. We maintain a -- maintain copies of all that in a database.

Q. So do you --

A. Even Telecheck, even some of the banks, you know, we --

Q. Do you -- as part of your photo ID business -- you're telling me that it's an information-gathering --

A. Yes.

Q. -- you know, business, as well, primarily.

A. Actually, it's going to probably more a role -- since we're getting into biometrics and we're going to be able to literally do your eyes and palmprints and

various other things, it's going to be more of a -- make money off of that, selling that information back.

Q. So would you say -- would it be fair to characterize this as a -- your business being involved somehow in the security business as well?

A. Yeah, except we're not licensed by the Texas Board of Private Investigators and we're not -- we don't fall under any of their rules or anything like that. But it's -- yeah, in a sense, it is, but --

Q. Okay. What would be the difference between you and a private investigator, since you gather information, as well?

A. I don't know because I don't know exactly what the specific definition of a private investigator is.

Q. Okay.

A. But, you know -- I mean, you have me there. I just don't know the difference.

Q. No, that's fine. How long have you worked with agencies like the Texas Rangers and --

A. Texas Rangers just came -- there was one ranger we were working with in Dallas, and that was recent. But we have been working with the federal authorities, I want to say since the '80s, early '80s.

Q. Okay. And do you provide them with ID cards? Do you provide them with documents, let's say, for --

A. I have, I have --

Q. Okay.

A. -- in the past. Even though they can go to the department of public safety and get their own bogus -- legitimate bogus --

Q. Right.

A. -- licensing or licenses, we have provided them, yeah, with different things.

Q. Okay. Have you provided other agencies with legitimate --

A. Yes.

Q. -- bogus documents, I guess?

A. Yes.

Q. Okay.

A. Well, legit -- I provide exactly what we sell.

Q. Right.

A. We have never gone above and beyond and removed any kind of disclaimers or done anything illegal for the police.

Q. Correct. But they themselves request these services from you?

A. Yes, they -- yes, they have.

Q Okay. And how do you -- do you advertise these services, or how does -- is it just by word of mouth that --

A. It says "identification" -- yeah, we have a listing in the phone book.

Q. Listing in the phone book. Do you have any other way of marketing your business as --

A. Yes, the Internet.

Q. The Internet?

A. Yes.

Q. Okay. Do you have a --

A. The Web page?

Q. -- Web page address?

A. www.photoid.com.

Q. Okay. It seems to me, then, that your contact with law enforcement agencies, that, as part of providing these services to law enforcement agencies, do they kind of tell you, or guide you, what it is that you can or can't do, or do you have your --

A. Oh, absolutely, but we also have teams of lawyers that --

Q. Okay.

A. -- that look at everything, and, you know, we make sure we don't cross the line.

Q. Right, because it seems like a sensitive --

A. Oh, it's very sensitive.

Q. It seems like a sensitive area, you know, that you're working in.

A. It is. It is.
Q. Have you ever been sued as a result of any -- I guess, civilly --
A. No.
Q. Have you ever been sued regarding any of the documents you have provided to any law enforcement agency?
A. No.
Q. Okay. Did you do, ever, any work for municipalities or police departments?
A. Oh, yes, yes.
Q. In North Texas or Dallas?
A. Oh, in North Texas, yeah, in North Texas.
Q. Okay.
A. When I say "work," I mean we have provided information. That's all we've done. I mean, we haven't, like, done any -- gone and provided them with any cards or software or anything like that.
Q. Okay. And do you provide this -- do you provide these services throughout a span of a year, six months, or is it as they need it, as the need arises --
A. As they need it, as they need it, but we have gone back as far as a year.
Q. Okay, okay. Do you have any running contracts with anybody right now?

A. No. It's all been provided free of charge up until -- you know, up to present.
Q. Okay, what do you mean, "free of charge"?
A. In other words, we have not charged any -- charged for any of this information.
Q. Okay, and why -- why haven't you?
A. Because it's been a service. We're public servants.
Q. Okay. So they come to you, ask you to provide these services, and, up until several years ago, you haven't charged them for anything?
A. I still don't charge them anything.
Q. Okay. But you would charge them for --
A. We're getting into that, and we're probably going to eventually charge the banks and some of the check investigation companies. We're probably going to end up having to charge them, ultimately.
Q. Okay. But you would charge them for any software you sold to them?
A. Oh, yeah, yeah.
Q. And equipment and supplies?
A. Right.
Q. Okay. So your photo ID card business encompasses more than just taking pictures of individuals. It's a little bit broader than that,

correct?
A. It's just pretty much individuals, and we do, you know, some -- when people call and they want to have company IDs.
Q. Okay.
A. And that's --
Q. That's what I thought, also. I just hadn't --
A. Yeah.
Q. -- heard you mention that.
A. Right.
Q. Okay. You said you had teams of lawyers that have assisted you in your businesses in the past; is that correct?
A. Yes.
Q. Okay. Do -- is their involvement limited to the actual photo ID business services, or do they also assist you in setting up the business and any -- like a business-law relationship, you know, of a law firm helping out an entrepreneur/small business owner?
A. Well, you know, it's like you have got to have the civil lawyers that watch all the business side, and then you have the criminal lawyers that watch the criminal side of everything.
Q. Okay.
A. And, you know, so that's how it's taken care

of.
Q. Other than the criminal proceeding started by the SPI Police Department, have you been involved in any other criminal -- or have your or --
A. Yes.
Q. -- your businesses been involved in any other --
A. Yes.
Q. -- criminal charges?
A. Yes.
Q. Okay, and what were those, and can you provide me with the dates of --
A. I don't have the dates or even -- you know, for me to sit here and try to give you the dates and the names --
Q. Okay.
A. -- would be fruitless because I don't really know.
Q. Okay.
A. I know that it had something to do with -- one was counterfeiting.
Q. Okay.
A. That was out of Dallas County and --
Q. And could you provide me at least with a range? Was it in the '80s, '90s, late '90s, late '80s?

ClibPDF - www.fastio.com

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 25 of 125

A. It was in the '90s.
Q. That was in Dallas County, you said?
A. Yes.
Q. Was that charges brought by the Dallas --
A. By the University Park Police Department.
Q. Okay.
A. Similar to the South Padre Island Police Department, a very small police department.
Q. Okay.
A. They were dropped.
Q. They were dropped?
A. Yes. I have never been convicted of a --
Q. Okay.
A. -- of a crime on identification fraud or anything like that.
Q. Okay.
A. There's been an instance in Houston. I don't know what the dates are. I would say it was in the '90s.
Q. Okay. Was the one in Dallas, the one at University Park, also in the '90s?
A. Yes.
Q. Okay. And Houston was also in the '90s?
A. Right.
Q. Okay. Were those charges brought by the Houston PD or --

A. I don't know who it was.
Q. Okay.
A. I'm guessing it was because it wasn't even -- I don't believe it was even brought against me. It was brought against the company.
Q. Which company was that?
A. This company.
Q. Digital Imaging?
A. Digital Imaging, yes.
Q. Okay. How about the one in Dallas, was that brought against you or Digital Imaging?
A. That was against me personally.
Q. Was the Houston charge also a counterfeit charge?
A. I don't know what it was. I don't remember.
Q. Okay. Were you -- did you -- were you arrested and taken for --
A. No, it was like they indicted the company.
Q. Okay, okay. Any other -- any others, sir?
A. There was some action in Austin, I want to say in the '80s, but, again, I never went to jail, and I don't really know what it was.
Q. Was that also a counterfeiting charge against --

A. I think it was criminal simulation or something. They came up with something.
Q. Okay, were those charges brought by the Austin PD or --
A. Or department of public safety, maybe.
Q. DPS. Was that against you or one of your companies?
A. Probably against the company. I don't know.
Q. Okay. So at one point you did have a Digital Imaging in Austin, Texas, then?
A. No, we had Kopy Kat.
Q. Kopy Kat in Austin, Texas?
A. Yes.
Q. Okay. Do you still maintain Kopy Kat?
A. No, no, that was a long -- that was in the '80s.
Q. Okay. Any others, Mr. DeSantos?
A. No.
Q. Okay. How about for any other criminal activity unrelated to your businesses? Have you ever been --
A. Yes, in 1979, I was arrested for possession of a controlled substance.
Q. Was that in Texas?
A. Yes, it was in Houston.

Q. Okay. Any others, sir?
A. No.
Q. Okay.
A. And that was a misdemeanor, by the way.
Q. How early in the '90s -- what was the earliest -- the earliest charge brought against you was around what year in the 1990s?
A. I can't -- I don't know. The best thing would be to pull up the record, you know, the TCI scene.
Q. Okay. How about -- any federal charges ever brought against you?
A. No.
Q. Okay.
MR. HAYES: Can we take a short break?
MR. RUIZ: Sure.
(Brief recess)
Q. Mr. DeSantos, you said that previously that you had -- that you and your companies had been at least criminally prosecuted during the 1990s.
A. No, criminally charged.
Q. Criminally charged.
A. Right.
Q. Did these instances pertain to the delivery or manufacture of a counterfeit instrument?
A. Again, I can't really comment on the exact

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 26 of 125

charge of that, but it was similar.

Q. Okay. I'm looking at Exhibit No. 9, which is a criminal investigation packet -- division by the SPI Police Department regarding the offense against you dated March 27th, 1999. It does -- it pertains to the delivery and manufacture of a counterfeit instrument. Were you -- had you been familiar with this law before then?

A. Oh, yes, absolutely.

Q. Since when would you say that?

A. We follow the laws, you know, as the legislature meets. We follow everything.

Q. Okay. How do you follow everything?

A. We follow it by the Internet, and we have attorneys that watch everything for us.

Q. Okay. Do you have in-house attorneys?

A. No.

Q. So you have a -- you hire a law firm or --

A. Right.

Q. Okay. And does he -- so he keeps you up to date with the changes --

A. Apprised of everything, everything.

Q. Okay.

A. Plus, again, we work with -- real closely with federal agents who watch these things, and we talk with

them and discuss it. And, if there's any kind of changes, we, you know, confer with them and, you know, ask them if there needs to be any changes or if there need to be any deletions or any -- just anything at all.

Q. Okay.

A. Walk a tight line.

Q. Right. Let me ask you something regarding the Gulf Coast T-shirt Shop. That is where your businesses were operated out of down --

A. Yes.

Q. -- in South Padre Island, correct?

A. Yes.

Q. Who are the owners of the building where --

A. The owners of the building --

Q. Yes.

A. -- is Franke -- the Franke Real Estate people. They actually own the building.

Q. Okay.

A. The actual tenants that have a lease there are a guy named Gilly Mitzrachi, M-i-t-z-r-a-c-h-i, and his wife Esti. I can't -- or it's Ester.

Q. Ester, okay. Would that be Ms. Levy?

A. Yes.

Q. Ester Levy? Okay. When did you first start

renting space from them?

A. The first year that we were down there. I believe it was '98.

Q. Would it be fair to say that you were subletting from them?

A. It really wasn't a sublet, really. It was more of a partnership.

Q. Okay. So were you involved in the -- was there a partnership where you had a business interest in the Gulf Coast T-shirt Shop?

A. Actually, he was more of a partner in my business.

Q. Okay, which -- would that be Digital Imaging, Inc. and the --

A. Right.

Q. -- scooter business, Kopy Kat?

A. Yes.

Q. Okay. How long had he -- how long has -- I'm just going to call him Gilly.

A. Okay.

Q. I don't want to butcher his last name. How long do you know of, if you know, obviously, if Gilly -- how long had Gilly been down here on South Padre Island running the Gulf Coast T-shirt Shop?

A. Well, he had his t-shirt shop forever. I have

no idea how long he has been here. He has been here forever, but just -- he's been involved with me just since '98.

Q. Since '98. How did your acquaintance with Gilly arise?

A. We just met one another and started talking and formed this little partnership.

Q. Okay. Were -- do any of the state documents reflect Gilly being in -- part owner of any of your businesses --

A. No.

Q -- on South Padre Island?

A. No.

Q. Okay. So it was an informal partnership?

A. Right.

Q. Right? Would you split profits and revenues?

A. The particulars of the thing, I would rather not speak about at this time.

Q. Okay. Did you pay him rent for having your business located there?

A Like I said, it's not really -- any of the financial details, I don't want to discuss at this time.

Q. Well, I'm not asking you for specific numbers. I'm just --

ClibPDF - www.fastio.com

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 27 of 125

MR. HAYES: No, I think the question was, "Did you pay him rent?" I think you can answer.
A. He received remuneration, but I don't really want to call it rent.
Q. Okay.
A. Okay?
Q. But there was something exchanged for the use --
A. Oh, yeah, yeah, sure, sure.
Q. -- of the building? Some kind of --
A. Absolutely, yeah.
Q. -- financial arrangement?
A. Yeah, there was a financial arrangement, yeah.
MR. RUIZ: I'm sorry. I'm sorry again.
THE REPORTER: Thank you.
THE WITNESS: Sorry.
MR. RUIZ: We'll slow down.
Q. So there was a financial arrangement --
A. Between the two of us, yes.
Q. -- between the two of you so that you were allowed to use the premises there for your two businesses?
A. Yes.
Q. The ID business and the motor scooter business?
A. Yes.

Q. Okay. What month in 1998 did you strike up this relationship with Mr. -- with Gilly?
A. It was toward the end of March, I believe.
Q. Was that the first time you had come down here?
A. Yes.
Q. Okay. Was it spring break, I guess, of '98?
A. Yes.
Q. Okay. Do you have a -- do you rent a condo on the island?
A. Yes, I do.
Q. Okay, what address is that, sir?
A. 2500 Gulf Boulevard.
Q. Do you have a phone number you can provide us?
A. 761-4319.
Q. 4319, thank you. 2500 Gulf Boulevard -- is there an apartment number there?
A. Yeah, No. 107.
Q. Okay. How many employees did you have working at the South Padre Island businesses of Digital Imaging Company, Inc. and the Kopy Kat, sir?
A. Never more than one at a time, but they were -- we kind of rotated them out of Dallas and Houston.
Q. Okay. Were they open all year? Were your businesses open throughout the year?
A. Oh, yeah, all my other businesses are open

throughout the year.
Q. Okay. When was your business first opened, then, on South Padre Island?
A. On Padre Island it was '98.
Q. Right. Was it March or was it later on?
A. Probably in March.
Q. Okay.
A. I don't know that for a fact.
Q. Okay. At that time, did you attempt to secure any type of local building permits from the city -- from the Town of South Padre Island?
A. No.
Q. Okay. Had you done so in the past with other businesses?
A. With other businesses, when I had a lease that was in my name, yes.
Q. All right, and what is it that you would do at that -- what is it that you did that time?
A. What time?
Q. When you said you had a lease in your name.
A. Well, if I had a -- no, now that I think about it, I think in Houston, we had to get a CO.
Q. Correct. How about in Dallas?
A. Yeah, in Dallas we had to get one, also, a CO.
Q. Okay. And, for your business that you had in

Austin, did you get a CO?
A. No, no.
Q. Okay. And did you make any inquiry as to whether you needed a CO for South Padre Island?
A. No, because the building was already occupied.
Q. Okay. By the Gulf Coast T-shirt Shop?
A. Right.
Q. Okay, but you have no business interest in Gulf Coast T-shirt Shop, correct?
A. Well, I mean, I do, but I don't.
Q. Okay. But let's say formally, in any documents. Do any documents reflect that you have some type of --
A. Not that we have here today.
Q. Okay. So it's an informal business interest that we can agree that you may have there?
A. Yeah, right. It's a -- right.
Q. Okay. And you said Gilly had been on the island with that business for a while?
A. Right.
Q. Do you know how long he had been there?
A. I have no idea.
Q. Okay. Would it be fair to say that Gilly, as part of a South Padre Island business person, was -- would you say that he is an active member of the

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 28 of 125

business community of South Padre Island?
A. He's an active member of the Israeli business community.
Q. And is that a formal business community on the island?
A. They are pretty formal. There are a group of them.
Q. Okay. But that would also mean that they are involved in the affairs of the island on a regular basis, correct?
A. Yeah, yeah, usually being -- I think they are usually targeted by the island. They are involved in a lawsuit with the island, as well, because they were targeted for various -- they were harassed for various things, and I believe they eventually went to court against the island.
Q. Okay. And do you know of any other business people of Jewish decent on the island in addition to Gilly that --
A. Yes, I'm --
Q. -- share these same sentiments you're saying?
A. Sentiments? I think most of them share these same sentiments.
Q. Okay. Including Gilly, do you think?
A. They know that the City is dishonest, yeah.

Q. Okay.
A. They perceive the City as being dishonest.
Q. They perceive the City as dishonest?
A. Yes.
Q. Do you perceive the City as dishonest?
A. Yes, I do.
Q. And based on what do you perceive the City as dishonest?
A. Well, that's why we are in these proceedings, isn't it?
Q. Okay. So then you are saying that only the allegations that you have raised in this petition authorizing the taking of these oral depositions, would it be fair to say that what's contained in here is everything that you perceive as being dishonest or as the reasons --
A. I perceive-
Q. -- as the reasons for starting these depositions and for investigating a potential claim?
MR. HAYES: Objection; form. You can answer.
A. I swear I didn't understand the question.
Q. Let me rephrase the question. Your petition alleges several incidents arising out of loose signs, rentals, parking instances, the photo ID criminal

charges brought and the Moped incident. Does that cover everything that you have to complain about the City at this time?
MR. HAYES: Objection; form.
A. Well, against me personally, yes, that's pretty much, but, you know, I have -- there are other things that I am aware of that the City has been involved in that I perceive as being dishonest, yeah.
Q. Okay, but those other things are not subject --
A. Relevant to today.
Q. They are not subject to the taking of these depositions, correct?
A. No.
Q. So these other things are -- are you agreeing with me that your complaint or your sentiment that the City is dishonest is limited to those allegations contained at this time in your petition filed by Mr. Hayes back in --
A. Whenever.
Q. -- May?
MR. HAYES: Objection; form. You can answer.
A. If I understand the question correctly, everything that we're discussing here -- you know, the things with the Israelis is not a relevant subject

today. We're just talking about the identification cards and the unlawful -- in my opinion, the unlawful shutting down of the scooter business in '99.
Q. Okay. I just want to know if there's anything else, basically.
A. No, no.
Q. Anything else that is beyond the depositions which you participated in yesterday?
MR. HAYES: Objection; form. You can answer.
A. No, this all started with a dishonesty thing, when I brought the dishonesty up. I mean, are you trying to ask me what I feel is dishonest? I don't think you're dishonest or anybody in here is dishonest, but those guys that got up on the stand yesterday, yeah, I think they were being dishonest --
Q. Okay, I'm just --
A. -- except one. I think one was being pretty honest.
Q. I just want to know if there are any other incidents that you may complain about that are not -- that were not covered by the depositions yesterday.
A. No.
MR. HAYES: Objection; form. You can answer.

ClibPDF - www.fastio.com

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 29 of 125

A. I don't think so.
Q. Okay.
A. I don't think so.
Q. That's all I wanted, Mr. DeSantos. Thank you. And I'm sorry I kind of went the long way on that. What was the first business that you established once you got down to the island?
A. The photo ID business.
Q. Okay, the photo ID -- and you didn't give me a specific time reference, but was that photo ID business operating during spring break of '98?
A. I believe so, yes, toward the end.
Q. Was it operating out of the Gulf Coast T-shirt Shop?
A. Yes.
Q. And that operation continued throughout 1998, sir?
A. Through the end of the summer of '98.
Q. Okay. August, did you close it down?
A. September.
Q. September?
A. Right after Labor Day.
Q. Okay, so September you voluntarily closed down the business?
A. Oh, yeah, yeah, right. It was an experiment.

Q. Okay. After September, when did you reopen that business again?
A. It was in -- I believe it was late February or March of the following year.
Q. Of '99?
A. Right.
Q. Okay. That was the same spring or when the complaint regarding the delivery of counterfeit instruments were brought against you?
A. Oh, they had a complaint prior to that, in '98.
Q. Okay. Who had a complaint?
A. Oh, it was great. We got -- they sent us a copy of a state -- a statute from a book that was outdated by several years. Eunice did.
Q. Eunice?
A. Oh, yeah, that's how they start. They start off with letters.
Q. Okay, now --
A. Well, actually, it started off with the code enforcement people.
Q. Okay. Because this is the first I have heard of that.
A. You have never heard of the code enforcement people last --
Q. No, of this incident. Let's give her some time

to --
A. I'm sorry.
Q. Of this complaint against you in 1998.
A. Oh, yeah. Oh, yeah.
Q. Okay. What was that complaint for?
A. Well, the first thing, the code enforcement -- see, we had a motor home, and we had no idea of the rules and regs pertaining to selling -- because you have people selling at fruit stands, and, I mean, you even have people selling in front of the hotels, shaved ice and various things. They allow special permits, I guess, for these people, or they allow them, these people, special interests, to do this, and we didn't think too much about it.

So we were in our motor home, and we were set up, and we went down to the park. That's where we camped, but we did not sell anything there. But we tried to sell them on Padre Boulevard, and we were stopped by code enforcement people, and they said, "You can't do this."

And I said, "Okay, that's fine," you know.

So we thought, "Well, you know, where can we do this?" So we asked these code enforcement people. I said, "Can we go down, say, to the County?"

And they said, "Oh, yeah, sure, you can go

to the County."

But we later investigated that, and they said, "No, only fruit stand people are allowed to sell in the County."

So they -- we looked at it a little bit further, and they said, "Only if a business -- if you can be inside of a business." These were code enforcement people that told us this.

So I talked to several of the t-shirt people and went into Gilly's and, you know, met him and sparked up a relationship. He said, "Hey, no problem."

So we get in there, and, of course, the code enforcement people came in and said, "No, you can't do this."

And I said, "Yes, I can."
Q. What was it that you wanted to do?
A. I wanted to sell the photo IDs inside of a shop, and --
Q. Okay, and this was in '98?
A. '98.
Q. Okay. And who were the people from code enforcement that --
A. Flunkies. They hire flunkies every year to help them. They come and they go. They probably have a dozen of them --

Q. Okay.

A. -- that have come and gone.

Q. You said they sent you a --

MR. HAYES: Objection; nonresponsive to the question. He asked you who were they.

THE WITNESS: Flunkies, nobodies, zeros.

Q. Okay, you don't have any --

A. No, they don't have -- I'm telling you, if you look and see, these guys come and they go. They can't hold on to them.

Q. Okay. Now, you said that they sent you a letter.

A. No, this is what happened. We were inside -- so then they come inside the building and they say, you know, "You can't do this."

And I said -- well, my motor home was parked out front. I said, "My motor home -- it's legal," you know. It's -- but it had signage on the outside of it, right, permanently affixed signage, but they said that that couldn't happen.

And I said, "Well, you know, I think it is. It's a motor vehicle, and I'm going to leave it parked there and" --

Q. Let me interrupt you. This was parked at Gilly's --

A. Right.

Q. -- in the Gilly's parking lot --

A. Right.

Q. -- of Gulf Coast T-shirts?

A. Right.

Q. Okay. Go ahead.

A. And, "We have a business, and I'm in here, and this is the way it -- this is it," you know. So they realized at that point, whoever was in charge of code enforcement, that, you know, this was a moot point.

So then I guess Chief Eunice, he sent the welcoming committee down, and he sent one of his police officers down with an old statute that said that anything that was deceptively similar to a Texas driver's license had to be marked diagonally with a "Not a Government Document."

Well, this was '98, and that law had changed, I believe, that year, in January. So we referred that over to -- I believe to Jim Sitgreaves, who is an attorney there that was next door to us, and I believe the embattling began.

I mean, it went back and forth between Sitgreaves and Eunice, and there was a meeting, and, eventually, we received a letter, I want to say, in late August from the district attorney's office --

Q. Is this in '98, sir?

A. In '98, yes, sir -- saying that they were going to prosecute us on these IDs. And it's my understanding -- you have got to excuse me. We tried to get documents from Sitgreaves, but I'm not really too sure -- he didn't respond.

Q. Okay.

A. And --

Q. Would you be willing to, if you get ahold of those documents, of producing those documents to us at a later time?

MR. HAYES: Oh, yeah, if they are responsive to the subpoena, certainly, yes.

MR. RUIZ: All right.

A. And so --

Q. Were you cited for anything, though, in '98?

A. Oh, no.

Q. Did the City -- did any South Padre Island court --

A. No, no, no, no, no, no.

Q. You have got to let me finish. Did they ever issue you a citation during that summer of '98 for the motor home being parked outside?

A. They did not issue me any citations for anything --

Q. Okay.

A. -- whatsoever.

Q. Did they issue any citations to Gilly or his wife, for that matter, arising out of the -- your parking of the motor vehicle on the parking lot or the photo ID business?

A. No.

Q. Okay. What was the result of that correspondence between Sitgreaves and the City at that point, if any, I guess?

A. Sitgreaves supposedly -- he told me, he said --

MR. HAYES: Wait. Don't discuss what your attorney, at that time, what advice he gave you. If you know of what the result of it is -- but don't say Sitgreaves -- that's attorney/client privilege which you're not waiving at this time. If you know the end result of --

MR. RUIZ: I just want to know -- I'm not getting in there.

MR. HAYES: Yeah, he's not getting in there, but --

A. Yeah, I don't have anything to hide here. Sitgreaves is --

Q. Listen to your attorney.

MR. HAYES: Don't give this up right now.

THE WITNESS: Okay, okay.

MR. HAYES: You can say the end result that you're aware of.

A. All right. There was a meeting, and there were letters that went back and forth between Sitgreaves and Chief Eunice at the time.

Q. Okay. And --

A. And there was no action taken by Cameron County or the City of Padre Island for anything because, by the time, I guess, the stuff -- they really got in a ball over this, we were shut down. You know, Labor Day came and we shut down.

Q. Okay.

A. Which brings us to '99.

Q. Okay, now slow down here, Mr. DeSantos.

A. Okay.

Q. I know you're eager to talk about these things. In '99 -- were there any complaints in '98 arising from the -- any counterfeit IDs being provided to minors for purposes of, I guess, drinking at local clubs?

A. Complaints by who?

Q. By -- well, these letters between Eunice and Sitgreaves. How is it that they -- why is it that they were complaining -- strike that. I'll start again. Why -- what were the specific allegations being alleged

by the police department of South Padre Island during the summer of '98?

A. They claimed that what I was doing was illegal and that --

Q. Illegal in what sense, Mr. DeSantos?

A. They -- according to this one statute that they had that was an old statute.

Q. Okay.

A. You know, they weren't reading the new statute. And then when they realized that they couldn't get me on the "Not a Government Document," on that statute, they went to this counterfeiting statute.

Q. Okay.

A. They fished until they found something.

Q. But that was not in '98 when that happened, the counterfeiting statute?

A. No.

Q. Okay.

A. It was some other statute.

Q. Now, you had been in the photo ID business since the late '70s?

A. Right.

Q. Had it been -- in the regular course of those businesses, was it at one point required that you put a label on the ID card stating "Not a Government

Document"?

A. Yes, on anything that was similar to a Texas card.

Q. Okay. Now, the cards you were issuing during the summer of '98, were they Texas cards?

A. I don't believe so. I think that they were out-of-state ID cards. We eventually went to a Texas card. Don't -- don't quote me on the day that they came out, though. I don't know.

Q. Now, I would like to know -- and just because I really don't know anything about this subject matter -- how is it that you can issue out-of-state ID cards in Texas?

A. It's an out-of-state ID card. It's a novelty -- it's a novelty ID card.

Q. Okay. And what is a novelty -- what is the purposes -- what is the purpose of having a novelty ID card in a state other than the one you're purchasing the ID card for?

MR. HAYES: Objection; form. You can answer.

A. It's for novelty and for fun. It's a souvenir.

Q. Okay. So you would issue, let's say, an ID card for the State of Hawaii, let's say, as a souvenir for these people while they are down here on the

island?

A. Sure.

Q. Okay. And that's the same type of novelty ID card that you would issue in, say, Dallas?

A. Sure.

Q. And Houston?

A. Anywhere.

Q. Okay.

A. In fact, you can probably go to a lot of different flea markets around the United States and get the same -- similar products.

Q. Okay, correct. Now, the majority of the people who purchase these souvenir ID cards, would it be fair to say that they were young people?

A. No. That's the misconception. It's not. We had people -- we had adults -- in fact, most of our customers, when I worked there the last month, most of them were adults.

Q. Okay. Now, a souvenir -- these novelty cards or souvenir cards, as you have called them, they are nothing more than a picture with another state's label on it?

A. With graphics.

Q. With graphics, okay.

A. Right.

Q. Can you explain some of those graphics?
A. They are just -- they are just graphics. You know, they are colorful.
Q. Are they images of a -- I don't know, a beach?
A. Sometimes they are images -- yeah, sometimes they are images of palm trees. They are images of cactus or images of -- they are just, you know, colorful images. They are digital colorful images.
Q. Okay. Now, and, to the best of your knowledge, would those cards be purchased for entry into clubs by some of your patrons?
A. There are people that will buy these things for purchase of adult materials or services, but it is -- this is not something we condone. It's not something -- in fact, there's disclaimers on the back of all these cards, and I believe they were even starting to sign some kind of agreement at the very end.
Q. Okay. Can you let me know what the disclaimer on the back of the card states?
A. I don't have any of these cards with me right now. It's very lengthy, but it's something like, "This is not a driver's license or a document issued by or for the department of identification -- Texas Department of Public Safety," or blah, blah, blah. It just goes on and on.

Q. Correct.
A. It's clear -- you know, it's quite clear that these are not a counterfeit document or meant to be a counterfeit document. If someone goes and erases something or -- which you can do with a Texas driver's license. You can go and, you know, you deface the document. Then you can turn it into something that it's not.
Q. Correct, but -- so you're saying that sometimes the patrons who purchase these cards tamper with the cards?
MR. HAYES: Objection; form.
A. As with -- it happens.
Q. Correct. But is your answer yes to that, sir?
A. It happens.
Q. Okay. And you said at one point you were also moving from the souvenir type of card to an ID card that resembled the Texas ID card; was that correct?
A. Yes, yes.
Q. Was that taking place during the summer of '98?
A. I don't know. I don't know exactly what year we did that.
Q. Okay. Was that in 1999, then?
A. Could -- yes, definitely '99.
Q. Okay. So, now, did they look like souvenir ID

cards in 1999 --
A. Oh, yeah.
Q. -- or are they looking more legitimate, like a Texas-issued government document?
MR. HAYES: Objection; form.
A. It's a matter of opinion. You know, you look at it and -- you know, but you look at the verbiage and only a moron would accept it as a legitimate Texas document.
Q. Right. Now, in -- during the spring of '99, during that spring break, you had said earlier that you had closed down for the season, I guess?
A. Right.
Q. And you reopened in '99, correct?
A. Yes, in '99 for -- yeah.
Q. Okay, now, the charges brought against you for the manufacture or delivery of a counterfeit instrument during that spring of 1999 --
A. Right.
Q. -- arised from, let's say, an undercover person who went to your shop, correct?
A. Right.
Q. Okay.
A. Carla K. Wade.
Q. Correct, Carla K. Wade. Now, you heard

testimony yesterday which indicated that there were two attempts by this Ms. Wade to purchase --
A. Right.
Q. -- ID cards.
A. Once Jason made one for her, and once I made one for her.
Q. Okay. Well, you were involved in the first --
A. No, actually, Jason was involved in the first one, and I was involved in the second one.
Q. Okay.
A. We've got both those slips, by the way, and her picture.
Q. I'm sorry?
A. We have both those slips that she signed. Those applications that she filled out --
Q. Okay.
A. -- and her picture, we have both of those --
Q. Okay.
A. -- on file.
Q. All right. I'm sorry. I'm reviewing this just to --
A. I mean, we didn't do anything that we wouldn't normally do.
Q. Did you issue, yourself, the identification card to Ms. Wade?

ClibPDF - www.fastio.com

Page 69

A. Yes, I did.
Q. Yes, you did. And what state -- what state did you -- what state ID card did you issue her?
A. I don't remember. I think she got an Oklahoma the first time, and then she got a Texas card the next, and I may have done the Texas card. But the Texas card was a state card. That's what it said on it, if I remember correctly, "state identification card."
Q. Okay.
A. It didn't have "Texas" anywhere on it, if I remember correctly.
Q. Okay, well, you issued her an Oklahoma ID card, or maybe Jason Eric Alexander did?
A. Yeah.
Q. Okay, is that correct?
A. Yes.
Q. Okay.
A. And, again, it didn't say "driver's license" on it anywhere.
Q. Okay. Now, do you -- did the State of Oklahoma somehow vest in you some power to issue an Oklahoma ID Card No. 445844005?
A. No, but it's not a State of Oklahoma document.
Q. You just call it an Oklahoma ID card?
A. It's just a -- I call it -- that's what the

Page 70

title of it is. It's just an Oklahoma ID card.
Q. Okay. Is it correct that the -- and you are -- I'm sorry. You previously stated that you issued her the second ID card?
A. I believe I was the second one. Jason was the first.
Q. Okay. Did you tell her that by peeling a certain section of it it could look more legitimate?
A. I never made any statements to that effect.
Q. Okay. Was there a film on the card which would allow itself to be taken off?
A. We placed a film on all of the cards, and the kids would network between themselves and figure out how to remove the film from the card, but this wasn't anything unusual because the film comes off a Texas driver's license, as well.
Q. But you had knowledge that the kids would sometimes tamper with them, correct?
A. Yeah, I had knowledge that people tamper with all documents.
Q. Okay, but I'm asking about these ID cards issued down on South Padre Island. Is that your statement that you made earlier?
A. The documents are issued all over the state from my company. If they had this on it, yes, I was

Page 71

aware that it could be tampered with, but I was also aware that it would leave a red residue permanently across the thing that would still say "Not a Government Document."
Q. Right.
A. But somehow or another they would mess with that as well and remove it.
Q. Would you also change the date of birth --
A. Never.
Q. -- the date of birth that the people would --
MR. HAYES: Objection; form.
Q. -- apply for?
MR. HAYES: Objection; form.
A. No, what would happen is the customer normally comes in, they fill out all the information, and I essentially input that information into the computer. I don't sit there and say, "Oh, okay, well, how old do you want to be?" I never do anything like that. That's illegal.
Q. Okay.
A. And I don't get into the particulars as to why they want the ID or whatever. You know, if they say they want to get into a club or whatever, I usually -- it's just -- there's just so mumbo jumbo and extraneous noise and stuff going on, I just don't pay any

Page 72

attention to it.
Q. Correct. Now, did you turn yourself in for that --
A. Yes, I did.
Q. -- charge against you?
A. Yes, I did.
Q. Okay. Was that on the advice of counsel?
A. Absolutely, and myself.
Q. Okay. As a result of the investigation and the charges brought against you, it's my understanding that the City confiscated your equipment at that -- at your place of business; is that correct?
A. Yes, they did.
Q. Okay. And they were later returned to you, as well, after the district attorney decided to drop the charges against you; is that correct?
A. Absolutely.
Q. Okay. Who did you hire to represent you in this criminal -- in the criminal charges brought against you?
A. At first, it was Jim Sitgreaves, and then I was told that the better attorney would be Edward Cyganawicz, and I then hired him. But, actually, I had an attorney in Dallas by the name of Reed Prosper who was coordinating everything for me.

Q. Now, and so the scope of the representation which Mr. Cyganawicz provided you was for the criminal complaint, for the criminal charges, arising from the manufacture of identification --

A. There were other matters that were discussed with him, but that's not the only -- that wasn't the only matter that was discussed with him, was this complaint. There were other matters discussed with him.

Q. Okay. Was this the primary matter, though?

A. Yes.

Q. Okay. And what other matters did you --

A. That's attorney/client privilege.

MR. HAYES: Objection. Yeah, you're not going to answer that.

A. Yeah. There were some good matters, though.

Q. The exhibit here of -- part of the -- one of the pages is a receipt for property dated February 14th, 2000, which you signed. Is this your signature at the bottom?

A. Yes.

Q. Okay. And that's stating that you had received the previously confiscated items?

A. Yes.

Q. Correct. During that time that you were --

first started your business in 1998, did you ever contact the South Padre Island Chamber of Commerce for any business assistance?

A. No.

Q. Okay. Did you ever go to the city commission to seek assistance with any of your businesses down here?

A. For what reason?

Q. I'm -- for purposes of, let's say, a CO. You said you didn't have one. Did you ever --

A. No, because you don't need a CO. He had a CO.

Q. And are you sure that you can -- you don't need a CO?

A. Absolutely, yeah.

Q. Okay, and what is that -- what are you relying on in making that statement?

A. Well, it's a pretty broad CO. It's the way they do things on Padre Island, you know. You can -- you know, you can sell a hash pipe or you can rent a float.

Q. Right.

A. That's the way they have a -- they have set themselves up for this.

Q. And do you also realize that there are other zoning -- that there are zoning ordinances for the city

-- for the Town of South Padre Island, correct?

A. I'm aware that they have a zoning ordinance that was just brought to my attention in -- I believe it was May of this year. I have now acquired the map. We have looked at it and looked at the rules, the regs, and it's interesting.

Q. Well, did you ever inquire as to whether the specific business uses that you intended to have on the island complied with the zoning back in March of 1998?

MR. HAYES: Objection; form.

Q. You can answer.

A. No, I didn't, but I was advised by one of the code enforcement -- by the code enforcement officers in '98 just to get into a business and I could sell the cards.

Q. Okay.

A. These were the guys that were telling me to get off the street.

Q. Did you follow that conversation up with any other member of the South Padre Island city staff or --

A. These were the staff.

Q. Right. Did you talk to a higher-up, his supervisor, regarding that -- those --

A. No, because the only -- his supervisor was the police. Then the police came in and said you couldn't

do that because what you were doing was -- did not comply with this old law that we discussed.

Q. Right, but that's not a zoning law.

A. Right, they didn't bring up any kind of zoning -- not one time did they say, "No, you're in an area that's not zoned for this. Leave." This never came up until May of this year, yeah, May of this year.

Q. Okay. Now, with respect to your -- I'm sorry. In the spring of this year, you decided to open up another business, correct?

A. Actually, it was in February. When we -- when I picked up that -- we had the meeting and picked this stuff up, Edward Cyganawicz met me in the -- I guess it's the council chambers or whatever, those alderman chambers, and I spoke with him about doing this.

He said, "Well, if you wanted to do these ID cards, we need to -- if you want to open this business again, then we need to discuss this pretty quick because they are not going to have time to fool with you because they are going to be so busy in the coming weeks." And I said, "Absolutely. I want to open this business up." And --

Q. Who was present at this meeting?

A. That was between Edward Cyganawicz and myself.

Q. Okay.

CibPDF - www.fastio.com

Page 77

A. And, at that point, we go in and we sit in Chief Rodriguez's office and --
Q. Wait.
A. Not Chief Rodriguez. He was -- at the time, he was a detective at the time, Detective Rodriguez.
Q. I want to know -- you said that you had a conversation with Mr. Cyganawicz by yourself, correct?
A. Yes, yes.
Q. Regarding the ID card business?
A. Yes.
Q. Okay. Then you just took me to another meeting with somebody else. What -- when was that, or what --
A. Same time.
Q. -- was the context?
A. This was all in the same -- we -- you know, he is there to facilitate and to help me get my equipment back.
Q. Correct.
A. And we immediately go into Detective Rodriguez's office and -- let me -- at some point, hopefully, you will ask me a question -- while I'm thinking about this -- why I was confused between Robert Rodriguez and Jaime Rodriguez and why there was an incident -- because the chief took such an exception to me -- there was confusion about his name. If you

Page 78

will ask me about this later on, I will tell you --
Q. Sure. We can get to that later. Just --
A. -- what happened. It was a misunderstanding, though.
Q. Okay.
A. And it was taken out of context. Nevertheless, we went into Detective Rodriguez -- the man that was -- that testified yesterday.
Q. Robert Rodriguez?
A. Right. And -- into his office. He was sitting -- he was sitting here. I was sitting over there, and Cyganawicz was here. And I explained to him the story about the IDs, about how I would like to reopen, and he said, "Well, the problem I have is that people peel these 'Not a Government Document' disclaimers off."
I said, "I have no control over that, and -- but, you know, I'll do the best I can."
And, at that point, I mentioned to him -- I said, "Oh, and by the way, I'm thinking about opening up a scooter business, and can you clarify something for me? What does it require in order to drive a scooter?"
And he said, "Well, what do you mean?"
I said, "Well, these are these Mopeds."
He said, "If it's a Moped, then you need a

Page 79

motorcycle endorsement."
And I had already been doing a lot of research on this, and I thought, "Okay," because it's very difficult to get an answer from the department public of safety. But he indeed said that you needed a motorcycle endorsement for Texas.
And I said, "Well, what happens" -- because I knew about the -- a little bit about this reciprocity law because I have friends that are police. And I asked him -- and I said, "Well, what about individuals, you know, from other states? What if you're -- say you're from Florida and you're not required to have a license to drive a Moped."
And he said, "Well, that's covered by the reciprocity statute in Texas."
And I said, "You're absolutely sure?"
And he said, "Yes."
And I said, "I am thinking about opening up this scooter business."
And he said, "Well, it seems like we had some businesses do this in years past and DPS determined that they were illegal."
I said, "No, I'm not talking about these toy scooters that you scoot around on that are motorized, go-toys or" -- I don't know what they are

Page 80

called, but these are actual Mopeds.
And he said, "Well, as long as it is, you know -- it conforms to state law, you don't violate any state laws, I think this would be a great business to have here on the island."
And Cyganawicz said, "Yeah, absolutely. I think this would be a -- you know, this would complement the island. This would be something that would be great to have here."
Q. Correct.
A. Right. And I thought, "Well, you know, that's -- you know, it sounds like we're doing good. We're going to do the IDs." And even though, you know, he felt a little uncomfortable about it, he was -- he didn't say no, you know.
Q. Right, but -- one second here. But did he ever state -- did you ever discuss with him anything regarding zoning compliance?
A. Oh, no.
Q. Okay. Did he -- did you ever tell him, "I want to open up this business in this part of town"?
A. I was already open. Oh, did I want to -- oh, yes, absolutely. He knew that I was going to open it there at the t-shirt shop.
Q. Did you state that explicitly?

A. Oh, yeah, absolutely, yes.
Q. Okay. And -- but he never said, "Yeah, go ahead and open that business there," right?
A. He said as long as it conformed to Texas law he thought that it would be a great asset to the community.
Q. Okay. Now, also, as a business person, you have opened up businesses before and you know that there are zoning requirements, correct?
A. Yes.
Q. Okay.
A. Well, some places. Like, in Houston, there's little or no zoning.
Q. Correct. Houston is special in that way.
A. Yeah, yeah, right.
Q. Also, did you ever -- and based on this statement "so long as it complies with Texas law," did you ever try to investigate whether the opening of that business complied with Texas law -- and with that -- I mean with respect to the motor scooter business?
A. Absolutely.
Q. After that?
A. Absolutely.
Q. Okay. Did you go to the City -- with the Town of South Padre Island to make sure that it was a use

that was permissible within the city's zoning scheme at that time?
A. No. What I did was I went straight to the top. I had the mayor, and I had the -- you know, one of the main detectives because this was one of the main guys at the time because I believe Eunice was on his way out.
Q. Correct.
A. And so I didn't feel like there was -- you know, as long as I had, you know, the head guy saying, "Well, this sounds great," and then the other guy saying, well, he thought it was going to be good, as long as it conformed to Texas law -- and believe me I wasn't going to go -- where I investigate as far as whether something is lawful, I usually go straight to the top, and there is what's called the Motorcycle Safety Division of the department of public safety, and we had it all verified there.
Q. Okay.
A. In other words, we knew what the law was, what the cc's were, the special models, the makes, the whole bit. We had it all down to a T.
Q. Okay. Now, but other than that discussion when you were picking up your property, you did no further investigation with respect to the zoning laws of the

city -- with the Town of South Padre Island?
A. Zoning laws never, ever came up until May of this year.
Q. Okay. So that was -- that's as far as you went investigating with the local law enforcement agents?
A. Yes, yes.
Q. Okay. You never sought the approval of the board of adjustments of the Town of South Padre Island, Texas?
A. I have never had to go to the board of adjustments for any -- ever for anything like that.
Q. Okay. So you didn't do that here, either, correct?
A. No, I never had to. I was never faced with that.
Q. Okay.
A. What are the board of adjustments?
MR. HAYES: Well --
Q. Mr. DeSantos --
MR. HAYES: He doesn't have to tell you, Mark.
Q. Enough of that.
A. And I wasn't trying to be rude or curt. I just want to know, what are the board of adjustments?
Q. Well, I'm the one who is going to make the

questions here --
A. Okay.
Q. -- Mr. DeSantos.
A. Okay.
Q. But thank you for your inquiry. Now, you also understood that there were local ordinances involved in setting up any business, right?
A. Local ordinances, yes.
Q. Okay.
A. Well, I mean, I guess there were -- there were local ordinances.
Q. Now, in --
A. No, local ordinance, it's either legal or it's not legal. If it's not a sexually-oriented business or a dope shop, like, you know, something to sell -- or even a tattoo parlor, I would say that -- and the funny thing about it is all of these things are allowed in this district that I'm in. And I figured, "I'm not even anywhere close to any of this stuff."
Q. Correct. Now --
A. I shouldn't be regulated -- you know, I just assumed that I would not be under any type of regulation by a city ordinance because, one, I was not a sexually-oriented business, which was already allowed in this district. I was not a tattoo parlor, which is

a very controversial thing. I was not a drug paraphernalia shop, which is usually -- these are the kinds of businesses that are usually very closely regulated by city ordinances.
Q. Have you ever served in any capacity with any municipality before?
A. No, but I just have been -- you know, I -- I'm just very familiar with these sort of things because I have lived in small towns and seen -- and seen this sort of thing.
Q. Have you ever lived in a tourist area?
A. Yes, I have lived in Aspen, Colorado.
Q. Okay.
A. And I live -- my home in Austin is really in Lakeway, which is a tourist community.
Q. Okay.
A. And so, yeah, I mean, I have seen -- and they restrict certain things but not --
Q. Okay.
A. -- a scooter business or a rental-type business.
Q. Okay. But you don't --
A. Unless it's like homes or something like that.
Q. But you really don't know the extent of any limitations entirely in either Aspen or Austin or South

Padre Island, correct?
A. I know that we were -- in my opinion, we're still in compliance, in my opinion.
Q. Okay. As a business person, don't you think it would have been advisable to check whether that was a permitted use under the City's zoning scheme?
MR. HAYES: Objection; form.
A. I'm going to go with him on this one.
Q. You can answer.
MR. HAYES: No, you can answer, subject to my objection.
A. No, I want to go ahead and stick with him. I feel --
MR. RUIZ: I'm going to object as nonresponsive, then.
MR. HAYES: Well, no, he was about to say something. You cut him off.
Q. Go ahead.
MR. HAYES: You said, "I feel" --
A. I feel that perhaps -- repeat the question one more time.
Q. Whether you would -- isn't it advisable for a business person to check up or to confirm the particular use in a zoning area before starting a business?

A. Not necessarily because I have been in areas where there weren't -- where they didn't even have any zoning requirements.
Q. Okay.
A. And it appeared that they had very little zoning with the various degrees of businesses in the area.
Like I said, they had a -- they have a sexually-oriented business. They have a tattoo parlor. They have got all these bars and clubs virtually all -- all in the same area, and it's all -- it's an entertainment district.
Q. But you would agree that there are purposes behind zoning?
A. There are definitely purposes behind zoning.
Q. You may not agree with all of them --
A. No, no, I think they're --
Q. -- or the uses of them, but there are purposes behind zoning, correct?
A. Yes, there are purposes.
Q. Now, you said that you closed up your shop in 1998 and then, once again, you reopened up the businesses, including a motor scooter business, in 1999, correct?
A. No.

Q. When did you --
A. The ID business was in '99. We had '98 -- we had the ID business, ID business in '99.
Q Okay.
A. That's when they shut the business down during Texas Week.
Q. Okay.
A. And we remained closed until the remainder --
Q. Okay.
A. -- of that particular year, got our stuff back in February -- January or February of 2000, had the meeting with Cyganawicz and with Detective Hernandez.
Q. Rodriguez.
A. I'm sorry. I have -- and then opened up.
Q. Okay. Well, then, when did you open up the motor scooter business?
A. I don't know the exact day that was opened. I don't have the exact day.
Q. Well, was that during -- for purposes of spring break 2000? Would that be fair?
A. Yeah, but it wasn't at the same time. You know, it was -- I want to say that it was in April.
Q. In April?
A. Versus March.
Q. So that's your best estimate of when you opened

it up?
A. Something like that, yeah, I believe.
Q. Okay. Now, when you closed up your business in August of '98 -- did you ever reside on the island after closing up your business for the season during 1998?
A. Oh, yeah.
Q. Did you come back?
A. I had a condominium here.
Q. Okay. And were you living on South Padre Island during the month of September of 1999?
A. '99? Yes, I came back here during that time.
Q. Okay. And I'm sorry. Maybe -- let's get our dates together. Let me get my dates correct. You opened up the photo ID business in 1998 --
A. Right.
Q. -- correct? You said you had some problems with the City regarding the motor vehicle?
A. Right.
Q. Then you once again reopened the business in 1999?
A. Right.
Q. And there were criminal charges brought against you --
A. Right.

Q. -- arising from counterfeit --
A. Right.
Q. When did you close the business in 1999?
A. Whenever they shut the business down, whatever the day --
Q. Okay.
A. -- they confiscated everything.
Q. Okay, so did you participate -- did you have any other business activity on the island during 1999?
A. No, just working with the attorneys and trying to get this thing straightened out.
Q. Okay, were you living down here during 1999?
A. I have had a condominium for three years down here.
Q. Okay, but were you -- were you work -- once that business got closed up, did you head back to Austin?
A. I was between all of the properties equally during that entire year.
Q. Okay. Were you on -- were you living in South Padre Island -- I know that you have a residence there, but were you down here in September of '99?
A. In September of '99, I believe I was here, yes.
Q. Yes, you were? Okay.
A. I believe I was.

Q. Okay.
MR. RUIZ: Now, I'm going to -- I would like this marked as Exhibit No. 10.
Q. And that is a memo from Ray -- from Chief Eunice to Ray Kendall, the city manager, dated September 20th of '99.
A. Okay.
Q. If you can take a look at that, Mr. DeSantos. And it states that there had been two meetings regarding toy vehicles, license registration of motors -- Mopeds, mini-bikes, go-carts. Did you participate in any of these meetings regarding these types of vehicles on September 9th or 16th of 1999?
A. I was not here on the 9th or the 16th, but it would not matter because any of these vehicles that they are discussing here were --
MR. RUIZ: I'm going to object as nonresponsive.
Q. I just want to know whether --
A. Okay.
Q. A yes or no, whether you --
A. No, I wasn't here during any of this time.
Q. Okay. So -- so, I mean, are you telling me now that you weren't in -- on the island in September of 1999?

A. No, I was here. I just wasn't on the -- I did not attend these meetings and was not here or -- or wasn't even notified of anything of this.
Q. Okay, now --
A. The first I got of this was whenever we opened our business here in May.
Q. Okay.
A. Or April, whenever it was, April.
Q. Right. Did you -- did you ever hear of anything regarding the rental of these toy vehicles, miniature vehicles or motor-driven cycles prior to opening up your motor scooter rental business in 2000?
A. Oh, absolutely. Oh, yeah, I heard about it.
Q. So you heard that there were restricted uses pertaining to those vehicles, correct?
A. These are miniature vehicles. It has nothing to do with -- this is --
MR. RUIZ: I'm going to object as nonresponsive.
Q. I just want to know whether you had heard about the City's involvement with the business community in relation to the rental of these types of vehicles prior to opening yours.
A. I knew that they did not like the motorized -- I call them skateboards.

ClibPDF - www.fastio.com

Q. Okay.
A. That's what I knew about.
Q. So your answer is yes?
A. I knew about their motorized -- nothing about Mopeds or anything like that. I think this "Moped" was a misspelling or something.
Q. Okay. Now, when -- on or about April 15th of 2000, a gentleman from code enforcement approached you, correct?
A. On what day?
Q. Approximately April 15th, regarding the rental signs on your motor scooters?
A. Right.
Q. Okay. Can you -- you were never cited for anything arising from a loose sign, correct?
A. No.
Q. Okay. Also during that time, there were discussions regarding the -- by Code Enforcement Officer, I think, Leo Garcia and yourself regarding the number of parking lot spaces?
A. Right.
Q. Okay. And the placement of these Mopeds on your -- on the parking lot areas --
A. Right.
Q. -- correct?

A. Right.
Q. Were you present when Mr. Garcia spoke to Ms. Levy regarding that matter?
A. Yes, I was.
Q. Okay. Was it clear from that time that you were the primary owner of that business?
MR. HAYES: Objection; form.
THE WITNESS: What does that mean --
MR. RUIZ: Well --
THE WITNESS: -- when you say, "Objection; form," or whatever?
MR. HAYES: Just for the record, it means I have an objection to some part of his question. Under the Texas rules, I'm not allowed to say anything but "Objection; form" unless he asks me to clarify -- it just preserves for later on whether his question -- my objection to whether his question was proper.
I'm not telling you not to answer the question, if you're able to answer the question.
THE WITNESS: Okay, and then when you respond with your statement of --
MR. RUIZ: I just want to know the answer to the question.
THE WITNESS: I know, but when you say --

when you make that statement, like, and it goes on the record and you said -- go ahead -- what is the term?
MR. RUIZ: I preserve my --
THE WITNESS: What does that mean?
MR. RUIZ: Well, like -- do you want to agree to get off the record here, Scott?
MR. HAYES: Sure, yeah.
(Off the record)
Q. Previously we were talking about the April 15th meeting between Ms. Levy, yourself, and this code enforcement officer, Leo Garcia.
A. Right.
Q. There was an incident report filed by Mr. Garcia --
MR. RUIZ: And I'm going to -- would like to mark this as Exhibit No. 11.
Q. -- noting that there were discussions between the three of you.
A. I want to see -- I don't think I have seen that one.
Q. Okay, you can take a look at that if you want. Towards the bottom of that first page, Mr. DeSantos, it says that the citation was voided. Is that your understanding of the citation which was issued to --
A. Excuse me.

Q. Is that your understanding of the conclusion of the citation issued to Ms. Levy?
A. Excuse me. Let me finish reading this --
Q. Okay, sure.
A. -- this thing here, and -- well, this is an interesting statement, an absolute lie, but a statement.
MR. HAYES: Okay, let him ask questions.
Q. You admitted earlier that Ms. Levy was cited, correct?
A. Yes, she was cited.
Q. Okay. Did she ever tell you whether she had to ever go to court as a result of that citation?
A. No, she never had to go to court.
Q. Okay. And the testimony yesterday by Mr. Garcia reflects the summary on this report where he states that the citation was voided on Monday the 17th. Were you aware that that citation had been voided?
A. Actually, I understood from the chief that it was never filed.
Q. Okay. Well, that technically means voided, or it was never presented to the Court.
A. Well, he corrected us, actually --
Q. Okay.
A. -- and said it was never filed.

Q. Well, okay, it was never filed. Were you aware of that, that it was never filed?
A. Actually, I just learned that it was never filed when the chief said yesterday.
Q. Okay. And here is a copy of this -- of that citation to Ms. Levy.
MR. RUIZ: I would like to mark that as the next exhibit number.
Q. Did you have to pay any fines or anything related to this incident?
A. No, no.
Q. Okay. Were you -- did you have to go to court as a result of this matter?
A. Can I read the rest of this? I want to see -- I haven't seen this, ever. I would like to read --
MR. RUIZ: If you could just please direct your client to answer the question, Mr. Hayes, I would appreciate it.
MR. HAYES: Okay.
A. I have not seen this report, and this guy has just perjured himself. This is an absolute lie.
MR. HAYES: Okay, here is the question, though: Is this all one report?
THE WITNESS: Yes.
MR. HAYES: I think you ought to let him

read the whole report.
THE WITNESS: Yes.
MR. HAYES: Because if you see -- the second page -- you can come back to the question.
MR. RUIZ: Right. Got it.
MR. HAYES: But he has now learned he hadn't read the whole report.
THE WITNESS: I haven't read this.
MR. HAYES: You're asking him --
THE WITNESS: I never saw the first part of it.
A. I never used the word --
MR. HAYES: Just read it and let him ask you questions.
THE WITNESS: Okay, okay.
A. Okay. I'm sorry.
Q. That's all right. I just wanted to know whether you were involved in any court proceedings as a result of that citation.
A. No.
Q. Okay. And you said you didn't pay any fines regarding that, either, correct?
A. No.
Q. With -- can you -- what is -- where is your -- can you provide me the address of your businesses on

South Padre Island?
A. I don't have an address. I mean, I don't know what the address is. It's Gulf Coast Beachwear, whatever the address is.
Q. Okay.
A. And it's on there somewhere. And you can hardly even tell with that map.
Q. Okay. Now, did you have a sign outside Gulf Coast Beachwear for Digital Imaging, Inc. and/or the motor scooter rental business?
A. I had signage on individual scooters.
Q. Okay.
A. Permanently affixed, and there is a sign in the window that just says "identification cards."
Q. Okay. Does it state the name of your business?
A. No.
Q. Does it state that you're the owner of the business?
A. No.
Q. Does it state that you're the person who is in charge of that aspect of that business within Gulf Coast T-shirt Shop?
A. No.
Q. Okay. Would you agree with me that the Gulf Coast T-shirt Shop building and your businesses, as

well, are contained within a C-2 zoning district for the Town of South Padre Island?
A. I can't read that thing. If we are, we are. I don't know.
Q. Okay, well --
A. If they say we are, then I --
Q. If you can look at this and tell me what address is provided there for Gulf Coast T-shirts. I believe it states it's 4405 Padre --
A. No, no, that's where the City -- then what's 2013 Padre Boulevard? Place of occurrence is 2013 Padre Boulevard.
Q. I'm sorry. You're correct, 2013 Padre Boulevard.
A. Right.
Q. Is that your address, as best as you can recall?
A. Best I can remember, yes, sir.
Q. Okay.
THE WITNESS: Do you have a copy of this?
MR. HAYES: If it was produced yesterday, I do.
A. This was produced yesterday?
Q. Yes, sir.
A. Okay.

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 41 of 125

Q. Although you can't tell from this map, your business does in fact -- is adjoining -- or, I'm sorry, is located on Padre Boulevard, and if we're -- is that correct?
A. On 20 -- I guess it's 2013, yeah.
Q. Okay, and if we're looking at the island from a north to south direction, it would be on the left-hand side of Padre Boulevard, correct?
A. Yes, yes, sir.
Q. Okay. Now, I'll represent to you that this is a zoning map for the city of -- for the Town of South Padre Island, Texas, where it indicates that Padre Boulevard runs through the middle of the town. Would it be correct to state that 2013 is located on this side --
A. Yes.
Q. -- of this map?
A. Yes.
Q. Okay.
A. And it's probably in the C-2 area.
Q. And it's probably in the C-2 area?
A. Probably, yeah.
MR. RUIZ: Okay. I would like to mark this as well.
Q. Now, as part of the C-2 district, there's a

specific ordinance. Had you ever taken a look at this ordinance, Mr. --
A. Not until -- not until this guy handed me a copy of that --
Q. Okay.
A. -- on -- in May.
Q. Okay. He -- I believe Mr. Garcia testified that he later went by your place of business at 2013 Padre Boulevard and provided you with a copy of their ordinances; is that correct?
A. Yes, in May.
Q. Okay. Were you -- did you read, you know, the Section 20-8.2 relating to C-2 businesses?
A. We read it from top to bottom, front to back.
Q. Okay, now, since you have done so, I'll go ahead and mark that as another exhibit. Do you see anywhere on this C-2 business district as a permitted use or an allowable use within that district the rental of Mopeds or --
A. No, but, on the --
MR. HAYES: Objection; form.
A. No, but, on the other hand, I don't see, you know, the rental of sailboats or rafts on that, either, and it's -- and, obviously, that's permissible.
Q. Okay. Well, did you -- when -- in reviewing

this, did you also read the section regarding special exceptions?
A. Right.
Q. You did?
A. Right.
Q. Okay. Did you read that uses which were not listed there --
A. Right, could be --
Q. There was a provision --
A. Right.
Q. -- allowing for that use --
A. Right.
Q. -- if you took it up to the board of adjustment?
A. Right, right, and the rafts were not a part of the special exception.
Q. Okay. Did you go before the board of adjustment to request a special exception for your business, Mr. DeSantos?
A. We hadn't gotten that far yet.
Q. Okay. Did you do this? So your answer is no, then?
A. Right, we hadn't gotten that far yet. The business was effectively closed when that --
Q. Okay.

A. -- because of -- well, because of these proceedings, actually.
Q. So you have never pursued it, that's what you're telling me, the special exceptions?
A. No, the special exceptions, we don't think they actually apply here.
Q. Okay, but you have never pursued that?
A. No, I have not.
Q. Okay. Thank you. I would like to -- okay, it's marked, okay. Now, several days after the April 15th incident regarding the signage and the parking area, zoning issues, there was an incident arising out of the rental of Mopeds to some Michigan kids; is that correct?
A. Right.
Q. Okay. To the best of your knowledge, were any of those children cited for any violations?
A. No.
Q. Okay. Were you cited for any violations as a result of that --
A. Threatened.
Q. Okay, what words did they use to threaten you, and who used them?
A. I don't know what his name is. I can't remember. It was that police officer yesterday.

Q. Okay.
A. Said that he could have cited me for renting them to people without driver's licenses and that, if I do so, that I would be cited.
Q. Okay.
A. He was going to cite me specifically for doing that.
Q. But he never did?
A. No, but he threatened me.
Q. Okay. As a result of that, when did your business regarding the rental scooter business stop?
A. The day that I received the documents from Leopoldo --
Q. You mean the packet --
A. In May, right.
Q. -- of April 25th?
A. It was in May. No, it wasn't on April 25th. It was in May that I got that.
Q. You're not -- are you referring to when you received this?
A. Right.
Q. Okay.
A. I guess.
Q. Does that reflect the date of --
A. That is not the date that -- no, that is the

date of -- huh-uh, we didn't receive it on this -- I may have signed it on that day, but I know that -- or I signed it, but that was not the day that I received this thing.
Q. Okay, well, let's assume that it is the day that you received it since it has your signature.
A. No, I don't want to -- no, I'm not going to assume it because we have another witness -- because that was there when I signed it, and it was not on the 25th of April. This is maybe when they --
Q. Was Mr. Hayes with you when you received that packet?
A. No, he was not, but he received this the same day that I got it, so he should have some type of --
Q. It's my understanding that you received a packet when there was a meeting between Mr. Hayes, your attorney, and Lieutenant Charles Morrison. Is that your understanding, as well, if you know?
MR. HAYES: You want me --
A. Oh, Hayes and Charles Morrison. Okay, now, wait a minute. Oh, that's when this was -- okay, yeah, there was.
THE WITNESS: Is that when we got this?
MR. HAYES: Yeah, it's when we got it.
Q. If you remember.

A. I don't know. I don't remember. You know, there's lots of dates in here.
Q. Okay. I'm just trying --
A. I don't want to lie about anything either.
Q. I know. That's fine. That's fine, Mr. DeSantos.
A. But I thought it was in May, the 1st of May, that we received this.
Q. Okay, when did you -- after receiving that, did you continue renting Mopeds after that?
A. Oh, wait a minute. Wait a minute. Okay, hold on. I'm just confused here. Let me get this. This is the day of -- yes, this has nothing to do with the zoning stuff. We didn't receive any zoning stuff at this time. We only received this, this -- about the toy vehicles --
Q. Yes.
A. -- and the transportation code.
Q. Correct.
A. Yes.
Q. And that's your signature at the bottom?
A. Yes, it is. I apologize. Yes, it is.
Q. And the letter -- and the correspondence is dated April 25th, correct?
A. Yes.

Q. Okay. Did you -- after receiving that, did you stop operating your motor -- your rental motor scooter business?
A. I believe we had some kind of business out of town, but, no, it did not cease and desist after that.
Q. Okay. So did it continue throughout the summer?
A. No, it -- we opened up -- I think it was the first part of May, and that's when I got this other thing from Leopoldo.
Q. Okay. Well, I just want to know whether -- how long were you in business during 2000, in the motor scooter rental business? That's all I want to know.
A. They effectively shut the whole business down. It was never, ever able to operate --
Q. Okay.
A. -- during the month of March, April, or May. They came up with something each time.
Q. Okay. What was it -- how did they effectively shut you down? Did they -- just explain that to me.
A. Okay, they came in and they started the foolishness with the signage, which was unfounded. Right? It was unfounded. Leopoldo and his --
Q. You were never cited, though, correct?
A. I was threatened. You know, I might as well

ClibPDF - www.fastio.com

have shut down. And then he came back later, and when he couldn't find that -- the scooters weren't even in a parking space. They were on the property but not on a parking space.

And it wasn't like, "Oh, well, we need to check and see how many parking spaces we have before you can legitimately park this stuff." It was, "Shut down now, or else." And when we didn't shut down within an hour, we had the police literally circling the building, going round and round.

So this statement is just perjury. It's a lie. It wasn't like, "Well, I think we need to count the spaces first." That's a total lie. So then, when I went ahead and --

Q. But were you still renting?

A. No, we shut down at that point. We shut -- we were effectively shut down.

Q. And then you reopened after the citation was removed and --

A. No, the citation was never filed, but you have to understand that Ms. Levy, she's Israeli and doesn't speak very good English, and she uses me a lot just to interpret and explain to her a little bit, and he was threatening her. She's in the middle of business on spring break. She has nobody else to help her, and

this is her livelihood.

This is her busiest time of the season, and this guy is sitting here saying, "We're going to shut your whole business down if you don't get rid of these scooters right this minute," makes her write -- sign a ticket when she knows that she's going to have to leave her business the following Monday to appear in court to answer to this. She's extremely frightened because she's been hassled by the City of Padre Island -- the Town of Padre Island before on numerous --

Q. Did she share these sentiments with you?

A. I think the entire --

Q. Yes or no, did she share all this with you?

A. Yes, she did.

Q. Okay. Now, I want to know whether her business, Gulf Coast T-shirts, continued on Monday morning. Was she able to sell T-shirts --

A. She was very upset.

Q. You're not answering my question.

MR. RUIZ: I'm going to object as nonresponsive.

Q. I just want to know whether that business continued its retail of t-shirts and whatever other merchandise it --

A. Yes, but this guy, he did --

Q. Thank you.

A. -- substantial damage to the business.

Q. Thank you.

A. He disrupted business and --

Q. That's all I had --

A. Okay.

Q. -- regarding that.

A. I just want to --

Q. Okay. And so when you received this packet of information several days later --

A. Right.

Q. -- on April 25th regarding the Moped incident with the Michigan kids --

A. Right.

Q. -- on the 26th, did you continue to rent Mopeds?

A. When I received this with them?

Q. Yes, the day after that, uh-huh.

A. I don't remember.

Q. So did you go and -- what did you do with the Mopeds?

A. We put them in storage.

Q. Okay.

A. Put them in storage.

Q. When?

A. I don't recall the exact day, but I'm pretty sure they went into storage --

Q. Okay.

A. -- whenever we realized that the island wasn't going to be cooperative and that we were going to have to go into court over this.

Q. Okay, well, was that in May, in June, July? I mean, what month was this?

A. No, it was -- I believe it was the first -- the actual time we completely shut it down, like I said, I had some kind of out-of-town business, and we put them in storage. I came back, I believe, it was that first weekend in May and opened up, and that's when I got the notice from Leopoldo Garcia about the zoning.

Q. But when did you shut down your business?

A. That was it. That was it.

Q. What date was that?

A. I think it was like the first week of May.

Q. Okay, okay.

A. But it never operated.

Q. Did you continue your photo ID business?

A. Oh, yes.

Q. Okay. When -- after -- since when? Since when did you --

A. Since when -- what do you mean?

Q. Well, since they dropped -- the DA decided not to --
A. Oh, we went right back into business.
Q. Okay. So that aspect of your business was not hurt during the year 2000, correct?
A. No, it was not -- no.
Q. Okay. And I'm just trying to determine what part of the year 2000 you shut down your Moped business.
A. It never got -- never got off the ground.
Q. Okay. How long were you in operation, then?
A. That one day that the -- that we had that rental, when we had the kids going out.
Q. Yes, I believe that was a Saturday.
A. Right, and then they, you know, made them get off the bikes and leave them at the Blue Marlin. That was really the only day that we were operational, fully operational.
Q. Okay.
A. And the reason for that is that -- like the day that we had the scooters, we were out setting up the signs. We were not even operational yet. We hadn't gotten our Master Card and Visa stuff and trying to get our insurance in line and all this other -- you know, we were just trying to get it all in place.

Q. Correct.
A. When we finally did, then that's when the police went after the kids, and that was pretty much when it was the end.
Q. All right. But you were never issued a citation for anything -- for --
A. Threatened, threatened.
Q. But you're not answering my question.
A. I was never issued a citation formally.
Q. Okay, thank you. Do you continue to reside in Austin at this time, sir?
A. Austin, Houston, Dallas and South Padre Island.
Q. Okay. Now, we're approaching the end of the year, and what -- of the remaining part of the year, what percentage do you think you're going to spend down here?
A. I don't know.
Q. You don't know. Okay. How do you keep up to date with the business issues that are -- that arise at South Padre Island or any of the other cities when you spend most of your time scattered?
A. It's hard.
Q. Hard. Would it be fair to say that sometimes you miss some of the issues?
A. No, no, I don't miss -- I don't miss -- no.

Q. So you're on top of everything?
A. As long -- yeah, yeah, I have an administrative assistant that helps me and --
Q. So if a new city ordinance in Dallas was passed last week, you would have been made aware about it if it pertained to your business?
A. I would probably be noticed.
Q. Okay.
A. I would hope to have been noticed.
Q. Right, but --
A. And, if not, then the -- you know, we pick it up through the legal channels.
Q. Okay.
A. And, certainly, since we're involved in these proceedings here and are so visible, we certainly -- it would be in the better interest of Padre Island to notice me on any kind of changes here.
Q. And what address do they have of that?
A. They have all my -- they have it right here, 381 Casa Linda Plaza.
Q. Okay.
A. The police have been noticed and --
Q. But that's your residence; isn't that correct?
A. Well, it's our mailing address.
Q. That's your mailing address for what?

A. Yes, it is. For everything.
Q. For -- what's "everything"?
A. For -- all my business affairs are handled at 381 Casa Linda Plaza.
Q. Okay, and -- but you never really applied for any type of permit from the Town of South Padre Island, correct?
A. Pertaining to what?
Q. Pertaining to the operation of any business that you have.
A. Don't need a permit because there's already a CO. Isn't that right?
Q. Well, but you didn't apply for any permits?
A. We had discussed this, and I didn't apply for any kind of -- because there wasn't a permit needed.
Q. Okay. So they really wouldn't know whether you were a business owner there if your residential address is at Casa Linda, correct?
A. I would hope that their attorneys would notice me on anything --
Q. Okay.
A. -- that had anything to do -- it would be in their better interests.
MR. RUIZ: Well, I'm going to object to that as nonresponsive.

THE WITNESS: Okay.

Q. How would you expect them to know if you have a residential address and yet you have not instituted any type of --

A. We have counsel. That would be good enough. That would be sufficient.

Q. Okay.

MR. RUIZ: I have got no further questions, Mr. Hayes.

MR. HAYES: I have got just a couple of questions.

EXAMINATION

BY MR. HAYES:

Q. Mr. DeSantos, you sat in Chief Rodriguez's deposition yesterday, and he had testified to statements that had been relayed to him regarding a meeting that occurred on the 25th of April involving you and me and Officer -- Detective Stukey and Lieutenant Morrison relating to statements regarding the name Rodriguez that you made. Could you explain the statements you made regarding the name Rodriguez in that particular meeting?

A. Oh, this was what had happened. The day that Leopoldo Garcia came by, I was trying to explain to him that I had this meeting between Cyganawicz and

Detective Rodriguez, and I used the word Robert -- I kept using "Robert Rodriguez." And this Leopoldo guy, who is just so obnoxious, you know, he said, "Oh, that wasn't Robert Rodriguez. That was Jaime Rodriguez."

And it's like I had no idea who he was talking about. I just know -- I just had a picture of the gentleman in my mind, you know. He happened to have a mustache, and he was a heavy-set figure.

And so we go into this meeting the day that we received these documents that we took issue over, and I apologize over that, and there's obviously -- there's just a lot of hate in there, and we're upset about this because they have stopped these Michigan students. They had no right to. And the chief had already -- had spoken with him, and there was just -- it was just thick with bad vibes.

And so we're in there, and we're trying to convey things to Detective Morrison, who was very courteous the whole time, and I mentioned the word "Jaime Rodriguez," and he said, "Robert Rodriguez." And at that point I was just so frustrated because, you know, it didn't matter whether it was Hernandez or Rodriguez or Canales.

I just wanted to get to the bottom of the situation. You know, I wasn't inferring any kind of

racial slur or being rude or any kind of disrespect. I was just trying to -- I felt like, "Well, they are just trying to throw me off. This is just more -- you know, another -- this is just another thing they are trying to get me on."

And, anyway, I apologize if that's -- you know, but I felt like it was taken out of context and Detective -- now Chief -- Rodriguez was not there, and he just had to hear it from the other two guys. And I know that may not make a bit of difference or a damn, but at least it's on the record now

EXAMINATION

BY MR. RUIZ:

Q. Was the chief --

MR. RUIZ: Go ahead. Redirect.

MR. HAYES: Go ahead.

A. He wasn't there. He wasn't there at the time. He had to go -- for whatever reason, which he did not make clear yesterday, he was not available for the meeting, so he put these other two guys on it, and they were left holding the bag of crap, so to speak. And it was really unfortunate, and, you know, that's what happened.

Q. Sure, sure. Something -- you said -- and going back to some of your testimony earlier, Mr. DeSantos, I

was wondering about your Moped incident. You said it really never got off the ground, correct?

A. No, it really never did.

Q. How much money did you spend in attempting to get it off the ground?

A. A substantial amount, and I would rather reserve that until another time.

Q. Well, I think you can answer the question for us, if you can estimate.

A. I really can't. Actually --

MR. HAYES: I'm going to object. I think we're here to the facts surrounding a potential lawsuit, and you don't have to get into potential damages. I'm going to ask him not to answer those questions right now.

A. And, truthfully, I could not give you that because I don't know the exact amount, but a lot.

Q. Okay. Another question, are you on any medication, Mr. DeSantos?

A. Am I on -- yeah, high blood pressure medicine.

Q. Okay, since when have you had that?

A. Forever, it seems like.

Q. Okay, do you have a year that you first started taking it?

A. No, I don't have a year. You know, the past

two or three years, something like that.

Q. Okay. Do you suffer from any other type of physical or mental ailment or anything like that?

A. Don't think so.

Q. Okay.

MR. RUIZ: All right, no further questions.

THE WITNESS: It's all right if you want to know anything more about my health.

(Deposition concluded)

ERRATA SHEET/SIGNATURE PAGE

PAGE LINE CHANGE REASON

________________________________________

I, PATRICK DeSANTOS, have read the foregoing transcript and hereby affix my signature that same is true and correct, except as noted above.

PATRICK DeSANTOS

THE STATE OF TEXAS

COUNTY OF CAMERON

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the _______ day of ____________________, 2000.

Notary Public in and for The State of Texas

CAUSE NO ...-050-1961-C

IN RE: )( IN THE DISTRICT COURT
)(
PATRICK DeSANTOS, ET AL )( CAMERON COUNTY, TEXAS
)(
)( 197TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
DEPOSITION OF PATRICK DeSANTOS
OCTOBER 10, 2000

I, SHELLEY STINGLEY, Certified Court Reporter in and for the State of Texas, hereby certify to the following:

That the witness, PATRICK DeSANTOS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

The original transcript is being delivered on _________________ to Mr. Mauro F. Ruiz, custodial attorney, for safekeeping and a duplicate transcript with the original Errata Sheet/Signature Page is being submitted to Mr. Scott Hayes for examination, signature, and return to Bryant & Stingley, Inc., by ____________________, 2000,

That the amount of time used by each party at the deposition is as follows:
SCOTT HAYES - 0 Hours, 3 Minutes
MAURO F RUIZ - 2 Hours, 11 Minutes

That $________ is the deposition officer's charges for preparing the original deposition transcript and any copies of exhibits, charged to The Town of South Padre Island.

That a copy of this certificate was provided to the following parties.

SCOTT HAYES
VIAL, HAMILTON, KOCH & KNOX
1717 Main Street, Suite 4400
Dallas, Texas 75201-7388

MAURO F RUIZ
DENTON, McKAMIE & NAVARRO
222 East Van Buren, Suite 405
Harlingen, Texas 78550

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Pursuant to Rule 203 of TRCP, an additional certificate will be issued.

Sworn to by me this _____ day of ________________, 2000.

SHELLEY STINGLEY, Texas CSR 5725
Expiration Date: 12-31-00
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550
(956) 428-0755

ClibPDF - www.fastio.com

CAUSE NO 2000-050-1961-C

| IN RE: | )( | IN THE DISTRICT COURT |
|---|---|---|
| | )( | |
| PATRICK DeSANTOS, ET AL | )( | CAMERON COUNTY, TEXAS |
| | )( | |
| | )( | 197TH JUDICIAL DISTRICT |

SUPPLEMENTAL CERTIFICATE UNDER TRCP RULE 203
TO THE DEPOSITION OF PATRICK DeSANTOS
TAKEN OCTOBER 10, 2000

I, Shelley Stingley, certify that the original Errata Sheet/Signature Page of PATRICK DeSANTOS:

___ was received by the Deposition Officer on

______________________;

___ was not received by the Deposition Officer;

That, if returned, the Errata Sheet/Signature Page was delivered in accordance with Rule 203, and that a copy is being served on all parties shown herein and filed with the Clerk.

Sworn to by me this _____ day of

______________________, 2000.

SHELLEY STINGLEY, Texas CSR 5725
Expiration Date: 12-31-00
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550
(956) 428-0755

ClibPDF - www.fastio.com

I
N
D
E
X

ClibPDF - www.fastio.com

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 49 of 125

**$** [1] 123:18
**'70s** [7] 19:19 19:20 20:24 21:1 21:2 24:20 62:21
**'75** [2] 24:21 24:22
**'80** [1] 12:25
**'80s** [7] 22:23 30:23 30:23 36:25 36:25 38:22 39:16
**'81** [2] 12:25 13:1
**'90s** [10] 15:18 19:10 19:13 36:25 36:25 37:1 37:19 37:21 37:23 40:5
**'98** [23] 43:3 44:3 44:4 46:6 47:4 53:11 53:18 54:10 56:19 56:20 58:17 59:1 59:2 59:16 59:22 61:18 62:2 62:15 63:5 66:20 75:14 88:2 89:4
**'99** [14] 52:3 54:5 61:14 61:18 66:24 67:10 67:14 67:15 88:2 88:3 89:12 90:22 90:23 91:6
**'Not** [1] 78:15
**0** [1] 123:16
**1** [4] 3:0 4:18 4:19 7:8
**10** [8] 1:0 1:0 3:0 3:0 10:19 91:3 123:6 125:6
**107** [1] 46:17
**11** [3] 3:0 95:16 123:17
**117** [1] 2:0
**12** [1] 3:0
**12-31-00** [2] 124:15 125:20
**122** [1] 2:0
**123** [1] 2:0
**12th** [1] 7:5
**13** [1] 3:0
**14** [1] 3:0
**14th** [1] 73:19
**15th** [4] 93:7 93:11 95:9 104:11
**16th** [2] 91:13 91:14
**17** [1] 20:1
**1717** [2] 2:0 124:3
**17th** [2] 6:10 96:17
**1952** [1] 11:6
**1979** [1] 39:22
**197TH** [3] 1:0 123:4 125:4
**1980s** [1] 20:24
**1990s** [3] 15:6 40:7 40:19
**1998** [8] 46:1 53:16 55:3 74:1 75:9 87:22 89:6 89:15
**1999** [12] 41:5 66:23 67:1 67:18 87:24 [illegible] 89:21 90:3 90:9 90:12 91:13 91:25
**1st** [1] 107:7
**2** [6] 2:0 3:0 5:21 6:1 7:16 123:17
**20** [1] 101:5
**20-8.2** [1] 102:13
**2000** [18] 1:0 1:0 6:23 7:5 73:19 88:11 88:20 92:12 93:8 108:12 113:5 113:8 122:22 123:6 123:14 124:12 125:6 125:17
**2000-050-1961-C** [3] 1:0 123:1 125:1
**2010** [3] 1:0 124:16 125:21
**2013** [6] 100:11 100:11 100:13 101:5 101:14 102:8
**203** [3] 124:10 125:5 125:13
**20s** [5] 20:8 20:8 20:13 20:14 20:15
**20th** [1] 91:6
**222** [2] 2:0 124:6
**25** [1] 24:22
**2500** [2] 46:12 46:15
**25th** [7] 6:23 105:16 105:17 106:10 107:24 111:12 117:17
**261** [1] 12:2
**26th** [1] 111:15
**27th** [1] 41:5
**3** [5] 3:0 5:22 6:3 6:4 123:16
**306** [1] 11:22
**381** [4] 16:13 17:17 115:20 116:4
**3rd** [1] 6:7
**4** [4] 2:0 3:0 3:0 6:8
**4-25-00** [1] 3:0
**405** [2] 2:0 124:6
**428-0755** [2] 124:17 125:22
**4319** [1] 46:15
**4400** [2] 2:0 124:3
**4405** [1] 100:9
**445844005** [1] 69:22
**5** [3] 3:0 3:0 3:0
**512-261** [1] 12:1
**521.030** [1] 10:12
**5725** [3] 1:0 124:14 125:20
**5th** [1] 6:11
**6** [4] 3:0 3:0 3.0 6:25
**6th** [1] 6:7
**7** [7] 3:0 3:0 7:5 9:17 9:17 9:19 10:1
**75201-7388** [2] 2:0 124:4
**75218** [1] 16:13
**761-4319** [1] 46:14
**78550** [4] 2:0 124:6 124:16 125:22
**78734** [1] 11:23
**8** [3] 3:0 9:14 10:2
**8535** [2] 12:7 12:8
**8th** [1] 11:6
**9** [5] 3:0 3:0 10:1 10:5 41:2
**9-20-99** [1] 3:0
**91** [1] 3:0
**95** [1] 3:0
**956** [2] 124:17 125:22
**99** [1] 3:0
**9th** [2] 91:13 91:14
**able** [4] 29:25 94:20 108:15 110:17
**above** [3] 1:0 31:17 122:15
**absolute** [2] 96:6 97:21
**absolutely** [15] 27:3 32:17 41:9 45:11 72:8 72:17 74:14 76:21 79:16 80:6 80:23 81:1 81:21 81:23 92:13
**accept** [1] 67:8
**accordance** [1] 125:13
**according** [1] 62:6
**acquaintance** [1] 44:4
**acquired** [1] 75:4
**action** [4] 38:21 61:8 124:8 124:9
**active** [3] 26:5 48:25 49:2
**activity** [2] 39:20 90:9
**actual** [4] 35:16 42:20 80:1 112:10
**addition** [1] 49:18
**additional** [1] 124:10
**address** [15] 11:20 16:11 32:10 46:11 98:25 99:2 99:3 99:4 100:8 100:16 115:18 115:24 115:25 116:17 117:3
**adjoining** [1] 101:2
**adjustment** [2] 103:14 103:18
**adjustments** [4] 83:8 83:11 83:17 83:24
**administrative** [1] 115:2
**admitted** [1] 96:9
**adult** [2] 28:5 65:13 64:16 64:18
**advertise** [1] 31:23
**advice** [2] 60:13 72:7
**advisable** [2] 86:5 86:22
**advised** [1] 75:12
**affairs** [3] 25:8 49:9 116:3
**affix** [1] 122:14
**affixed** [2] 57:19 99:13
**again** [12] 7:20 9:8 38:22 40:25 41:24 45:14 54:2 61:24 69:18 76:18 87:22 89:20
**against** [21] 9:21 38:5 38:6 38:12 38:13 38:25 39:6 39:8 40:6 40:11 41:4 49:16 51:5 54:9 55:3 67:16 72:5 72:10 72:16 72:20 89:23
**agencies** [7] 7:19 28:14 29:6 30:19 31:9 32:13 32:14
**agency** [1] 33:7
**agent** [2] 9:5 9:6
**agents** [2] 41:25 83:5
**ago** [1] 34:10
**agree** [6] 10:13 48:16 87:13 87:16 95:6 99:24
**agreeing** [1] 51:14
**agreement** [1] 65:17
**agreements** [1] 8:14
**ahead** [9] 58:6 81:3 86:12 86:18 95:2 102:16 109:14 119:15 119:16
**ahold** [1] 59:9
**ailment** [1] 121:3
**AL** [3] 1:0 123:3 125:3
**alderman** [1] 76:14
**Alexander** [4] 9:16 25:10 25:11 69:13
**allegations** [3] 50:12 51:16 61:25
**alleged** [1] 61:25
**alleges** [1] 50:24
**allow** [3] 55:11 55:12 70:11
**allowable** [1] 102:18
**allowed** [5] 45:21 56:3 84:17 84:24 94:14
**allowing** [1] 103:11
**Amended** [1] 3:0
**American** [1] 29:4
**amount** [3] 120:6 120:17 123:15
**answer** [22] 8:18 45:2 50:21 51:22 52:10 52:25 63:21 66:14 73:15 75:11 79:4 86:9 86:10 93:3 94:18 94:20 94:23 97:17 103:21 110:8 120:8 120:14
**answering** [2] 110:19 114:8
**anyway** [1] 119:6
**apartment** [1] 46:16
**apologize** [3] 107:22 118:11 119:6
**appear** [3] 3:0 3:0 110:7
**Appearances** [2] 2:0 2:0
**appeared** [1] 87:5
**applications** [1] 68:15
**applied** [1] 116:5
**apply** [4] 71:12 104:6 116:13 116:14
**appreciate** [1] 97:18
**Apprised** [1] 41:22
**approached** [1] 93:8
**approaching** [1] 114:13
**approval** [1] 83:7
**approximate** [1] 24:20
**April** [17] 6:23 7:5 88:22 88:23 92:8 92:8 93:7 93:11 95:9 104:10 105:16 105:17 106:10 107:24 108:17 111:12 117:17
**area** [10] 12:1 32:24 76:5 85:11 86:24 87:7 87:11 101:20 101:21 104:12
**areas** [2] 87:1 93:23
**arise** [2] 44:5 114:19
**arised** [1] 67:20
**arises** [1] 33:21
**arising** [7] 50:24 60:4 61:18 73:3 90:1 93:15 104:12
**arrangement** [3] 45:12 45:13 45:18
**arrested** [2] 38:17 39:22
**asks** [1] 94:15
**aspect** [2] 99:21 113:4
**Aspen** [2] 85:12 85:25
**asset** [1] 81:5
**assist** [1] 35:17
**assistance** [2] 74:3 74:6
**assistant** [1] 115:3

ClibPDF - www.fastio.com

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 50 of 125

assisted [1] 35:12
associate's [2] 18:22 18:23
associated [2] 29:2 29:3
Associates [2] 3:0 14:12
Association [1] 29:4
assume [2] 106:5 106:8
assumed [3] 3:0 7:4 84:22
attached [2] 2:0 4:12
attained [1] 17:6
attempt [1] 47:9
attempting [1] 120:4
attempts [1] 68:2
attend [3] 18:25 19:9 92:2
attended [1] 19:6
attention [2] 72:1 75:3
attorney [10] 4:11 6:10 58:20 60:13 60:24 72:15 72:22 72:24 106:17 123:12
attorney's [2] 9:22 58:25
attorney/client [2] 60:15 73:13
attorneys [5] 41:15 41:16 90:10 116:19 124:8
attribute [1] 27:18
August [3] 53:19 58:25 89:4
Austin [22] 11:16 11:19 11:21 11:23 12:17 12:21 12:24 13:4 13:18 14:2 14:9 19:1 38:21 39:3 39:10 39:12 48:1 85:14 85:25 90:17 114:11 114:12
authorities [2] 28:11 30:22
authority [3] 7:8 7:16 122:21
authorizing [1] 50:13
available [1] 119:19
aware [8] 51:7 61:3 71:1 71:2 75:2 96:18 97:1 115:5
away [3] 13:18 13:19 13:20
bad [1] 118:16
bag [1] 119:21
ball [1] 61:11
banks [2] 29:17 34:15
bars [1] 87:10
based [2] 50:7 81:16
basics [1 19:5
basis [1] 49:10
beach [1] 65:4
Beachwear [4] 8:15 9:2 99:3 99:9
began [1] 58:21
beginning [1] 4:13
behind [3] 87:14 87:15 87:19
Bellaire [1] 20:20
best [8] 7:6 40:8 65:9 78:17 88:25 100:16 100:18 104:16
better [3] 72:22 115:16 116:23
between [20] 8:14 10:3 10:8 13:10 13:14 30:10 45:19 45:20 58:22 60:9 61:5 61:22 70:13 76:24 77:22 90:18 95:10 95:17 106:16 117:25
beyond [2] 31:17 52:7
big [4] 5:12 26:16 26:22 27:12
bigger [1] 22:11
bikes [1] 113:16
biometrics [1] 29:24
birth [4] 11:5 13:25 71:8 71:10
bit [9] 14:6 14:7 19:21 34:25 56:5 79:8 82:22 109:23 119:10
blah [3] 65:24 65:24 65:24
blood [1] 120:20
Blue [1] 113:16
board [7] 30:7 83:8 83:10 83:17 83:24 103:13 103:17
bogus [3] 31:4 31:5 31:12
book [3] 32:2 32:3 54:13
born [1] 11:7
bottom [5] 73:20 95:22 102:14 107:21 118:24
bought [3] 21:18 21:23 22:2
Boulevard [10] 46:12 46:15 55:18 100:11 100:12 100:14 101:3 101:8 101:13 102:9
Box [1] 19:25
branch [1] 15:19
branches [2] 17:22 24:7
branded [1] 28:19
break [9] 25:1 26:12 26:17 40:14 46:6 53:11 67:11 88:20 109:25
Brief [1] 40:16
bring [2] 10:10 76:4
brings [1] 61:14
broad [1] 74:17
broader [1] 34:25
brought [17] 9:21 37:4 37:25 38:5 38:6 38:12 39:3 40:6 40:11 51:1 52:12 54:9 67:16 72:10 72:19 75:3 89:23
Bryant [4] 1:0 123:14 124:15 125:21
building [9] 42:14 42:15 42:18 45:10 47:10 48:5 57.14 99:25 109.10
bunch [1] 5:4
Bureau [1] 28:13
Buren [2] 2:0 124:6
busiest [1] 110:2
business [149] 12:17 13:20 13:21 13:25 14:3 15:2 15:20 16:5 17:2 17:8 18:14 19:15 19:18 20:21 21:2 21:4 22:2 22:5 22:9 22:19 24:17 24:23 25:25 26:4 26:9 26:13 27:2 27:4 27:6 27:11 27:18 27:21 28:7 28:8 29:19 29:22 30:4 30:5 32:4 34:23 35:16 35:17 35:19 35:21 43:9 43:12 43:16 44:20 45:24 45:24 47:2 47:25 48:8 48:15 48:19 48:24 49:1 49:2 49:4 49:17 52:3 53:6 53:8 53:10 53:24 54:2 56:6 56:7 58:7 60:6 62:20 72:12 74:1 74:3 75:8 75:14 76:10 76:18 76:22 77:9 78:20 79:19 80:4 80:21 81:3 81:7 81:19 81:20 84:7 84:14 84:24 85:20 85:21 86:4 86:23 86:25 87:9 87:23 88:2 88:3 88:3 88:5 88:16 89:3 89:5 89:15 89:20 90:3 90:4 90:9 90:16 92:6 92:12 92:21 94:6 99:10 99:15 99:18 99:21 101:2 102:8 102:17 103:19 103:24 105:11 105:11 108:3 108:4 108.12 108:13 108:14 109:24 110:4 110:7 110:16 110:22 111:2 111:4 112:11 112:15 112:21 113:3 113: 113:9 114:19 115:6 116:3 116:9 116:17
business-law [1] 35:18
businesses [30] 8:7 12:15 14:10 14:11 16:4 16:18 23:23 24:4 25:15 35:12 36:6 39:20 42:9 44:10 45:22 46:19 46:24 46:25 47:14 47:15 62:24 74:6 79:21 81·8 85:3 87:6 87:23 98:25 99:25 102:13
busy [1] 76:20
butcher [1] 43:21
buy [1] 65:12
Buzz [1] 21:21
C-2 [6] 100:1 101:20 101:21 101:25 102:13 102:17
cactus [1] 65:7
Cameron [7] 1:0 7:14 9:22 61:8 122:19 123:3 125:3
camped [1] 55:17
Canales [1] 118:23
capacity [1] 85:5
card [35] 5:17 10:21 19:15 27:18 27:21 34:23 62:25 63:3 63:8 63:14 63:15 63:18 63:19 63:24 64:4 65:19 66:17 66:17 66:18 68:25 69:3 69:5 69:6 69:6 69:7 69:8 69:12 69:22 69:24 70:1 70:4 70:10 70:14 77:9 113:23
cards [25] 14:20 21:10 27:13 30:24 33:18 52:2 63:4 63:5 63:7 63:12 64:13 64:19 64:20 65:10 65:16 65:20 66:10 66:11 67:1 68:4 70:12 70:21 75:15 76:17 99:14
care [1] 35:25
Carla [2] 67:24 67:25
Casa [5] 16:13 17:17 115:20 116:4 116:18
cash [1] 28:5
causeway [1] 26:22
cc's [1] 82:21
cease [1] 108:5
certain [2] 70:8 85:18
certainly [3] 59:13 115:14 115:15
certificate [6] 2:0 3:0 7:4 124:1 124:11 125:5
CERTIFICATION [1] 123:5
Certified [2] 1:0 123:7
certify [3] 123:7 124:7 125:7
Chamber [1] 74:2
chambers [2] 76:14 76:15
change [2] 71:8 122:2
changed [3] 22:14 22:17 58:18
changes [4] 41:21 42:2 42:3 115:17
channels [1] 115:12
characterize [1] 30:4
charge [16] 25:4 34:1 34:3 34:12 34:13 34:15 34:17 34:18 38:14 38:15 38:24 40:6 41:1 58:9 72:5 99:21
charged [6] 34:4 34:5 34:11 40:20 40:21 123:19
charges [14] 9:21 36:9 37:4 37:25 39:3 40:10 51:1 67:16 72:10 72:16 72:19 73:3 89:23 123:18
Charles [2] 106:17 106:20
check [6] 28:5 29:1 34:16 86:5 86:23 109:6
check-cashing [1] 28:18
chief [13] 3:0 58:11 61:6 77:2 77:4 77:24 91:4 96:19 97:4 117:14 118:14 119:8 119:14
child [1] 28:3
children [1] 104:17
circling [1] 109:9
citation [15] 9:14 9:15 59:22 95:23 95:24 96:2 96:13 96:17 96:18 97:6 98:19 109:18 109:20 114:6 114:9
citations [5] 5:13 5:15 9:4 59:24 60:3
cite [1] 105:6
cited [9] 59:16 93:14 96:9 96:11 104:17 104:19 105:2 105:4 108:24
cities [6] 11:13 11:15 12:15 13:14 17:3 114:20
city [32] 3:0 4:7 6:6 6:21 10:14 14:2 47:10 49:25 50:2 50:3 50:5

ClibPDF - www.fastio.com

50:7 51:3 51:7 51:16 59:18 60:9 61:9 72:11 74:5 74:25 75:20 81:24 83:1 84:23 85:4 89:18 91:5 100:10 101:11 110:9 115:4
**city's** [3] 82:1 86:6 92:21
**civil** [2] 1:0 35:21
**civilly** [1] 33:3
**claim** [2] 10:7 50:19
**claimed** [1] 62:3
**clarify** [2] 78:20 94:15
**clear** [4] 66:2 66:2 94:5 119:19
**clerk** [2] 20:9 125:15
**client** [1] 97:17
**clients** [1] 27:22
**close** [4] 18:23 53:19 84:19 90:3
**closed** [7] 53:23 67:12 87:21 88:8 89:3 90:16 103:24
**closely** [2] 41:24 85:3
**closing** [1] 89:5
**club** [2] 28:4 71:23
**clubs** [3] 61:20 65:10 87:10
**CO** [10] 47:22 47:24 48:1 48:4 74:9 74:11 74:11 74:13 74:17 116:12
**Coast** [15] 8:15 9:2 42:9 43:10 43:24 48:6 48:9 53:13 58:4 99:3 99:9 99:22 99:25 100:8 110:16
**code** [17] 3:0 12:1 54:19 54:23 55:6 55:19 55:23 56:7 56:13 56:21 58:9 75:13 75:13 93:8 93:18 95:10 107:18
**college** [6] 18:20 18:25 19:1 19:2 19:2 20:7
**colleges** [1] 19:7
**Colorado** [1] 85:12
**colorful** [3] 65:3 65:8 65:8
**coming** [1] 76:21
**commencing** [1] 6:9
**comment** [1] 40:25
**Commerce** [1] 74:2
**commission** [1] 74:5
**committee** [1] 58:12
**community** [10] 19:1 19:1 19:2 20:7 49:1 49:3 49:4
81:6 92:21
**companies** [3] 34:16 39:7 40:18
**company** [13] 14:19 14:22 14:25 20:23 23:7 35:4 38:6 38:7 38:8 38:19 39:8 46:20 70:25
**complain** [2] 51:2 52:21
**complaining** [1] 61:24
**complaint** [8] 51:15 54:8 54:10 54:11 55:3 55:5 73:3 73:8
**complaints** [2] 61:18 61:21
**complement** [1] 80:8
**completed** [1] 18:20
**completely** [1] 112:10
**compliance** [2] 80:18 86:3
**complied** [2] 75:9 81:19
**complies** [1] 81:17
**comply** [1] 76:2
**computer** [1] 71:16
**concentration** [1] 19:3
**concerning** [2] 7:8 9:1
**concerns** [1] 9:20
**concluded** [1] 121:10
**conclusion** [1] 96:1
**condo** [1] 46:8
**condominium** [2] 89:9 90:13
**condone** [1] 65:14
**confer** [1] 42:2
**confirm** [1] 86:23
**confiscated** [3] 72:11 73.23 90:7
**conformed** [2] 81:4 82:13
**conforms** [1] 80:3
**confused** [2] 77:22 107:12
**confusion** [1] 77:25
**consists** [1] 29:5
**constant** [1] 28:11
**contact** [5] 28:11 28:15 28:16 32.12 74:2
**contained** [3] 50:14 51:17 100:1
**contains** [2] 6:24 10:16
**context** [3] 77:14 78:6 119:7
**continue** [5] 107:10 108:6 111:15 112:21 114:10
**continued** [3] 53:16
110:16 110:23
**contracts** [1] 33:24
**control** [1] 78:16
**controlled** [1] 39:23
**controversial** [1] 85:1
**conversation** [2] 75:19 77:7
**convey** [1] 118:18
**convicted** [1] 37:12
**cooperative** [1] 112:5
**coordinating** [1] 72:25
**copies** [3] 10:5 29:14 123:19
**copy** [10] 10:11 10:19 10:23 54:13 97:5 100:20 102:4 102:9 124:1 125:14
**corner** [1] 21:12
**corporate** [16] 3:0 3:0 4:22 5:5 5:20 7:2 7:13 7:21 8:11 14:14 14:15 16:7 16:14 17:14 26:2 26:3
**corporation** [1] 23:1
**correct** [66] 5:19 9:3 12:11 22:7 22:14 22:20 31:20 35:1 35:13 42:12 47:23 48:9 49:10 51:12 64:12 66:1 66:9 66:14 66:18 67:14 67:21 67:25 69:15 70:2 70:18 72:2 72:12 72:16 73:25 75:1 76:10 77:7 77:18 80:10 81:9 81:14 82:8 83:13 84:20 86:1 87:19 87:24 89:14 89:17 92:15 93:9 93:15 93:25 96:10 98:22 100:13 101:4 101:8 101:14 102:10 104:14 107:19 107:24 108:24 113:5 114:1 115:23 116:7 116:18 120:2 122:15
**corrected** [1] 96:23
**correctly** [3] 51:23 69:8 69:11
**correspondence** [8] 5:1 5:4 5:8 6:5 6:21 10:3 60:9 107.23
**council** [1] 76:14
**counsel** [6] 2:0 2:0 10:3 72:7 117:5 124:7
**count** [1] 109:12
**counterfeit** [9] 38:14 40:24 41:6 54:8 61:19 66:3 66:4 67:17 90:1
**counterfeiting** [4] 36:21 38:24 62:12
62:1[illegible]
**County** [12] 1:0 7:14 9:22 36:23 37:2 55:24 56:1 56:4 61:8 122:19 123:3 125:3
**couple** [2] 19:8 117:10
**course** [3] 13:25 56:12 62:23
**court** [16] 1:0 1:0 4:10 18:6 49:15 59:19 96:13 96:14 96:22 97:12 98:18 110:8 112:6 123:2 123:7 125:2
**courteous** [1] 118:19
**cover** [3] 5:23 6:23 51:2
**covered** [2] 52:22 79:14
**crap** [1] 119:21
**crime** [1] 37:14
**Crimes** [1] 29:5
**criminal** [14] 35:22 35:23 36:2 36:4 36:9 39:1 39:19 41:3 50:25 72:19 72:19 73:2 73:3 89:23
**criminally** [3] 40:19 40:20 40:21
**cross** [1] 32:21
**crowds** [2] 24:25 26:12
**cruise** [1] 28:3
**CSR** [2] 124:14 125:20
**curt** [1] 83:23
**custodial** [1] 123:12
**customer** [1] 71:14
**customers** [1] 64:17
**cut** [1] 86:17
**cycles** [1] 92:11
**Cyganawicz** [9] 72:23 73:2 76:13 76:24 77:7 78:12 80:6 88:12 117:25
**DA** [1] 113:1
**Dallas** [40] 2:0 11:16 13:21 14:10 14:10 14:17 16:5 16:13 16:17 16:21 16:23 16:24 17:2 18:1 19:2 22:11 22:20 23:15 23:19 23:20 23:25 25:8 25:16 26:1 27:10 30:21 33:12 36:23 37:2 37:4 37:20 38:11 46:22 47:23 47:24 64:4 72:24 114:12 115:4 124:4
**damage** [1] 111:2
**damages** [1] 120:14
**damn** [1] 119:10
**database** [1] 29:15
**date** [12] 11:5 22:15 41:21 71:8 71:10 105:24 105:25 106:1 112:17 114:19 124:15 125:20
**dated** [8] 3:0 3:0 6:7 6:23 41:5 73:18 91:5 107:24
**dates** [7] 36:12 36:13 36:14 37:18 89:14 89:14 107:2
**days** [2] 104:10 111:10
**DBA** [2] 22:3 22:14
**decent** [1] 49:18
**deceptively** [1] 58:14
**decided** [5] 25:1 25:2 72:15 76:9 113:1
**dedicated** [2] 19:14 27:11
**deface** [1] 66:6
**definitely** [2] 66:24 87:15
**definition** [1] 30:14
**degree** [2] 18:22 18:24
**degrees** [1] 87:6
**deletions** [1] 42:4
**delivered** [2] 123:11 125:13
**delivery** [4] 40:23 41:6 54:8 67:17
**DENTON** [2] 2:0 124:5
**department** [17] 3:0 3:0 3:0 6:22 28:16 31:4 36:3 37:5 37:8 37:8 39:5 41:4 62:1 65:23 65:24 79:4 82:17
**departments** [1] 33:10
**depo** [1] 4:20
**deposition** [17] 1:0 1:0 3:0 4:9 4:9 4:19 12:9 117:15 121:10 123:5 123:10 123:16 123:18 123:18 125:5 125:9 125:11
**depositions** [5] 50:13 50:19 51:12 52:7 52:22
**DeSantos** [49] 1:0 1:0 1:0 2:0 2:0 3:0 3:0 3:0 4:1 4:5 5:1 6:5 6:11 6:22 8:8 8:15 9:5 9:6 9:21 10:7 11:4 11:7 12:24 15:3 18:17 19:18 22:6 39:17 40:17 53:4 61:15 62:5 83:19 84:3 91:8 95:22 103:19

ClibPDF - www.fastio.com

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 52 of 125

107:6 117:14 119:25 120:19 122:14 122:16 123:3 123:5 123:9 125:3 125:5 125:8
**DeSantos's [3]** 8:5 10:3 10:20
**DESCRIPTION [1]** 3:0
**desist [1]** 108:5
**details [1]** 44:22
**detective [9]** 77:5 77:5 77:19 78:7 88:12 117:18 118:1 118:18 119:8
**detectives [1]** 82:5
**determine [1]** 113:7
**determined [1]** 79:22
**diagonally [1]** 58:15
**difference [3]** 30:10 30:17 119:10
**different [3]** 27:8 31:8 64:10
**difficult [1]** 79:4
**digital [26]** 3:0 7:9 7:17 7:25 8:6 14:12 14:12 14:17 14:21 14:24 16:12 17:10 22:18 22:22 23:1 23:23 24:7 24:8 38:9 38:10 38:12 39:9 43:13 46:19 65:8 99:9
**direct [1]** 97:16
**direction [1]** 101:7
**disclaimer [1]** 65:18
**disclaimers [3]** 31:18 65:15 78:15
**discuss [5]** 42:1 44:22 60:12 76:18 80:17
**discussed [6]** 10:12 73:5 73:7 73:8 76:2 116:14
**discussing [2]** 51:24 91:16
**discussion [1]** 82:23
**discussions [2]** 93:18 95:17
**dishonest [12]** 49:25 50:2 50:3 50:5 50:8 50:15 51:8 51:16 52:13 52:14 52:14 52:16
**dishonesty [2]** 52:11 52:12
**disrespect [1]** 119:1
**disrupted [1]** 111:4
**district [17]** 1:0 1:0 9:22 20:9 58:25 72:15 84:18 84:25 87:12 100:1 101:25 102:17 102:18 123:2 123:4 125:2 125:4
**division [2]** 41:3 82:17
**documei[...] [1]** 58:16 62:11 6[...]:1 65:22 66:3 66:4 66:7 67:4 67:9 69:23 71:4
**Document' [1]** 78:15
**documents [33]** 3:0 3:0 4:16 4:23 5:6 5:20 5:23 6:1 6:12 7:7 7:12 7:15 7:16 7:22 7:23 8:4 8:14 8:25 9:18 28:17 30:25 31:12 33:6 44:8 48:12 48:12 59:5 59:10 59:10 70:20 70:24 105:12 118:10
**doesn't [2]** 83:20 109:21
**done [7]** 28:24 31:18 33:16 33:17 47:13 69:6 102:15
**door [1]** 58:20
**dope [1]** 84:15
**doubt [1]** 27:20
**down [42]** 4:18 25:3 25:13 26:13 42:10 43:2 43:23 45:17 46:4 52:3 53:7 53:19 53:23 55:16 55:24 58:12 58:13 61:11 61:12 61:15 63:25 67:12 70:22 74:6 82:22 88:5 90:4 90:12 90:13 90:22 108:14 108:20 109:1 109:8 109:8 109:16 109:17 110:4 112:10 112:15 113:8 114:15
**downtown [1]** 21:12
**dozen [1]** 56:25
**DPS [2]** 39:6 79:21
**drinking [1]** 61:20
**drive [2]** 78:21 79:13
**driver's [8]** 10:20 10:24 58:15 65:22 66:5 69:18 70:16 105:3
**drop [1]** 72:15
**dropped [3]** 37:10 37:11 113:1
**drug [1]** 85:1
**duces [9]** 3:0 4:11 4:12 4:16 7:7 7:15 9:17 10:1 10:2
**duly [2]** 4:2 123:9
**duplicate [1]** 123:12
**duplicates [2]** 6:15 6:17
**during [26]** 19:9 24:25 25:7 40:19 53:11 59:22 62:1 63:4 66:20 67:10 67:11 67:18 73:25 88:5 88:19 89:5 89:11 89:12 90:9 90:12 90:19 91:22 93:17 108:12 108:17 113:5
**eager [1]** 61:17
**earliest [2]** 40:5 40:6
**early [3]** 20:8 30:23 40:5
**East [5]** 1:0 2:0 124:6 124:16 125:21
**education [2]** 17:5 18:18
**Edward [3]** 72:22 76:13 76:24
**effect [1]** 70:9
**effectively [4]** 103:24 108:14 108:19 109:17
**eight [3]** 25:22 25:23 25:25
**either [6]** 83:12 84:13 85:25 98:22 102:23 107:4
**embattling [1]** 58:21
**employed [2]** 21:24 124:8
**employee [2]** 9:6 9:7
**employees [4]** 25:17 25:19 25:25 46:18
**employment [2]** 19:21 19:23
**encompasses [1]** 34:24
**end [11]** 2:0 5:3 34:17 46:3 53:12 53:18 60:16 61:2 65:17 114:4 114:13
**endorsement [2]** 79:1 79:6
**enforcement [18]** 32:13 32:14 33:6 54:20 54:23 55:6 55:19 55:23 56:8 56:13 56:22 58:10 75:13 75:13 83:5 93:8 93:18 95:11
**engage [1]** 19:17
**English [1]** 109:22
**entertainment [1]** 87:12
**entire [2]** 90:19 110:12
**entirely [1]** 85:25
**entrepreneur [1]** 19:22
**entrepreneur/small [1]** 35:19
**entry [1]** 65:10
**equally [1]** 90:18
**equipment [6]** 14:20 19:15 27:15 34:21 72:11 77:16
**equivalent [1]** 20:3
**erases [1]** 66:4
**Eric [2]** 9:15 69:13
**Erra[...] [...]** 2:0 122:[...] 123:13 125:8 125:12
**essentially [1]** 71:16
**established [1]** 53:6
**Estate [1]** 42:17
**Ester [4]** 9:15 42:22 42:23 42:25
**Esti [1]** 42:22
**estimate [2]** 88:25 120:9
**ET [3]** 1:0 123:3 125:3
**Eunice [9]** 3:0 54:14 54:15 58:11 58:23 61.6 61:22 82:6 91:5
**evenly [1]** 13:14
**eventually [6]** 21:18 25:13 34:15 49:15 58:24 63:7
**evincing [2]** 7:15 7:16
**exact [5]** 40:25 88:17 88:18 112:1 120:17
**exactly [4]** 13:5 30:13 31:15 66:21
**examination [6]** 2:0 2:0 4:3 117:12 119:12 123:13
**examples [1]** 28:1
**except [3]** 30:6 52:18 122:15
**exception [3]** 77:24 103:16 103:18
**exceptions [3]** 103:2 104:4 104:5
**Excerpt [1]** 3:0
**exchanged [1]** 45:7
**excuse [3]** 59:4 95:25 96:3
**exhibit [17]** 4:19 5:20 5:21 5:22 6:1 6:8 6:12 6:25 7:5 9:14 10:1 41:2 73:17 91:3 95:16 97:8 102:16
**exhibits [2]** 3:0 123:19
**exist [1]** 8:16
**expect [1]** 117:2
**experiment [1]** 53:25
**Expiration [2]** 124:15 125:20
**explain [5]** 65:1 108:20 109:23 117:20 117:24
**explained [1]** 78:12
**explicitly [1]** 80:25
**explore [1]** 25:3
**extent [1]** 85:24
**extra [1]** 25:2
**extraneous [1]** 71:24
**extremely [1]** 110:8
**eyes [1]** 29:25
**F [4]** 2:0 123:12 123:17 124:5
**faced [1]** 83:14
**facilitate [1]** 77:16
**fact [5]** 47:8 64:9 64:16 65:15 101:2
**facts [1]** 120:12
**fair [11]** 18:21 22:22 24:3 27:7 30:3 43:4 48:23 50:14 64:13 88:20 114:23
**fake [1]** 28:19
**fall [1]** 30:8
**familiar [2]** 41:7 85:8
**family [2]** 12:20 12:22
**far [6]** 29:11 33:23 82:14 83:4 103:20 103:23
**Fast [2]** 17:13 18:9
**February [6]** 11:6 54:3 73:18 76:11 88:11 88:11
**federal [5]** 8:5 28:13 30:22 40:10 41:25
**felt [3]** 80:14 119:2 119:7
**few [3]** 15:4 18:15 18:16
**figure [2]** 70:13 118:8
**figured [1]** 84:18
**file [1]** 68:19
**filed [10]** 7:5 51:17 95:13 96:20 96:25 97:1 97:2 97:4 109:20 125:15
**fill [1]** 71:15
**filled [1]** 68:15
**film [4]** 70:10 70:12 70:14 70:15
**finally [2]** 10:19 114:2
**financial [5]** 29:5 44:22 45:12 45:13 45:18
**financially [1]** 124:9
**fine [6]** 10:25 12:13 30:18 55:21 107:5 107:5
**fines [2]** 97:9 98:21
**fingerprints [1]** 29:12
**finish [4]** 18:2 18:3 59:21 96:3
**fired [1]** 20:11
**firm [2]** 35:18 41:18
**first [24]** 3:0 21:3 42:25 43:2 46:4 47:2 53:6 54:21 55:6 68:7 68:8 69:5 70:6 72:21 74:1 92:5 95:22 98:10 108:9 109:13

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 53 of 125

112:9 112:12 112:18 120:23
**fished** [1] 62:14
**flea** [1] 64:10
**float** [1] 74:20
**Florida** [2] 26:16 79:12
**flunkies** [3] 56:23 56:23 57:6
**follow** [5] 41:11 41:12 41:13 41:14 75:19
**following** [4] 54:4 110:7 123:8 124:1
**follows** [2] 4:2 123:16
**fond** [1] 20:6
**fool** [1] 76:19
**foolishness** [1] 108:22
**foregoing** [1] 122:14
**forever** [3] 43:25 44:2 120:22
**form** [16] 50:20 51:4 51:21 52:9 52:24 63:20 66:12 67:5 71:11 71:13 75:10 86:7 94:7 94:11 94:15 102:21
**formal** [2] 49:4 49:6
**formally** [2] 48:11 114:9
**formed** [2] 23:1 44:7
**forth** [3] 13:10 58:22 61:5
**found** [1] 62:14
**four** [2] 13:14 24:4
**Franke** [2] 42:17 42:17
**fraud** [1] 37:14
**free** [2] 34:1 34:3
**friends** [1] 79:9
**frightened** [1] 110:8
**front** [4] 5:23 55:10 57:17 102:14
**fruit** [2] 55:9 56:3
**fruitless** [1] 36:17
**frustrated** [1] 118:21
**full** [1] 11:2
**fully** [1] 113:17
**fun** [1] 63:22
**funny** [1] 84:16
**Garcia** [8] 93:19 94:2 95:11 95:14 96:16 102:7 112:14 117:24
**gather** [1] 30:11
**gentleman** [5] 21:5 21:17 29:4 93:8 118:7
**Gilly** [12] 42:21 43:19 43:22 43:23 44:5 44:9 46:2 48:18 48:23 49:19
49:24 (
**Gilly's** [3] 56:10 57:25 58:2
**given** [1] 123:10
**go-carts** [1] 91:11
**go-toys** [1] 79:25
**goes** [3] 65:25 66:4 95:1
**gone** [4] 31:17 33:17 33:23 57:2
**good** [8] 4:5 4:6 27:5 73:16 80:12 82:12 109:22 117:5
**government** [6] 58:16 62:11 62:25 67:4 71:3 78:15
**graduate** [1] 19:4
**graphics** [4] 64:23 64:24 65:1 65:2
**great** [6] 29:7 54:12 80:4 80:9 81:5 82:11
**ground** [3] 113:10 120:2 120:5
**group** [2] 6:11 49:6
**guess** [17] 5:11 15:19 23:17 24:8 31:12 33:3 46:6 55:12 58:11 60:10 61:10 61:20 67:12 76:13 84:10 101:5 105:23
**guessing** [1] 38:4
**guide** [1] 32:15
**Gulf** [17] 8:15 9:1 42:9 43:10 43:24 46:12 46:15 48:6 48:8 53:13 58:4 99:3 99:8 99:21 99:24 100:8 110:16
**guy** [9] 21:6 42:21 82:10 82:12 97:20 102:3 110:3 110:25 118:2
**guys** [6] 52:15 57:9 75:17 82:5 119:9 119:20
**HAMILTON** [2] 2:0 124:3
**hand** [2] 17:13 102:22
**handed** [2] 9:11 102:3
**handled** [1] 116:3
**handling** [1] 25:7
**hands** [2] 18:9 25:2
**harassed** [1] 49:14
**hard** [4] 18:6 25:21 114:22 114:23
**hardly** [1] 99:7
**Harlingen** [5] 1:0 2:0 124:6 124:16 125:22
**Harrison** [3] 1:0
124:16 125:21
**hash** [1] 74:19
**hassled** [1] 110:9
**hate** [1] 118:12
**Hawaii** [1] 63:24
**Hayes** [91] 2:0 2:0 3:0 4:11 4:15 4:17 4:21 4:25 5:3 5:7 5:10 5:12 5:17 6:10 6:13 6:19 7:1 7:6 7:12 7:20 8:2 8:9 8:11 8:16 8:18 8:22 9:8 9:11 9:19 9:23 10:10 10:15 10:18 10:22 18:2 18:4 18:6 40:14 45:1 50:20 51:4 51:18 51:21 52:9 52:24 57:4 59:12 60:12 60:20 60:25 61:2 63:20 66:12 67:5 71:11 71:13 73:14 75:10 83:18 83:20 86:7 86:10 86:16 86:19 94:7 94:12 95:7 96:8 97:17 97:19 97:22 97:25 98:3 98:6 98:9 98:13 100:21 102:21 106:11 106:16 106:19 106:20 106:24 117:9 117:10 117:13 119:16 120:11 123:13 123:16 124:2
**head** [2] 82:10 90:16
**headquarters** [5] 14:14 14:15 16:7 16:15 17:14
**health** [1] 121:9
**hear** [2] 92:9 119:9
**heard** [8] 24:25 35:9 54:21 54:23 67:25 92:13 92:14 92:20
**heavy-set** [1] 118:8
**help** [3] 56:24 77:16 109:25
**helping** [1] 35:19
**helps** [1] 115:3
**hereby** [2] 122:14 123:7
**herein** [1] 125:14
**Hernandez** [2] 88:12 118:22
**Hey** [1] 56:11
**hide** [1] 60:22
**high** [1] 120:20
**higher-up** [1] 75:22
**highest** [2] 17:5 18:17
**himself** [1] 97:21
**hire** [3] 41:18 56:23 72:18
**hired** [1] 72:23
**HISD** [1] 20:10
**histc** 2] 19:22 19:24
**hold** [2] 57:10 107:11
**holding** [2] 23:7 119:21
**home** [7] 13:24 55:7 55:15 57:16 57:17 59:23 85:14
**homes** [1] 85:23
**homestead** [2] 11:19 12:24
**honest** [1] 52:19
**hope** [2] 115:9 116:19
**hopefully** [1] 77:21
**hotels** [1] 55:10
**hour** [1] 109:9
**hours** [3] 18:19 123:16 123:17
**House** [1] 20:3
**Houston** [31] 11:8 11:9 11:12 11:14 11:16 13:24 14:22 15:13 16:5 16:18 18:9 19:1 20:7 20:8 21:13 22:7 22:20 23:15 23:21 25:8 37:17 37:23 38:1 38:14 39:25 46:22 47:22 64:6 81:12 81:14 114.12
**huh-uh** [1] 106:1
**hurt** [1] 113:5
**ice** [1] 55:11
**ID** [52] 8:5 19:15 21:10 24:2 24:16 27:4 27:6 27:18 27:21 28:7 28:19 28:21 29:19 30:24 34:23 35:16 45:24 50:25 53:8 53:9 53:10 60:6 62:20 62:25 63:7 63:12 63:14 63:15 63:17 63:19 63:23 64:3 64:13 66:17 66:18 66:25 68:4 69:3 69:12 69:21 69:24 70:1 70:4 70:21 71:22 76:17 77:9 88:2 88:3 88:3 89:15 112:21
**idea** [4] 44:1 48:22 55:7 118:5
**ideal** [3] 26:20 26:23 26:25
**identification** [12] 14:19 14:20 27:12 29:12 32:1 37:14 52:1 65:23 68:24 69:8 73:4 99:14
**IDs** [8] 27:11 27:19 35:4 56:17 59:3 61:19 78:13 80:13
**illegal** [5] 31:18 62:3 62:5 71:19 79:22
**images** [7] 65:4 65:5 65:6 65:6
65:7 65:8 65:8
**imagine** [1] 12:5
**Imaging** [25] 3:0 7:9 7:17 7:25 8:7 14:12 14:12 14:17 14:21 14:25 16:12 17:11 22:18 22:22 23:2 23:23 24:7 24:8 38:9 38:10 38:12 39:10 43:13 46:19 99:9
**immediately** [1] 77:19
**in-house** [1] 41:16
**Inc** [15] 1:0 3:0 3:0 7:9 7:9 7:17 7:24 7:25 8:7 43:14 46:20 99:9 123:14 124:15 125:21
**incident** [9] 51:1 54:25 77:24 95:13 97:10 104:11 104:12 111:12 120:1
**incidents** [2] 50:24 52:21
**including** [4] 7:9 7:18 49:24 87:23
**incorporated** [2] 22:11 22:24
**incorporating** [1] 5:25
**indeed** [1] 79:5
**Independent** [1] 20:8
**INDEX** [1] 2:0
**indicated** [1] 68:1
**indicates** [1] 101:12
**indicating** [1] 7:24
**indicted** [1] 38:19
**individual** [1] 99:11
**individuals** [3] 34:25 35:2 79:11
**inferring** [1] 118:25
**informal** [2] 44:14 48:15
**information** [10] 7:2 28:22 29:11 30:2 30:12 33:16 34:5 71:15 71:16 111:10
**information-gathering** [3] 28:8 28:18 29:20
**input** [1] 71:16
**inquire** [1] 75:7
**inquiry** [2] 48:3 84:5
**inside** [4] 56:7 56:17 57:13 57:14
**instance** [2] 1:0 37:17
**instances** [3] 28:22 40:23 50:25
**instituted** [1] 117:3
**instrument** [3] 40:24

41:6 67:17
**instruments** [1] 54:9
**insurance** [1] 113:24
**intended** [2] 7:1 75:8
**Intent** [1] 3:0
**interest** [5] 17:8 43:9 48:8 48:15 115:16
**interested** [2] 28:17 124:9
**interesting** [2] 75:6 96:6
**interests** [5] 13:21 16:5 17:2 55:13 116:23
**Internet** [3] 32:5 32:6 41:14
**interpret** [1] 109:23
**interrupt** [1] 57:24
**investigate** [2] 81:18 82:14
**investigated** [1] 56:2
**investigating** [2] 50:19 83:5
**investigation** [6] 28:13 29:1 34:16 41:3 72:9 82:25
**investigator** [2] 30:11 30:14
**Investigators** [2] 29:5 30:7
**involved** [16] 21:3 26:8 30:4 36:3 36:6 43:8 44:2 49:9 49:12 51:7 68:7 68:8 68:9 84:6 98:18 115:14
**involvement** [2] 35:15 92:21
**involving** [1] 117:17
**island** [83] 1:0 2:0 3:0 3:0 3:0 3:0 3:0 3:0 4:8 6:6 6:22 7:11 9:7 10:4 11:16 13:19 14:25 15:11 15:21 15:22 16:6 16:21 16:22 18:12 24:23 25:5 26:6 26:10 26:21 26:23 37:7 42:12 43:24 44:12 46:9 46:19 47:3 47:4 47:11 48:4 48:19 48:24 49:1 49:5 49:9 49:12 49:13 49:16 49:18 53:7 59:18 61:9 62:1 64:1 70:22 74:2 74:18 75:1 75:9 75:20 80:5 80:8 81:25 83:1 83:8 86:1 89:4 89:11 90:9 90:21 91:24 99:1 100:2 101:6 101:12 110:9 110:10 112:4 114:12
114:20 16 116:6 123:19
**isolated** [1] 26:21
**Israeli** [2] 49:2 109:21
**Israelis** [1] 51:25
**issue** [10] 59:22 59:24 60:3 63:12 63:23 64:4 68:24 69:3 69:21 118:10
**issued** [17] 5:14 5:16 7:10 7:18 9:5 9:14 9:15 65:22 69:12 70:3 70:22 70:24 95:24 96:2 114:5 114:9 124:11
**issues** [3] 104:12 114:19 114:24
**issuing** [1] 63:4
**Item** [1] 10:5
**items** [1] 73:23
**itself** [1] 70:11
**Jack** [1] 19:25
**jail** [1] 38:22
**Jaime** [3] 77:23 118:4 118:20
**January** [2] 58:18 88:11
**Jason** [7] 9:15 25:9 25:11 68:5 68:8 69:13 70:5
**Jewish** [1] 49:18
**Jim** [2] 58:19 72:21
**job** [2] 21:16 21:17
**JUDICIAL** [3] 1:0 123:4 125:4
**July** [3] 6:7 6:7 112:7
**jumbo** [1] 71:24
**June** [1] 112:7
**K** [2] 67:24 67:25
**Kat** [19] 3:0 5:25 7:4 7:9 7:17 7:24 8:6 16:7 16:15 16:17 22:25 22:25 24:11 24:12 39:11 39:12 39:14 43:16 46:20
**keep** [2] 28:10 114:18
**keeps** [1] 41:20
**Kendall** [2] 3:0 91:5
**kept** [1] 118:2
**Key** [3] 26:15 26:15 26:21
**kids** [6] 70:13 70:17 104:13 111:13 113:13 114:3
**kind** [16] 23:7 27:22 31:18 32:15 42:1 45:10 46:22 53:5 65:17 76:4 108:4 112:11 115:17 116:15 118:25 119:1
**kinds** [1] 85:3
**knew** [6] 79:8 80:23 82:20 92:24 93:2 93:4
**knowledge** [5] 7:6 65:9 70:17 70:19 104:16
**knows** [1] 110:6
**KNOX** [2] 2:0 124:3
**KOCH** [2] 2:0 124:3
**Kopy** [19] 3:0 5:25 7:4 7:8 7:17 7:24 8:6 16:7 16:15 16:17 22:25 22:25 24:11 24:12 39:11 39:12 39:14 43:16 46:20
**label** [2] 62:25 64:21
**Labor** [2] 53:22 61:11
**lady** [1] 20:19
**Lakeway** [1] 85:15
**landscaping** [1] 20:20
**last** [7] 9:11 18:16 19:6 43:21 54:24 64:17 115:5
**late** [7] 20:24 21:1 36:25 36:25 54:3 58:25 62:21
**law** [17] 32:13 32:14 33:6 35:18 41:7 41:18 58:17 76:2 76:3 79:9 80:3 81:4 81:17 81:19 82:13 82:20 83:5
**lawful** [1] 82:15
**laws** [5] 6:24 41:11 80:4 82:25 83:2
**lawsuit** [2] 49:13 120:13
**lawyers** [4] 32:18 35:11 35:21 35:22
**learned** [3] 20:20 97:3 98:6
**lease** [5] 8:13 9:1 42:20 47:15 47:20
**least** [5] 15:9 15:10 36:24 40:18 119:11
**leave** [5] 57:22 71:2 76:6 110:7 113:16
**left** [1] 119:21
**left-hand** [1] 101:7
**legal** [4] 57:18 84:13 84:14 115:12
**legislature** [1] 41:12
**legit** [1] 31:15
**legitimate** [5] 31:5 31:10 67:3 67:8 70:8
**legitimately** [1] 109:7
**lengthy** [1] 65:21
**Leo** [2] 93:19 95:11
**Leopoldo** [6] 105:13 108:10 108:23 112:14 117:24 118:2
**lette** 3:0 6:23 57:1 58:24 107:23
**letters** [6] 3:0 3:0 6:9 54:17 61:5 61:22
**level** [2] 17:5 18:17
**Levy** [9] 9:15 42:23 42:25 94:3 95:10 96:2 96:9 97:6 109:21
**license** [9] 10:20 10:24 58:15 65:22 66:6 69:18 70:16 79:13 91:10
**licensed** [1] 30:6
**licenses** [4] 7:10 7:18 31:7 105:3
**licensing** [2] 10:8 31:7
**lie** [5] 96:6 97:21 107:4 109:12 109:13
**Lieutenant** [2] 106:17 117:19
**life** [3] 19:14 24:18 24:19
**limitations** [1] 85:25
**limited** [4] 16:20 16:22 35:15 51:16
**Linda** [5] 16:13 17:17 115:20 116:4 116:18
**line** [4] 32:21 42:7 113:24 122:2
**listed** [2] 14:11 103:7
**Listen** [1] 60:24
**listing** [2] 32:2 32:3
**literally** [2] 29:25 109:9
**live** [1] 85:14
**lived** [4] 12:23 85:9 85:11 85:12
**livelihood** [1] 110:1
**living** [3] 89:10 90:12 90:20
**local** [8] 28:14 47:10 61:20 83:5 84:6 84:8 84:11 84:13
**located** [4] 24:25 44:20 101:3 101:14
**location** [4] 15:11 16:10 17:10 27:1
**locations** [5] 23:18 23:19 23:20 23:21 23:22
**look** [11] 28:7 32:20 57:9 66:25 67:6 67:7 70:8 91:8 95:21 100:7 102:1
**looked** [3] 56:5 75:5 75:5
**looking** [5] 19:4 27:8 41:2 67:3 101:6
**loose** [2] 50:24 93:15
**losing** [1] 17:24
**lots** [1] 107:2
**M-i-t-z-r-a-c-h-i** [1] 42:21
**mail** [1] 20:9
**mailing** [2] 115:24 115:25
**main** [5] 2:0 21:12 82:5 82:5 124:3
**maintain** [3] 29:14 29:14 39:14
**maintenance** [1] 20:18
**majority** [2] 27:10 64:12
**makes** [2] 82:21 110:5
**man** [2] 19:19 78:7
**manager** [1] 91:5
**managers** [1] 23:12
**manufacture** [4] 40:24 41:6 67:17 73:4
**map** [6] 3:0 75:4 99:7 101:1 101:11 101:17
**March** [8] 41:5 46:3 47:5 47:6 54:4 75:9 88:24 108:17
**mark** [28] 3:0 4:19 5:19 5:20 5:22 6:1 6:5 6:8 6:11 6:25 8:5 8:8 8:14 8:23 9:5 9:6 9:13 9:21 9:25 10:7 11:4 18:2 22:5 83:21 95:16 97:7 101:23 102:16
**marked** [6] 3:0 7:21 10:12 58:15 91:3 104:10
**marketing** [1] 32:4
**markets** [2] 27:8 64:10
**Marlin** [1] 113:16
**Master** [1] 113:23
**materials** [1] 65:13
**matter** [9] 60:4 63:11 67:6 73:7 73:10 91:15 94:3 97:13 118:22
**matters** [4] 73:5 73:8 73:12 73:16
**Mauro** [7] 2:0 4:7 6:14 18:4 123:12 123:17 124:5
**may** [26] 6:10 6:11 48:16 51:20 52:21 69:6 75:4 76:7 76:7 83:2 87:16 92:6 102:6 102:11 105:15 105:17 105:18 106:2 107:7 107:7 108:9 108:17 112:7 112:13 112:18 119:10

ClibPDF - www.fastio.com

**mayor** [1] 82:4
**McAllen** [1] 28:16
**McKAMIE** [2] 2:0 124:5
**mean** [21] 30:16 33:15 33:16 34:3 48:10 49:8 52:12 55:9 58:22 68:22 78:23 81:20 84:10 85:17 91:23 94:8 95:4 99:2 105:14 112:8 112:25
**means** [2] 94:12 96:21
**meant** [1] 66:3
**medication** [1] 120:19
**medicine** [1] 120:20
**meeting** [13] 58:23 61:4 76:12 76:23 77:11 88:12 95:10 106:16 117:17 117:22 117:25 118:9 119:20
**meetings** [3] 91:9 91:12 92:2
**meets** [1] 41:12
**member** [3] 48:25 49:2 75:20
**memo** [1] 91:4
**Memorandum** [1] 3:0
**memories** [1] 20:6
**mental** [1] 121:3
**mention** [1] 35:9
**mentioned** [2] 78:18 118:19
**merchandise** [1] 110:24
**mesh** [1] 23:3
**mess** [1] 71:6
**met** [3] 44:6 56:10 76:13
**Michigan** [3] 104:13 111:13 118:13
**middle** [2] 101:13 109:24
**might** [1] 108:25
**mind** [1] 118:7
**mini-bikes** [1] 91:11
**miniature** [2] 92:11 92:16
**minors** [1] 61:19
**minute** [4] 106:21 107:11 107:11 110:5
**Minutes** [2] 123:16 123:17
**misconception** [1] 64:15
**misdemeanor** [1] 40:4
**miss** [3] 114:24 114:25 114:25
**misspelling** [1] 93:6
**misunderstanding** [1] 78:3
**Mitzrachi** [1] 42:21
**models** [ 82:21
**Monday** [3] 96:17 110:7 110:16
**money** [2] 30:2 120:4
**month** [5] 46:1 64:17 89:11 108:17 112:8
**months** [4] 13:3 13:5 13:9 33:21
**moot** [1] 58:10
**Moped** [7] 51:1 78:25 79:13 93:5 111:12 113:8 120:1
**Mopeds** [10] 78:24 80:1 91:11 93:5 93:22 102:19 104:13 107:10 111:16 111:21
**morning** [3] 4:5 4:6 110:17
**moron** [1] 67:8
**Morrison** [4] 106:17 106:20 117:19 118:18
**most** [8] 15:19 24:18 24:19 27:19 49:22 64:16 64:17 114:21
**motivation** [1] 26:14
**motor** [18] 45:24 55:7 55:15 57:16 57:17 57:22 59:23 60:5 81:20 87:23 88:16 89:18 92:12 93:12 99:10 108:2 108:2 108:12
**motor-driven** [1] 92:11
**motorcycle** [3] 79:1 79:6 82:16
**motorized** [3] 79:25 92:24 93:4
**motors** [1] 91:10
**mouth** [1] 31:24
**move** [1] 22:20
**moving** [1] 66:17
**Ms** [9] 42:23 68:2 68:25 94:3 95:10 96:2 96:9 97:6 109:21
**mumbo** [1] 71:24
**municipalities** [1] 33:10
**municipality** [1] 85:6
**mustache** [1] 118:8
**name** [17] 3:0 4:7 7:4 11:2 21:8 21:14 21:21 22:1 43:21 47:16 47:20 72:24 77:25 99:15 104:24 117:20 117:21
**named** [1] 42:21
**names** [2] 24:7 36:15
**NAVARRO** [2] 2:0 124:5
**necessarily** [2] 29:3 87:1
**need** [14] 17:7 33:21 33:21 33:22 33:22 42:4 74:11 74:12 76:17 76:18 78:25 109:5 109:12 116:11
**needed** [3] 48:4 79:5 116:15
**needs** [1] 42:3
**neither** [1] 124:7
**network** [1] 70:13
**never** [40] 24:24 31:17 37:12 38:22 46:21 54:23 70:9 71:9 71:18 76:6 81:2 83:2 83:7 83:10 83:14 83:14 93:14 96:14 96:20 96:22 96:25 97:1 97:2 97:3 98:10 98:12 104:3 104:7 105:8 108:15 108:24 109:20 112:20 113:10 113:10 114:5 114:9 116:5 120:2 120:3
**Nevertheless** [1] 78:6
**new** [2] 62:9 115:4
**next** [4] 14:9 58:20 69:5 97:8
**nobodies** [1] 57:6
**nobody** [1] 109:25
**noise** [1] 71:25
**none** [3] 8:20 8:23 8:24
**nonresponsive** [6] 57:4 86:15 91:18 92:19 110:21 116:25
**nor** [1] 124:8
**normally** [2] 68:23 71:14
**north** [4] 33:12 33:13 33:13 101:7
**Notary** [1] 122:24
**noted** [1] 122:15
**nothing** [4] 64:21 92:16 93:4 107:13
**notice** [7] 3:0 3:0 4:12 4:19 112:14 115:17 116:19
**noticed** [3] 115:7 115:9 115:22
**Notices** [1] 3:0
**notified** [1] 92:3
**noting** [1] 95:17
**novelty** [8] 28:21 63:14 63:15 63:16 63:17 63:22 64:3 64.19
**now** [50] 23:12 25:21 25:25 27:7 33:25 47:21 54:18 57:11 60:25 61:15 62:20 63:4 63:10 64:12 64:19 65:9 65:21 66:2 67:10 67:16 67:25 69:20 72:2 73:1 75:4 76:8 81:7 82:23 84:5 84:12 84:20 87:21 89:3 91:2 91:23 92:4 93:7 98:6 99:8 101:10 101:25 102:15 104:10 106:20 109:8 110:15 114:13 119:8 119:11 120:15
**number** [8] 3:0 8:6 10:23 11:24 46:13 46:16 93:20 97:8
**numbered** [1] 1:0
**numbers** [3] 12:4 29:12 44:24
**numerous** [2] 28:14 110:10
**Nursery** [2] 20:19 20:23
**object** [6] 86:14 91:17 92:18 110:20 116:24 120.11
**objection** [21] 50:20 51:4 51:21 52:9 52:24 57:4 63:20 66:12 67:5 71:11 71:13 73:14 75:10 86:7 86:11 94:7 94:10 94:13 94:15 94:17 102:21
**obnoxious** [1] 118:3
**obtain** [1] 28:22
**obtained** [2] 18:18 18:22
**obviously** [3] 43:22 102:24 118:11
**occupied** [1] 48:5
**occurred** [1] 117:17
**occurrence** [1] 100:11
**OCTOBER** [4] 1:0 1:0 123:6 125:6
**off** [18] 5:4 16:3 26:22 30:2 54:17 54:19 70:11 70:15 75:18 78:15 86:17 95:6 95:8 113:10 113:16 119.3 120:2 120:5
**offense** [1] 41:4
**Offense/Incident** [1] 3:0
**office** [10] 8:1 9:22 23:6 25:5 26:2 26:3 58:25 77:2 77:20 78:10
**officer** [7] 93:19 95:11 104:25 117:18 123:9 125:9 125:11
**officer's** [1] 123:18
**officers** [2] 58:13 75:13
**offices** [4] 1:0 16:23 23:13 23:17
**Oklahoma** [7] 69:4 69:12 69:20 69:21 69:23 69:24 70:1
**old** [4] 58:13 62:7 71:17 76:2
**once** [7] 12:8 53:6 68:5 68:5 87:22 89:20 90:15
**one** [49] 5:17 5:17 9:20 16:18 17:10 17:21 17:23 18:1 19:13 20:4 23:25 26:4 26:9 30:20 36:20 37:20 37:20 38:11 39:6 39:9 44:6 46:21 47:24 52:18 52:18 58:12 62:6 62:24 63:18 66:16 68:5 68:6 68:9 68:9 70:5 73:17 74:10 75:12 76:5 80:16 82:4 82:5 83:25 84:23 86:8 86:20 95:20 97:23 113:12
**open** [15] 15:3 15:24 24:22 26:13 46:23 46:24 46:25 76:9 76:17 76:22 80:21 80:22 80:23 81:3 88:15
**opened** [9] 47:2 81:8 88:14 88:17 88:25 89:15 92:5 108:8 112:13
**opening** [7] 25:5 26:9 78:19 79:18 81:18 92:12 92:23
**operate** [3] 7:8 7:17 108:15
**operated** [3] 8:7 42:10 112:20
**operating** [3] 53:11 53:13 108:2
**operation** [3] 53:16 113:11 116:9
**operational** [3] 113:17 113:18 113:22
**opinion** [4] 52:2 67:6 86:2 86:3
**opportunity** [1] 12:11
**oral** [4] 1:0 1:0 50:13 123:9
**Oral/Video** [1] 3:0
**order** [4] 4:10 4:17 4:21 78:21
**ordinance** [6] 75:2 84:13 84:23 102:1 102:2 115:4
**ordinances** [11] 3:0 6:24 10:6 10:16 10:17 74:25 84:6 84:8 84:11 85:4 102:10
**original** [4] 123:11 123:13 123:18 125:7
**Ortiz** [1] 2:0
**otherwise** [1] 124:9
**ought** [1] 97:25
**out-of-state** [3] 63:7

63:12 63:14
**out-of-town** [1] 112:11
**outcome** [1] 124:9
**outdated** [1] 54:14
**outside** [3] 57:19 59:23 99:8
**own** [6] 12:13 12:17 14:10 20:12 31:4 42:18
**owned** [1] 22:25
**owner** [6] 8:15 35:19 44:9 94:6 99:17 116:17
**owners** [2] 42:14 42:15
**owns** [1] 23:8
**packet** [8] 5:9 6:23 10:13 41:3 105:14 106:12 106:16 111:9
**Padre** [71] 1:0 2:0 3:0 3:0 3:0 3:0 3:0 3:0 4:8 6:6 6:21 7:10 9:7 10:4 11:16 13:19 14:25 15:11 15:21 15:22 16:5 16:21 16:22 24:23 25:5 26:6 26:10 37:7 42:12 43:23 44:12 46:19 47:3 47:4 47:11 48:4 48:24 49:1 55:18 59:18 61:9 62:1 70:22 74:2 74:18 75:1 75:20 81:25 83:1 83:8 86:1 89:10 90:21 99:1 100:2 100:9 100:11 100:12 100:13 101:3 101:8 101:12 101:12 102:9 110:9 110:10 114:12 114:20 115:16 116:6 123:19
**page** [13] 2:0 2:0 3:0 5:24 32:9 32:10 95:22 98:4 122:1 122:2 123:13 125:8 125:13
**pages** [1] 73:18
**palm** [1] 65:6
**palmprints** [1] 29:25
**paraphernalia** [1] 85:2
**park** [4] 37:5 37:21 55:16 109:7
**parked** [4] 57:17 57:23 57:24 59:23
**parking** [10] 50:25 58:2 60:5 60:5 93:20 93:23 104:11 109:3 109:4 109:6
**parlor** [3] 84:16 84:25 87:9
**part** [14] 27:12 29:19 32:13 44:9 48:24 73:17 80:21 94:13 98:10 101:25 103:15

108:9 8 114:14
**participate** [2] 90:8 91:11
**participated** [1] 52:8
**particular** [5] 4:17 19:4 86:24 88:10 117:22
**particulars** [2] 44:17 71:21
**parties** [3] 124:1 124:8 125:14
**partner** [1] 43:11
**partnership** [4] 43:7 43:9 44:7 44:14
**party** [1] 123:15
**passed** [1] 115:4
**past** [7] 19:21 19:23 31:3 35:12 47:13 79:21 120:25
**Patrick** [27] 1:0 1:0 1:0 2:0 2:0 3:0 3:0 3:0 4:1 6:10 6:22 8:5 8:8 8:14 9:5 9:6 9:21 10:6 11:4 122:14 122:16 123:3 123:5 123:9 125:3 125:5 125:8
**patrons** [2] 65:11 66:10
**pay** [5] 44:19 45:2 71:25 97:9 98:21
**PD** [2] 38:1 39:4
**peel** [1] 78:14
**peeling** [1] 70:7
**people** [26] 29:2 35:3 42:17 49:18 54:20 54:24 55:9 55:10 55:12 55:13 55:19 55:24 56:3 56:8 56:10 56:13 56:21 63:25 64:12 64:14 64:16 65:12 70:19 71:10 78:14 105:3
**perceive** [7] 50:2 50:3 50:5 50:7 50:15 50:17 51:8
**percentage** [2] 27:17 114:15
**perhaps** [1] 86:20
**perjured** [1] 97:21
**perjury** [1] 109:11
**permanently** [3] 57:19 71:2 99:13
**permissible** [2] 82:1 102:24
**permit** [3] 116:6 116:11 116:15
**permits** [4] 7:18 47:10 55:11 116:13
**permitted** [2] 86:6 102:17
**person** [8] 20:18 25:4 48:24 67:20 81:7 86:4 86:23

99:20
**personally** [2] 38:13 51:5
**pertain** [1] 40:23
**pertained** [1] 115:6
**pertaining** [5] 28:17 55:8 92:15 116:8 116:9
**pertains** [1] 41:5
**petition** [3] 50:12 50:23 51:17
**phone** [5] 11:24 12:4 32:2 32:3 46:13
**photo** [20] 14:19 19:15 21:10 24:16 27:4 27:18 27:19 27:21 29:19 34:23 35:16 50:25 53:8 53:9 53:10 56:17 60:6 62:20 89:15 112:21
**photographs** [1] 29:12
**physical** [2] 28:22 121:3
**pick** [1] 115:11
**picked** [2] 76:12 76:12
**picking** [1] 82:24
**picture** [4] 64:21 68:12 68:17 118:6
**pictures** [1] 34:24
**pipe** [1] 74:19
**place** [10] 13:19 14:1 17:16 26:20 27:5 66:20 72:12 100:11 102:8 113:25
**placed** [1] 70:12
**placement** [1] 93:22
**places** [1] 81:12
**plant** [1] 20:18
**Plaza** [2] 115:20 116:4
**Plus** [1] 41:24
**point** [13] 19:21 22:14 39:9 58:9 58:10 60:10 62:24 66:16 77:1 77:20 78:18 109:16 118:21
**police** [22] 3:0 3:0 3:0 6:22 28:14 28:16 31:19 33:10 36:3 37:5 37:7 37:8 41:4 58:12 62:1 75:25 75:25 79:9 104:25 109:9 114:3 115:22
**possession** [1] 39:22
**postal** [1] 28:12
**potential** [3] 50:19 120:12 120:13
**power** [1] 69:21
**premises** [1] 45:21
**preparing** [1] 123:18
**present** [4] 2:0

34:2 76:23 94:2
**presented** [1] 96:22
**preserve** [1] 95:3
**preserves** [1] 94:16
**pressure** [1] 120:20
**pretty** [10] 18:23 19:16 35:2 49:6 51:5 52:18 74:17 76:18 112:1 114:3
**previously** [4] 40:17 70:3 73:23 95:9
**primarily** [2] 10:11 29:22
**primary** [4] 11:17 25:4 73:10 94:6
**private** [3] 30:7 30:11 30:14
**privilege** [2] 60:15 73:13
**problem** [2] 56:11 78:14
**problems** [1] 89:17
**Procedure** [1] 1:0
**proceeding** [2] 36:2 124:8
**proceedings** [4] 50:9 98:18 104:2 115:15
**produce** [1] 8:21
**produced** [5] 1:0 4:15 10:2 100:21 100:23
**producing** [1] 59:10
**production** [1] 27:11
**products** [1] 64:11
**profits** [1] 44:16
**prompt** [1] 26:13
**prompted** [1] 24:22
**proper** [1] 94:17
**properties** [1] 90:18
**property** [4] 9:1 73:18 82:24 109:3
**prosecute** [1] 59:3
**prosecuted** [1] 40:19
**Prosper** [1] 72:24
**provide** [16] 7:7 8:13 11:20 11:24 29:7 29:10 30:24 30:25 31:15 33:19 33:20 34:9 36:11 36:24 46:13 98:25
**provided** [12] 10:14 31:7 31:9 33:6 33:15 33:17 34:1 61:19 73:2 100:8 102:9 124:1
**providing** [2] 29:8 32:14
**provision** [1] 103:9
**public** [7] 31:4 34:7 39:5 65:24 79:5 82:17 122:24
**pull** [2] 6:17 40:9
**purchase** [5] 27:24 64:13 65:13 66:10 68:2

**purchased** [1] 65:10
**purchasing** [1] 63:18
**purpose** [1] 63:17
**purposes** [8] 61:20 63:17 74:9 87:13 87:15 87:18 87:20 88:19
**pursuant** [3] 1:0 4:9 124:10
**pursued** [2] 104:3 104:7
**put** [6] 13:12 62:24 111:22 111:24 112:11 119:20
**questions** [7] 84:1 96:8 98:14 117:9 117:11 120:15 121:7
**quick** [1] 76:19
**quit** [1] 20:12
**quite** [5] 10:25 14:6 14:7 15:4 66:2
**quote** [1] 63:8
**racial** [1] 119:1
**rafts** [2] 102:23 103:15
**raised** [2] 11:9 50:12
**ran** [1] 25:17
**range** [1] 36:24
**ranger** [1] 30:20
**Rangers** [3] 28:12 30:19 30:20
**rather** [2] 44:17 120:6
**Ray** [3] 3:0 91:4 91:5
**RE** [3] 1:0 123:2 125:2
**read** [12] 97:14 97:15 98:1 98:7 98:8 98:13 100:3 102:12 102:14 103:1 103:6 122:14
**reading** [2] 62:9 96:3
**real** [2] 41:24 42:17
**realize** [1] 74:24
**realized** [3] 58:9 62:10 112:4
**really** [22] 13:12 14:3 27:9 36:17 38:23 40:25 43:6 43:6 44:21 45:3 59:5 61:10 63:11 85:14 85:24 113:17 116:5 116:16 119:22 120:2 120:3 120:10
**reason** [5] 28:5 74:8 113:20 119:18 122:2
**reasons** [2] 50:16 50:18
**receipt** [1] 73:18
**receive** [2] 106:1 107:14
**received** [17] 45:3 58:24 73:22 105:12

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 57 of 125

105:20 106:3 106:6 106:11 106:13 106:15 107:8 107:15 111:9 111:17 118:10 125:9 125:11
**receiving** [2] 107:9 108:1
**recent** [2] 15:19 30:21
**recently** [1] 28:16
**recess** [1] 40:16
**reciprocal** [1] 10:8
**reciprocity** [2] 79:9 79:15
**record** [8] 11:3 40:9 94:12 95:2 95:6 95:8 119:11 123:10
**records** [3] 3:0 28:10 29:11
**red** [1] 71:2
**Redirect** [1] 119:15
**Reed** [1] 72:24
**refer** [1] 6:2
**reference** [1] 53:10
**referred** [1] 58:19
**referring** [1] 105:19
**reflect** [3] 44:9 48:12 105:24
**reflecting** [1] 8:5
**reflects** [1] 96:16
**regarding** [28] 3:0 3:0 4:18 10:8 33:5 41:4 42:8 54:8 75:23 77:9 80:18 89:18 91:10 91:12 92:10 93:11 93:18 93:19 94:3 98:22 103:1 104:11 105:11 111:7 111:12 117:16 117:19 117:21
**registration** [2] 7:24 91:10
**regs** [2] 55:8 75:5
**regular** [2] 49:9 62:23
**regulated** [2] 84:21 85:4
**regulation** [1] 84:23
**related** [3] 5:25 97:10 124:8
**relating** [2] 102:13 117:19
**relation** [1] 92:22
**relationship** [3] 35:18 46:2 56:11
**relayed** [1] 117:16
**relevant** [4] 10:6 10:17 51:10 51:25
**relied** [1] 10:7
**relying** [1] 74:15
**remainder** [1] 88:8
**remained** [1] 88:8
**remaining** [1] 114:14
**remember** [13] 21:8 21:14 1 22:12 38:16 6>.4 69:8 69:11 100:18 104:25 106:25 107:1 111:19
**remove** [2] 70:14 71:7
**removed** [2] 31:17 109:19
**remuneration** [1] 45:3
**Rene** [1] 2:0
**rent** [6] 44:19 45:2 45:4 46:8 74:19 111:15
**rental** [17] 7:4 16:8 16:15 16:17 16:20 92:10 92:12 92:22 93:11 99:10 102:18 102:23 104:13 105:11 108:2 108:13 113:13
**rental-type** [1] 85:20
**rentals** [1] 50:25
**renting** [4] 43:1 105:2 107:10 109:15
**reopen** [2] 54:1 78:13
**reopened** [4] 67:14 87:22 89:20 109:18
**repeat** [1] 86:20
**rephrase** [1] 50:23
**report** [7] 3:0 95:13 96:16 97:20 97:23 98:1 98:7
**reported** [1] 1:0
**reporter** [6] 1:0 6:3 17:24 18:7 45:15 123:7
**Reporter's** [2] 2:0 123.5
**represent** [3] 4:7 72:18 101:10
**representation** [1] 73:1
**request** [4] 9:17 10:1 31:20 103:18
**requests** [2] 4:12 4:16
**require** [1] 78:21
**required** [2] 62:24 79:13
**requirements** [2] 81:9 87:3
**research** [1] 79:3
**resembled** [1] 66:18
**reserve** [1] 120:7
**reside** [3] 12:20 89:4 114:10
**residence** [4] 11:18 13:21 90:21 115:23
**resident** [3] 11:11 11:13 11:14
**residential** [2] 116.17 117:3
**residue** [1] 71:2
**resort** [1] 13:18
**respect** [4] 8:6 76:8 81:20 82:25
**respective** [1] 17:3
**respond** [2] 59:6 94:22
**response** [3] 4:16 7:7 10:1
**responsive** [1] 59:13
**rest** [2] 13:3 97:14
**restrict** [1] 85:18
**restricted** [1] 92:14
**result** [11] 33:2 60:8 60:14 60:17 61:2 72:9 96:13 97:13 98:19 104:20 105:10
**retail** [1] 110:23
**return** [1] 123:14
**returned** [2] 72:14 125:12
**revenues** [1] 44:16
**review** [2] 4:10 12:8
**reviewing** [2] 68:20 102:25
**revise** [1] 17:7
**rid** [1] 110:4
**right** [111] 4:13 5:5 6:4 8:23 9:24 11:1 14:2 14:4 16:1 16:25 17:18 20:5 20:11 22:15 24:2 24:9 24:12 24:13 25:13 25:21 26:5 26:24 29:13 31:6 31:16 32:22 33:25 34:22 35:10 37:24 40:22 41:19 42:8 43:15 44:15 44:16 47:5 47:17 48:7 48:17 48:17 48:20 53:22 53:25 54:6 57:19 58:1 58:3 58:5 59:14 60:25 61:4 62:22 64:25 65:20 67:10 67:13 67:19 67:22 68:3 68:20 71:5 74:21 75:22 76:3 76:4 78:10 80:11 80:16 81:3 81:15 84:7 89:16 89:19 89:22 89:25 90:2 92:9 93:13 93:21 93:24 94:1 95:12 98:5 98:17 100:15 103:3 103:5 103:8 103:10 103:12 103:15 103:15 103:23 104:15 105:15 105:21 108:23 110:5 111:11 111:14 113:3 113:15 114:5 115:10 115:19 116:12 118:14 120:15 121:6 121:8
**Robert** [7] 3:0 77:23 78:9 118:1 118:2 118:4 118:20
**Rodriguez** [18] 3:0 77:4 77:5 77:23 77:2_ 78:7 78:9 88:13 117:20 117:21 118:1 118:2 118:4 118:4 118:20 118:20 118:23 119:8
**Rodriguez's** [3] 77:2 77:20 117:14
**role** [2] 29:8 29:23
**rolled** [1] 29:13
**rotated** [1] 46:22
**round** [2] 109:10 109:10
**rude** [2] 83:23 119:1
**Ruiz** [59] 2:0 2:0 4:4 4:7 4:24 5:2 5:5 5:8 5:11 5:15 5:19 6:4 6:16 6:20 7:3 7:14 7:23 8:4 8:10 8:13 8:17 8:19 8:25 9:4 9:10 9:13 9:20 9:25 10:13 10:16 10:19 10:25 40:15 45:14 45:17 59:14 60:18 86:14 91:2 91:17 92:18 94:9 94:23 95:3 95:5 95:15 97:7 97:16 98:5 101:23 110:20 116:24 117:8 119:13 119:15 121:6 123:12 123:17 124:5
**Rule** [3] 124:10 125:5 125:13
**rules** [5] 1:0 30:8 55:8 75:5 94:14
**run** [1] 20:4
**running** [3] 25:17 33:24 43:24
**runs** [1] 101:13
**S-a-i-l-m-a-s-t-e-r** [1] 11:22
**safekeeping** [1] 123:12
**safety** [6] 31:4 39:5 65:24 79:5 82:17 82:17
**sailboats** [1] 102:23
**Sailmaster** [1] 11:22
**sat** [1] 117:14
**Saturday** [1] 113:14
**saw** [1] 98:10
**says** [3] 32:1 95:23 99:14
**scattered** [1] 114:21
**scene** [1] 40:9
**scheme** [2] 82:1 86:6
**school** [3] 17:6 18:18 20:9
**scoot** [1] 79:24
**scooter** [24] 7:4 16:8 16:15 16:17 16:20 25:25 26:4 26:9 27:2 43:16 45:24 52:3 78:20 78:22 79:19 81:20 85:20 87:23 88:16 92:12 99:10 105:11 108:2 108:13
**scooters** [7] 26:5 79:24 93:12 99:11 109:2 110:5 113:21
**scope** [1] 73:1
**Scott** [7] 2:0 3:0 6:10 95:6 123:13 123:16 124:2
**season** [3] 67:12 89:5 110:2
**second** [6] 9:19 68:9 70:4 70:5 80:16 98:4
**Secretary** [3] 5:24 7:25 23:5
**section** [3] 70:8 102:13 103:1
**secure** [1] 47:9
**security** [3] 10:20 10:23 30:5
**see** [8] 55:7 57:9 95:19 97:14 98:3 102:16 102:22 109:6
**seek** [1] 74:6
**self-employed** [2] 21:25 22:1
**sell** [10] 14:20 31:15 55:17 55:18 56:3 56:17 74:19 75:14 84:15 110:17
**selling** [5] 21:10 30:2 55:8 55:9 55:10
**sense** [2] 30:9 62:5
**sensitive** [3] 32:22 32:23 32:24
**sent** [6] 5:4 54:12 57:3 57:11 58:11 58:12
**sentiment** [1] 51:15
**sentiments** [4] 49:21 49:22 49:23 110:11
**September** [10] 53:20 53:21 53:23 54:1 89:11 90:22 90:23 91:6 91:13 91:24
**series** [4] 3:0 3:0 6:5 6:9
**servants** [1] 34:8
**served** [2] 85:5 125:14
**serves** [1] 16:14
**service** [3] 28:12 29:7 34:7
**services** [13] 3:0 5:25 7:9 7:17 7:24 8:6 31:21 31:24 32:14 33:20 34:10 35:16 65:13
**set** [2] 55:16 74:22
**setting** [3] 35:17 84:7 113:21

**several** [10] 6:24 11:13 13:5 21:18 34:10 50:24 54:14 56:9 104:10 111:10
**sexually-oriented** [3] 84:14 84:24 87:9
**share** [4] 49:21 49:22 110:11 110:13
**shaved** [1] 55:10
**Sheet/Signature** [5] 2:0 122:1 123:13 125:8 125:12
**Shelley** [5] 1:0 123:7 124:14 125:7 125:20
**shop** [20] 5:17 17:13 24:2 28:19 28:21 42:9 43:10 43:24 43:25 48:6 48:9 53:14 56:18 67:21 80:24 84:15 85:2 87:21 99:22 99:25
**shops** [1] 17:11
**short** [1] 40:14
**shortly** [1] 20:18
**shown** [1] 125:14
**shut** [16] 61:11 61:12 88:5 90:4 108:14 108:20 109:1 109:7 109:8 109:16 109:16 109:17 110:4 112:10 112:15 113:8
**shutting** [1] 52:3
**side** [4] 35:21 35:23 101:8 101:15
**sign** [5] 65:17 93:15 99:8 99:13 110:6
**signage** [5] 57:18 57:19 99:11 104:11 108:22
**signature** [5] 73:19 106:6 107:21 122:14 123:14
**signatures** [1] 28:23
**signed** [5] 68:14 73:19 106:2 106:3 106:9
**signs** [3] 50:24 93:12 113:22
**similar** [8] 24:9 26:17 26:21 37:7 41:1 58:14 63:2 64:11
**simulation** [1] 39:1
**single** [1] 12:22
**sit** [3] 36:14 71:17 77:1
**Sitgreaves** [10] 58:19 58:23 59:5 60:9 60:11 60:15 60:23 61:5 61:23 72:21
**sitting** [4] 78:10 78:11 78:11 110:3
**situation** [1] 118:25
**six** [3] 13:9 24:4 33:20
**skatebo:** [1] 92:25
**slips** [2] 68:11 68:14
**slow** [2] 45:17 61:15
**slur** [1] 119:1
**small** [3] 28:3 37:8 85:9
**social** [2] 10:20 10:22
**software** [5] 14:20 19:15 27:15 33:18 34:19
**sold** [1] 34:19
**someone** [2] 28:2 66:4
**sometimes** [5] 65:5 65.5 66:9 70:18 114:23
**somewhere** [1] 99:6
**sorry** [18] 6:4 17:24 18:8 26:3 45:14 45:14 45:16 53:5 55:2 68:13 68:20 70:3 76:8 88:14 89:13 98:16 100:13 101:2
**sort** [2] 85:8 85:10
**sought** [1] 83:7
**sounds** [3] 12:6 80:12 82:11
**south** [54] 1:0 2:0 3:0 3:0 3:0 3:0 3:0 3:0 4:8 6:6 6:21 7:10 9:7 10:4 14:25 15:21 15:22 16:5 16:21 16:22 24:23 25:5 26:6 26:9 37:7 42:12 43:23 44:12 46:19 47:3 47:11 48:4 48:24 49:1 59:18 62:1 70:22 74:2 75:1 75:20 81:25 83:1 83:8 85:25 89:10 90:20 99:1 100:2 101:7 101:11 114:12 114:20 116:6 123:19
**souvenir** [7] 63:22 63:24 64:13 64:19 64:20 66:17 66:25
**space** [3] 43:1 109:3 109:4
**spaces** [3] 93:20 109:6 109:13
**span** [1] 33:20
**sparked** [1] 56:11
**speak** [3] 44:18 109:22 119:21
**special** [9] 55:11 55:13 81:14 82:21 103:1 103:16 103:18 104:4 104:5
**specific** [6] 30:14 44:24 53:10 61:25 75:8 102:1
**specifically** [1] 105:6
**spell** [1] 20:22
**spend** [5] 13:4 13:13 114:15 114:21 120:4
**SPI** [2] 36:3 41:3
**split** [1] 44:16
**spoke** [2] 76:15 94:2
**spoken** [1] 118:15
**spring** [12] 25:1 26:12 26:17 46:6 53:11 54:7 67:10 67:11 67:18 76:9 88:19 109:25
**stack** [4] 5:1 7:13 7:21 8:11
**staff** [2] 75:20 75:21
**stand** [2] 52:15 56:3
**stands** [1] 55:9
**start** [5] 19:17 42:25 54:16 54:16 61:24
**started** [11] 20:16 21:2 21:5 23:2 36:2 44:6 52:11 54:19 74:1 108.21 120:23
**starting** [3] 50:18 65:16 86:24
**state** [32] 1:0 5:24 5:24 6:24 7:19 10:8 10:9 11:2 24:5 44:8 54:13 63:18 63:24 69:2 69:2 69:3 69:7 69:8 69:20 69:23 70:24 80:3 80:4 80:17 80:25 99:15 99:17 99:20 101:14 122:18 122:25 123:7
**state's** [3] 8:1 23:6 64:21
**statement** [8] 70:23 74:16 81:17 94:22 95:1 96:6 96:7 109:11
**statements** [4] 70:9 117:16 117:19 117:21
**states** [7] 10:9 64:10 65:19 79:11 91:9 96:17 100:9
**stating** [2] 62:25 73:22
**statute** [10] 54:13 58:13 62:6 62:7 62:9 62:11 62:12 62:16 62:19 79.15
**statutes** [1] 10:6
**stick** [1] 86:12
**still** [6] 26:25 34:12 39:14 71:3 86:3 109:15
**Stingley** [9] 1:0 1:0 123:7 123:14 124:14 124:15 125:7 125:20 125:21
**Stipulations** [1] 2:0
**stop** 105:11 108:2
**stopped** [2] 55.19 118:13
**storage** [4] 111:22 111:24 112:2 112:12
**story** [1] 78:12
**straight** [2] 82:3 82:15
**straightened** [1] 90:11
**street** [4] 1:0 2:0 75:18 124:3
**strict** [1] 28:10
**strike** [2] 46:1 61:24
**student** [1] 28:3
**students** [1] 118:14
**stuff** [9] 61:10 71:25 76:13 84:19 88:10 107:14 107:14 109:7 113:23
**Stukey** [1] 117:18
**styled** [1] 1:0
**subject** [5] 51:9 51:11 51:25 63:11 86:10
**sublet** [1] 43:6
**subletting** [1] 43:5
**submitted** [1] 123:13
**subpoena** [2] 3:0 59:13
**SUBSCRIBED** [1] 122:20
**substance** [1] 39:23
**substantial** [2] 111:2 120:6
**such** [1] 77:24
**sued** [2] 33:2 33:5
**suffer** [1] 121:2
**sufficient** [1] 117:6
**Suite** [4] 2:0 2:0 124:3 124:6
**summary** [1] 96:16
**summer** [6] 53:18 59:22 62:2 63:5 66:20 108:7
**suntan** [2] 17:13 24:1
**supervisor** [2] 75:23 75:24
**SUPPLEMENTAL** [1] 125:5
**supplies** [2] 27:16 34:21
**support** [1] 10:7
**supposedly** [1] 60:11
**surrounding** [1] 120:12
**swear** [2] 12:2 50:22
**sworn** [5] 4:2 122:20 123:9 124:12 125:16
**System** [1] 20:7
**T** [1] 82:22
**T-e-a-s** [1] 20:23
**t-shirt** [11] 42:9 43:10 43:24 43:25 48:6 48:9 53:13 56:9 80:24 99:22 99:25
**t-shirts** [5] 58:4 100:8 110:16 110:17 110:23
**taking** [7] 4:9 19:5 34:24 50:13 51:11 66:20 120:24
**tamper** [3] 66:10 70:18 70:19
**tampered** [1] 71:1
**targeted** [2] 49:12 49:14
**tattoo** [3] 84:16 84:25 87:9
**tax** [1] 8:5
**TCI** [1] 40:9
**teams** [2] 32:17 35:11
**Teas** [1] 20:19
**technically** [1] 96:21
**tecum** [9] 3:0 4:11 4:12 4:16 7:8 7:15 9:17 10:1 10:2
**Telecheck** [1] 29:17
**telling** [6] 29:20 57:8 75:17 91:23 94:18 104:4
**ten** [3] 15:8 15:10 15:17
**tenants** [1] 42:20
**term** [1] 95:2
**terminated** [1] 20:11
**testified** [4] 4:2 78:8 102:7 117:15
**testimony** [4] 68:1 96:15 119:25 123:10
**Texas** [67] 1:0 1:0 1:0 1:0 1:0 2:0 2:0 2:0 3:0 4:8 5:24 6:7 7:11 7:19 7:25 9:7 10:9 11:8 11:12 11:23 12:24 15:22 28:12 30:6 30:19 30:20 33:12 33:13 33:13 39:10 39:12 39:24 58:14 63:2 63:5 63:7 63:13 65:23 66:5 66:18 67:8 69:5 69:6 69:6 69:10 70:15 79:6 79:15 81:4 81:17 81:19 82:13 83:9 88:6 94:14 101:12 122:18 122:25 123:3 123:7 124:4 124:6 124:14 124:16 125:3 125:20 125:22
**Texas'** [1] 3:0
**Texas-issued** [1] 67:4

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 59 of 125

**thank** [9] 4:15 45:15 46:15 53:4 84:5 104:9 111:1 111:3 114:10
**themselves** [3] 31:20 70:13 74:23
**thick** [1] 118:16
**thinking** [3] 77:22 78:19 79:18
**thought** [8] 26:19 35:7 55:22 79:3 80:11 81:5 82:12 107:7
**threaten** [1] 104:22
**threatened** [5] 104:21 105:9 108:25 114:7 114:7
**threatening** [1] 109:24
**three** [3] 90:13 95:18 121:1
**through** [3] 53:18 101:13 115:12
**throughout** [7] 13:14 24:4 33:20 46:24 47:1 53:16 108:6
**throw** [1] 119:3
**thumbprints** [1] 28:23
**ticket** [1] 110:6
**tight** [1] 42:7
**title** [1] 70:1
**today** [5] 8:18 10:24 48:14 51:10 52:1
**together** [1] 89:14
**too** [2] 55:14 59:6
**took** [4] 77:11 77:24 103:13 118:10
**top** [6] 4:22 5:6 82:3 82:16 102:14 115:1
**total** [2] 25:19 109:13
**tourism** [2] 25:1 26:12
**tourist** [2] 85:11 85:15
**toward** [4] 4:22 5:3 46:3 53:12
**towards** [2] 5:6 95:22
**town** [23] 1:0 2:0 3:0 4:8 6:6 6:21 7:10 9:7 10:4 26:17 47:11 75:1 80:21 81:24 83:1 83:8 100:2 101:11 101:13 108:5 110:10 116:6 123:19
**towns** [1] 85:9
**toy** [4] 79:24 91:10 92:10 107:16
**trace** [1] 19:20
**traffic** [1] 6:24
**transcript** [6] 2:0 122:14 123:9 123:11 123:12 18
**transportation** [1] 107:18
**TRCP** [2] 124:10 125:5
**trees** [1] 65:6
**tried** [2] 55:18 59:4
**true** [2] 122:15 123:10
**truthfully** [1] 120:16
**try** [5] 13:16 13:16 18:2 36:14 81:18
**trying** [12] 52:13 83:23 90:10 107:3 113:7 113:23 113:25 117:24 118:17 119:2 119:3 119:4
**turn** [2] 66:7 72:2
**two** [20] 5:13 5:15 9:9 9:11 15:12 15:15 15:24 16:1 23:2 23:20 23:20 24:3 45:19 45:20 45:21 68:1 91:9 119:9 119:20 121:1
**two-year** [1] 18:22
**type** [9] 47:10 48:13 64:3 66:17 84:22 106:14 116:6 117:4 121:2
**types** [2] 91:12 92:22
**ultimately** [1] 34:17
**uncomfortable** [1] 80:14
**under** [6] 24:7 30:8 84:22 86:6 94:14 125:5
**undercover** [1] 67:20
**undersigned** [1] 122:21
**understand** [5] 8:22 17:1 50:22 51:23 109:21
**understood** [2] 84:6 96:19
**unfortunate** [1] 119:22
**unfounded** [2] 108:22 108:23
**United** [2] 10:9 64:10
**University** [2] 37:5 37:21
**unlawful** [2] 52:2 52:2
**unless** [2] 85:23 94:15
**unrelated** [1] 39:20
**unusual** [1] 70:15
**up** [52] 22:10 24:23 25:5 26:9 26:13 34:1 34:2 34:10 34:17 35:17 39:2 40:9 41:20 46:1 52:12 52:15 55:16 56:11 60:25 74:23 75:19 76:4 76:6 76:9 76:12 76:13 76:22 78:20 79:19 80:21 81:8 82:24 83:2 84:7 86:23 87:21 87:22 88:14 88:15 89:1 89:3 89:5 89:15 90:16 92:12 103:13 108:8 108:18 112:13 113:21 114:18 115:12
**upset** [2] 110:18 118:12
**used** [4] 98:12 104:23 118:1 123:15
**uses** [5] 75:8 87:18 92:14 103:6 109:22
**using** [1] 118:2
**usually** [6] 49:11 49:12 71:23 82:15 85:2 85:3
**Van** [2] 2:0 124:6
**various** [5] 30:1 49:14 49:14 55:11 87:6
**vehicle** [3] 57:22 60:5 89:18
**vehicles** [9] 91:10 91:13 91:15 92:10 92:11 92:15 92:16 92:22 107:16
**verbiage** [1] 67:7
**verified** [1] 82:18
**Versus** [1] 88:24
**vest** [1] 69:21
**VIAL** [2] 2:0 124:3
**vibes** [1] 118:16
**Videographer** [1] 2:0
**VIDEOTAPED** [2] 1.0 1:0
**violate** [1] 80:3
**violations** [2] 104:17 104:19
**virtually** [1] 87:10
**Visa** [1] 113:23
**visible** [1] 115:15
**voided** [4] 95:23 96:17 96:18 96:21
**voluntarily** [1] 53:23
**Wade** [4] 67:24 67:25 68:2 68:25
**Waffle** [1] 20:3
**wait** [5] 60:12 77:3 106:21 107:11 107:11
**waiving** [1] 60:16
**Walk** [1] 42:7
**Walker** [1] 21:12
**wanting** [2] 28:3 28:4
**wants** [1] 28:5
**watch** [4] 35:21 35:22 41:15 41:25
**Web** [2] 32:9 32:10
**week** [3] 88:6 112:18 115:5
**wee!⁀d** [1] 112:13
**week.** [1] 76:21
**welcoming** [1] 58:12
**West** [3] 26:15 26:16 26:21
**whatsoever** [1] 60:2
**whole** [6] 82:21 98:1 98:7 108:14 110:4 118:19
**wife** [2] 42:22 60:4
**willing** [1] 59:9
**window** [1] 99:14
**within** [5] 82:1 99:21 100.1 102:18 109:9
**without** [2] 27:20 105:3
**witness** [26] 1:0 8:24 9:3 18:3 18:5 18:8 45:16 57:6 61:1 94:8 94:10 94:21 94:25 95:4 97:24 98:2 98:8 98:10 98:15 100:20 106:8 106:23 117:1 121:8 123:9 123:10
**wondering** [1] 120:1
**word** [4] 31:24 98:12 118:1 118:19
**words** [3] 34:4 82:20 104:22
**worked** [10] 19:25 20:3 20:6 20:9 20:18 20:19 21:5 25:13 30:18 64:17
**write** [1] 110:5
**www.photoid.com** [1] 32:11
**year** [29] 13:4 13:6 13:9 13:15 24:20 33:20 33:23 40:7 43:2 46:23 46:24 47:1 54:4 56:23 58:18 66:21 75:4 76:7 76:7 76:9 83:3 88:10 90:19 113:5 113:8 114:14 114:14 120:23 120:25
**years** [18] 15:4 15:8 15:10 15:12 15:15 15:17 15:25 16:1 18:15 18:16 19:8 21:18 24:22 34:10 54:14 79:21 90:13 121:1
**yesterday** [13] 10:12 52:8 52:15 52:22 68:1 78:8 96:15 97:4 100:21 100:23 104:25 117:15 119:19
**yet** [4] 103:20 103:23 113:22 117:3
**you-all** [1] 17:24
**young** [2] 19:19 64:14
**yourself** [5] 68:24 72:2 77:7 93:19 95:10
**zeros** [1] 57:6
**zoned** [1] 76:6
**zoning** [25] 74:25 74:25 75:2 75:9 76:3 76:4 80:18 81:9 81:13 82:1 82:25 83:2 86:6 86:24 87:3 87:6 87:14 87:15 87:19 100:1 101:11 104:12 107:14 107:14 112:14

ClibPDF - www.fastio.com

EXHIBIT " B "

ClibPDF - www.fastio.com

luminaire with elements such as shields, reflectors, or refractor panels which direct and cut-off the emitted light at a specific cut-off angle). All luminaires shall have a cut-off angle of ninety (90) degrees or less.

(d) The lighting from any luminaire shall be so shaded, shielded, or directed to prevent direct light from being cast upon any adjacent residential property, and to prevent glare or other objectionable problems to surrounding areas.

(e) Neither the direct or reflected light from any luminaire shall fall upon any adjacent public street.

(f) No exterior light shall have any blinking, flashing, or fluttering light or other illuminating device which has a changing light intensity or brightness of color.

(g) Prior to any exterior lighting being installed or substantially modified, an exterior lighting plan shall be submitted to the City Manager, or his designee, to determine if the requirements of this Section have been met.

(10) Outside Storage: All outside storage of materials, equipment, the storage of fleet vehicles or the long-term storage vehicles for others shall be within an area so screened by a solid masonry wall or wood fence of sufficient height so that said materials and/or equipment are not visible at the grade of the nearest street and/or adjoining properties.

## Sec. 20-8.2 DISTRICT "C-2" ENTERTAINMENT RELATED USES DISTRICT (added by Ord 77N; 11/1/95)

(A) Purpose and Intent:

The "C-2" Entertainment Related District is unique through its development as a center of similar entertainment and recreational uses within the Town of South Padre Island, and is an object of special and substantial public interest due to its richness and character, imparting a distinct aspect to an otherwise new city. It is deemed essential to the public welfare that these qualities relating to the "C-2" Entertainment Related Uses District be preserved and protected from destructive changes in use, and the growth pressures evident within the area and throughout the community it serves, which threaten its existence as a unique, cohesive, and definable whole.

It is the intent of these regulations to preserve and enhance the best elements of the Entertainment District through the review of changes in land use to protect against the undesirable encroachment by incompatible uses on the district, while encouraging uses which will lead to its continuance, conservation, and improvement in a manner appropriate to the preservation of this unique area of the community.

(B) Use Regulations:

(1) Permitted Uses: The following uses shall be permitted as-of-right within the "C-2" Entertainment Related Uses District:

Residential
- Hotel/Motel

Retail Trade
- Antiques
- Apparel and Accessories
- Arts and Crafts/Art Gallery
- Bait Shop
- Bicycle Sales and Rental
- Books, Stationery, Newspapers, and Magazines
- Cameras and Photographic Supplies

        - Candy, Nuts, and Confectionery
- Delicatessen
- Department Store, Mail Order, and Direct Selling Organizations
- Florist
- Gifts, Novelties, and Souvenirs
- Hardware
- Ice Cream and Frozen Deserts
- Liquor -- Retail
- Music Supplies
- Restaurant, Fast-Food, With or Without Drive-Thru
- Restaurant, Sit-Down, No Drive-Thru
- Specialty Food Shops/Bakery
- Sporting Goods -- Sales and Rental
- Taverns, Bars, and Saloons
- Tobacco Products
- Variety and General Merchandise

Cultural, Entertainment, and Recreational

- Amphitheater
- Amusement Center
- Aquarium
- Aqua-Sports
- Arcade
- Auditorium
- Banquet Hall
- Bicycle -- Rental and Repair
- Billiard Hall
- Boat Ramp -- Public
- Boat Ramp -- Private
- Boat Rental
- Bowling Center
- Dinner Theater
- Exhibition Hall
- Health Club\Gymnasium
- Historic and Monument Sites
- Ice Skating Rink -- Indoor
- Library
- Marina
- Museum
- Public Parks
- Piers -- Private and Public
- Planetaria
- Private Club
- Reception Hall
- Recreational Center
- Roller Skating Rink
- Theater -- Stage Play
- Theater -- Motion Picture

Repair Services

- Bicycle Repair
- Boat Repair Services

Governmental Services

- Postal Services
- Governmental Functions, Facilities, and Buildings

Personal Services

- Artist's Studio
- Photographic Services
- Beauty and Barber Shops

ClibPDF - www.fastio.com

Apparel Repair and Alterations
Shoe Repair and Shoe Shining Services
Tattooing and body art
Financial Services
Bank
Savings and Loan Association
Commercial Credit Institutions
Credit Unions
Holding and Investment Services
General Offices for Business and Professional Services

(2) Special Exceptions: Within the "C-2" Entertainment Related Uses District, the following uses may be permitted as special exceptions upon review and approval by the Board of Adjustment. Any property located within the "C-2" Entertainment Related Uses District May be approved for any of the following listed uses, provided the Board of Adjustment shall first make a positive finding that any proposed use or change in use shall have no negative impact upon surrounding properties or upon the character of the District, as required by Section 20-16.

Apartments
Bingo Parlor
Condominiums
Duplex
Go-Cart Track
Heliport Pad
Miniature Golf
Outdoor Entertainment Uses Not Otherwise Listed
Racetrack
Single-Family Dwelling
Townhouse
Public Service Facility. (Ord 96-05, 10-2-96)

Any use which is permitted as a special exception within the "C-2" Entertainment Related Uses District and is an existing use shall not be deemed a non-conforming use in such district, but shall without further action be considered a conforming use. Any existing residential use shall be considered permitted as a special exception, without further action, as provided herein.

(3) Accessory Uses: Within the "C-2" Entertainment Related Uses District, any use that is (a) clearly incidental and subordinate to the principal use of the property, (b) is definitely an integral part of the services of such principal use, and (c) is intended for the convenience of the customers of the principal use of the property may be permitted as an accessory use. Such accessory uses shall meet the following requirements:

(a) The accessory use shall be located within the same structure as the principal use.

(b) The accessory use shall maintain internal pedestrian traffic flow with the principal use and shall not be designed to function as a separate and independent business operation.

(c) The sum of all accessory uses shall not constitute a total area larger than twenty (20) percent of the total building area of the principal use.

(d) No accessory use shall be constructed or used until the principal use is established on the same lot.

(e) No accessory use shall continue after the termination of the principal use upon the lot.

The City Manager, or his designee, shall determine if a proposed use qualifies as an accessory use under these regulations. In cases of doubt, or on specific questions raised, as to whether a proposed use qualifies as an accessory use under the requirements of this Ordinance, the matter may be appealed to the Board of Adjustment, in accordance with Section 20-16, and shall be decided by the Board as a question of fact.

ClibPDF - www.fastio.com

(C) Area Regulations: The following regulations shall apply in all "C-2" Entertainment Related Uses Districts:

(1) Minimum Site Area: The minimum site area shall be two thousand (2,000) square feet.

(2) Minimum Lot Width: The minimum lot width shall be twenty (20) feet.

(3) Maximum Lot Coverage: The maximum lot coverage shall be as dictated by the other area and performance standards, such as yard setbacks, landscaping, and parking.

(4) Yard and Setback Requirements:

(a) Front Yard: There shall be a front yard having a minimum depth of fifteen (15) feet.

(i) Where lots have double frontage, running through from one street to another, the required front yard shall be provided on both streets.

(ii) The minimum front yard shall be increased one (1) foot for each two (2) feet in height if a building exceeds six (6) standard stories.

(b) Side Yards: A minimum side yard of five (5) feet shall be provided on each side of the structure, **except** under the following circumstances:

(i) Where commercial buildings are constructed at the side property line with fire walls complying with the requirements of the Building Code for zero property line clearance, no sideyard will be required.
(ii) Where a side line of a lot in this district abuts the side line of a lot in a residential district (Districts "A," "B," or "E"), a side yard shall be provided the same as required in the residential district it abuts.
(iii) Where the side yard is adjacent to a street, the side yard shall be not less than ten (10) feet.
(iv) Any building exceeding three (3) standard stories shall have a sideyard of four (4) feet for each additional story.

(c) Rear Yard: A minimum rear yard of ten (10) feet shall be provided, **except** where a rear line of a lot in this district abuts lots zoned residential (Districts "A," "B," or "E"), then a rear yard of not less than twenty (20) feet shall be provided.

(5) Innovative Subdivision Designs: The Board of Aldermen, upon recommendation by the Planning and Zoning Commission, may approve innovative subdivision designs in which the minimum site area and minimum width requirements vary from those listed in Section (C)(1), above, in order to more closely achieve the spirit and intent of this District through a unified and comprehensive design approach.

(D) Parking Regulations: Parking regulations for all uses within the "C-2" Entertainment Related Uses District shall be the same those outlined in the "C" District, Section 20-8(F)(5), and the "D" District, Section 20-9(E)(3), as applicable, **except** as follows:

(1) If the property-owner of a property located within the "C-2" Entertainment Related Uses District voluntarily elects to participate in the construction of off-site publicly-owned parking, whose use will be made available to all patrons of the District, the property-owner's on-site parking requirement may be reduced on a 1:1 ratio. The amount of on-site parking reduced will be determined by dividing the amount of the property-owner's contribution by the cost per parking space to construct the public parking.

ClibPDF - www.fastio.com

(E) Signage: The rules and regulations governing the provision of signage for uses within the "C-2" Entertainment Related Uses District shall be as provided in Chapter 15 of the Town Code of Ordinances, as applicable, except as follows:

(1) Free-Standing Ground-Mounted Signs: All permanent, free-standing, ground-mounted signs, including but not limited to pole signs and monument signs, otherwise permitted by Chapter 15, are hereby prohibited on all properties within the "C-2" Entertainment Related Uses District, with the exception of those lots within the district, bordering Padre Boulevard.

(2) Projecting Signs: Each principal structure within the "C-2" Entertainment Related Uses District may provide one (1) projecting sign in addition to all other permitted signage, under the following conditions:

(a) Projecting signs shall be pedestrian oriented, and of a carved or hand-painted, artistic nature.
(b) The sign shall consist of simple, clear graphics and recognizable symbols or logos to communicate the nature of the business. Lettering shall not encompass more than twenty-five (25) percent of the sign face.
(c) The maximum size of each sign face shall not exceed four (4) square feet, including all projections or extensions.
(d) Projecting signs shall only be placed directly over the main entrance to the structure.
(e) Projecting signs shall clear the adjacent sidewalk grade by a minimum of eight (8) feet, and shall not extend vertically beyond the window sill of the second story, or 15 feet whichever is the lesser.
(f) Projecting signs shall project at a ninety (90) degree angle from the structure, shall be pinned away from the wall of the structure a minimum of six (6) inches, and shall project no further than four (4) feet, six (6) inches from the wall of the building.
(g) Angular projection from a corner of the structure is prohibited, unless the architectural style of the structure is such that the angle of the corner has been cut-off in order to provide the main entrance to the structure at that location.
(h) Every sign shall be designed as an integral architectural element of the building to which it principally relates. The mounting brackets of such signs shall be an integral part of the sign and complementary to the design of the sign. Visible angle iron or other frames supporting projecting signs, as well as chain supports are prohibited, except as an artistic element of the sign. No projecting sign shall be entirely supported by an unbraced parapet wall.
(i) Lighting shall be discreet and unobtrusive. No unshielded lights will be permitted. All lighting fixtures shall be placed such that they will not be struck or otherwise damaged by the projecting sign in the event of high wind.

(3) A-Frame/Sandwich Signs: Restaurants, Cafes, and Nightclubs may provide one (1) portable a-frame or sandwich sign, not exceeding twelve (12) square feet in size, under the following conditions:

(a) The sign shall only be permitted as an "on-premises" sign, that is, located upon the same property as the principal use to which it directly relates, as opposed to an "off-premises" sign (See Section 15-2 of the Town Code of Ordinances, "Definitions").
(b) The sign shall not be placed in such a fashion as to block or otherwise interfere with traffic on a public street or sidewalk.
(c) The sign shall not be placed in such a fashion as to block or otherwise interfere with any parking space or vehicle access to the property.
(d) The sign shall not be placed so as to block or otherwise obstruct any fire exit or other form of safety ingress/egress.
(e) The sign shall be removed within the premises during non-business hours.

(4) Wall Signs: Notwithstanding the requirements of Chapter 15 as they relate to the provision of wall signs:

ClibPDF - www.fastio.com

(a) Within the "C-2" Entertainment Related Uses District, a colored, neon tube, outline sign may be used as the permitted wall sign at a size not to exceed ten (10) percent of the building facade upon which the sign is placed.
(b) Within the "C-2" Entertainment Related Uses District, in the instance of corner lots, an additional wall sign, conforming to the size requirements of Chapter 15 of the Town's Code of Ordinances, will be permitted on each street frontage of the building, providing that neither sign is visible at the same time from either direction.

(5) Alternative Signage Plan: For buildings with multiple occupancies, where utilization of the standard sign requirements may present difficulties, the property-owner may submit a comprehensive alternative signage plan for approval by the Planning and Zoning Commission. The alternative sign plan may provide for a "directory" sign, or a larger number of wall signs as may be necessary to address the multiple occupancies, provided that the total square footage of sign area permissible for the structure is not exceeded.

(F) Repealed per Ordinance 99-10 enacted June 17, 1999. (99.05 prohibited completely 4/21/99)

(G) Repealed per Ordinance 99-03 enacted Mar 3, 1999.

(H) Repealed per Ordinance 99-3 [handwritten: 99-03] enacted Mar 3, 1999.

## SEC. 20-8.3 "C-3" LIMITED BUSINESS DISTRICT – FIRE ZONE (added by Ord 96-02;5/1/96)

(A) Purpose and Intent:

This district is composed of those areas of the Town whose principal use is and ought to be retail, service, and repair business activities which serve community. This district has been located within the Town to permit the development of these business activities, to protect adjacent areas against the encroachment of incompatible uses, and to lessen congestion on the public streets. To these ends, certain uses which would function more effectively in other districts and would interfere with the operation of these business activities, and the purposes of this district, have been excluded.

(B) Use Regulations:

(1) Permitted Uses: The following uses shall be permitted as-of-right within the "C-3" District:

Hotels/Motels

Transportation/Communication
- radio broadcasting station
- television broadcasting station
- travel arrangement services
- transportation ticket services

Retail Trade
- antiques
- apparel and accessories
- arts and crafts
- bicycles – sales and rental
- books
- cameras and photographic supplies
- candy, nut, and confectionery
- china, glassware, and metalware
- cigars and cigarettes
- custom tailoring
- department stores
- direct selling organizations
- draperies, curtains, and upholstery

ClibPDF - www.fastio.com

EXHIBIT " C "

ClibPDF - www.fastio.com

CAUSE NO. 2000 05 19 1 C

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE DISTRICT COURT** |
| | § | |
| **PATRICK MARK DESANTOS, KOPY KAT SERVICES, INC., AND DIGITAL IMAGING, INC.** | § | **OF CAMERON COUNTY** |
| | § | |
| | § | |
| | § | **197th JUDICIAL DISTRICT** |

**PETITION AUTHORIZING TAKING OF ORAL DEPOSITIONS**

COME NOW, Patrick Mark Desantos, Kopy Kat Services, Inc., and Digital Imaging, Inc., hereinafter referred to as "Petitioners" and file this Petition seeking the authority to take the oral depositions of Robert Rodriquez, Charles Morrison, Leopoldo Garcia, Jr. and J. Valdez, pursuant to Rule 202 of the Texas Rules of Civil Procedure.

1. Robert Rodriquez is one of the individuals to be deposed. His business address is the South Padre Island Police Department, 4501 Padre Boulevard, So. Padre Island, Texas 78597-7326, telephone number area code 956/761-5454.

2. Charles Morrison is one of the individuals to be deposed. His business address is the South Padre Island Police Department, 4501 Padre Boulevard, So. Padre Island, Texas 78597-7326, telephone number area code 956/761-5454.

3. Leopoldo Garcia, Jr. is one of the individuals to be deposed. His business address is Code Enforcement Department, 4501 Padre Boulevard, South Padre Island, Texas 78597, telephone number area code 956/761-5454.

4. J. Valdez is one of the individuals to be deposed. His business address is the South Padre Island Police Department, 4501 Padre Boulevard, South Padre Island, Texas 78597-7326, telephone number area code 956/761-5454.

ClibPDF - www.fastio.com

5. Cameron County is the proper county for this matter, as Cameron County is where venue of the anticipated suit may lie and it is where Messrs. Rodriquez, Morrison, Garcia, and Valdez reside and/or conduct their business.

6. Petitioners expect the City of South Padre Island (a.k.a. Town of South Padre Island) to have interests adverse to Petitioners' in the anticipated suit/potential claim. It's address is through its City Manager, 4501 Padre Boulevard, South Padre Island, Texas 78597.

7. Petitioners expect Robert Rodriquez to have interests adverse to Petitioners' in the anticipated suit/potential claim.

8. Petitioners anticipate the institution of a suit in which Petitioners may be a party, and Petitioners seek to investigate potential claims of the Petitioners.

## BACKGROUND FACTS

### A. Moped Business

9. In the afternoon of Saturday, April 15, 2000, Mark Desantos, the owner of Kopy Kat Services, Inc. began unloading motor scooters on the property of Gulf Coast Beachwear at 2013 Padre Boulevard in South Padre Island and attaching "Rent Me" signs onto the motor scooters. Within an hour, an individual stating that he was with the South Padre Island Code Enforcement Division arrived on the scene and announced to Mr. Desantos that it was a violation to attach the "Rent Me" signs to the motor scooters, without some sort of permit. Several hours later, another South Padre Island Code Enforcement Division individual, Leopoldo Garcia, Jr., arrived on the scene and told Mr. Desantos that he could not park the motor scooters on the Gulf Coast Beachwear parking lot and then wrote a citation to the owner of such property, apparently on the grounds that there was a violation of Section 20-14 of the ordinances of South Padre Island because there were

ClibPDF - www.fastio.com

insufficient parking spaces for the motor scooters to be on the parking lot. A copy of such citation is attached hereto as Exhibit "1".

10. On Monday morning, April 17, 2000, counsel for Petitioners called Mr. Garcia, who quickly stated the citation relating to parking spaces was withdrawn. Additionally, Mr. Garcia admitted that there was not a problem with the attachment of the "Rent Me" signs to the motor scooters, despite the announcements to that effect by the other Code Enforcement Division individual on April 15.

11. On information and belief, later in the day on April 17, 2000, a South Padre Island Code Enforcement Division individual apparently went to Mr. Desantos's private residence at the LaConcha Condos at 2500 Gulf Boulevard and demanded answers from the manager of the condos regarding two motor scooters parked near Mr. Desantos's unit.

12. Between April 15 and April 25, 2000 South Padre Island police officers frequently drove by or stopped near Mr. Desantos's business, appearing to be monitoring Mr. Desantos's actions. (Mr. Desantos has been out-of-town much of the time since then.)

13. On April 24, 2000, the first day that Kopy Kat Services, Inc. began renting the motor scooters, Officer J. Valdez of the South Padre Island Police Department, at approximately 4:00 p.m., approached five individuals who had rented mopeds from Kopy Kat Services, Inc. thirty minutes earlier. A copy of their drivers' licenses is attached hereto as Exhibit "2" and their statement of the events is attached as Exhibit "3". Officer Valdez told the individuals that they could not operate the mopeds because they did not have Texas operator licenses that allowed for the operation of mopeds. Officer Valdez made the individuals leave the mopeds in a parking lot and threatened them against further operation of the mopeds, and he additionally told them that he was going to ticket Mr. Desantos for illegally renting the mopeds to individuals not licensed to operate them. Later that afternoon, Officer Valdez came to Kopy Kat Services, Inc.'s office and advised Mr. Desantos that a

ClibPDF - www.fastio.com

Texas operator's license was required to operate a moped in Texas. Officer Valdez handed Mr. Desantos a copy of the Texas Transportation Code § 521.460, and said that Mr. Desantos was in violation of such provision relating to renting of vehicles. Mr. Desantos advised Officer Valdez of Texas Transportation Code § 521.030, titled "Reciprocal License", which allows for the operation of a vehicle if a non-resident may operate that type of vehicle. Section 521.030 of the Transportation Code provides in part:

> (b) A nonresident who is 16 years of age or older and who has in the person's possession a license issued to the person by the person's state or Canadian province of residence may operate a type of motor vehicle that is permitted to be operated with a Class C or Class M driver's license in this state if the license held by the nonresident permits operation of that type of vehicle in the person's state or province of residence.

Officer Valdez disagreed, stating that the Michigan individuals could not operate mopeds in Texas.

14. Soon thereafter on April 24, 2000, counsel for Mr. Desantos called Acting Chief Rodriquez regarding the matter and faxed him a copy of § 521.030 (Reciprocal License) of the Transportation Code; Acting Chief Rodriquez was apparently gone for the day.

15. In the morning on April 25, 2000, counsel for Mr. Desantos talked to Acting Chief Rodriquez by telephone regarding the South Padre Island Police Department refusing to allow the Michigan individuals to operate the mopeds. Acting Chief Rodriquez concurred that under Transportation Code § 521.030 (Reciprocal License), if an individual was licensed in his home state to operate a moped, then he could operate a moped in Texas. However, Acting Chief Rodriquez, in about a 30-second span, first stated that the Michigan individuals on the mopeds on April 24 were "weaving" and that is why they were stopped. Acting Chief Rodriquez then stated that they were Mexican citizens, so they could not operate the mopeds, and then finally he said that the individuals were under age and must have gotten the mopeds from older drivers.

ClibPDF - www.fastio.com

16. Later in the day, on April 25, 2000, Mr. Desantos and his counsel attempted to meet with Acting Chief Rodriquez regarding this matter. While a meeting was scheduled at 4:00 p.m., Acting Chief Rodriquez did not show up and in his place was Officer Charles Morrison of the South Padre Island Police Department and another officer. The discussion centered around the actions of Officer Valdez on April 24 as to the five Michigan individuals. Officer Morrison initially concurred that he understood that Section 521.030 (Reciprocal License) of the Transportation Code allows individuals to operate mopeds if they can operate them in their home state. He then stated that Michigan law required a motorcycle or moped endorsement, and that the five Michigan individuals did not have such . Officer Morrison then pulled out a copy of a summary of the relevant Michigan statute, which stated: "Moped: Must have a valid operator, chauffeur, or a "moped only" license. Minimum age is 15." A copy of the information provided by Officer Morrison is attached hereto as Exhibit "4". Officer Morrison then admitted a moped endorsement was not required in Michigan and that his previous statement was wrong, and then he decided that it was a legal issue and abruptly ended the meeting. Mr. Desantos and his counsel then went to the office of Paul Cunningham, Attorney for South Padre Island for some type of explanation as to the actions by the South Padre Island Police Department. Mr. Cunningham was not at his office. Counsel for Mr. Desantos left his name, telephone number and business card and requested that Mr. Cunningham call him regarding the matter. Since that time, Mr. Cunningham has made no attempt whatsoever to communicate with Mr. Desantos's counsel.

17. Mr. Desantos's motor scooter business is certainly no surprise to the Acting Police Chief Rodriquez or the City of South Padre Island. In February, 2000, Mr. Desantos, Mayor Ed Cyganawicz, who was also the attorney representing Mr. Desantos and his interest (and as discussed below, he also represented Mr. Desantos regarding the raid of his other business), and Acting Chief

ClibPDF - www.fastio.com

Rodriquez met to discuss the possible opening of a motor scooter rental business by Mr. Desantos on South Padre Island. The meeting went well and both Mayor Cyganawicz and Acting Chief Rodriquez endorsed the idea as something that would be of great benefit to South Padre Island. Mr. Desantos has subsequently spent a great amount of time, effort, and money over the last two and a half months to prepare for the opening of the motor scooter business, Kopy Kat Services, Inc. However, as is evident, for reasons only known by the South Padre Island Police Department, the South Padre Island Code Enforcement Division and other City officials in South Padre Island, they do not want Mr. Desantos to operate such a business and have engaged in a course and pattern of illegal means to effectively shut it down.

**B. <u>Novelty shop business</u>**

18. The actions involving the mopeds is not the first intrusion by the South Padre Island Police Department and Code Enforcement Division against Mr. Desantos and a business that he operates. Mr. Desantos also owns and operates a business, Digital Imaging, Inc., in South Padre Island. The business involves manufacturing novelty products, including identification cards.

19. The South Padre Island Code Enforcement Division and the Police Department used the same *modus operandi* to attempt to shut down the business. In 1998, South Padre Island Code Enforcement individuals came to the Digital Imaging, Inc. business and made verbal complaints regarding the business. Mr. Desantos also received a form of a "cease and desist" letter from the South Padre Island Police Department threatening to shut down the operation of the business, and he received similar correspondence from the Cameron County District Attorneys office. These actions continued in 1999. On March 25, 1999, an employee of Digital Imaging, Inc., Jason Alexander, received a ticket from a South Padre Island Code Enforcement Department individual, Thomas Deckard, regarding a sign at the business. Like the citation relating to the parking spaces,

ClibPDF - www.fastio.com

the citation was soon there. .r withdrawn.

20. On March 27, 1999, a warrant of arrest was issued for Mr. Desantos, charging him with the offense of delivery or manufacture of counterfeit instrument under Transportation Code § 521.456(b), a third degree felony. His business was also raided with virtually everything confiscated by the South Padre Island Police Department, and an employee of the business was arrested, and Mr. Desantos was later arrested on April 1, 1999.

21. The charges were, of course, later summarily dropped, but only after his business was shut down and Mr. Desantos and his employee arrested, and almost everything in the business confiscated by the police.

## SUBJECT MATTER OF ANTICIPATED ACTION

22. The subject matter of Petitioners' anticipated suit is that the City of South Padre Island, through a pattern of acts by its police and Code Enforcement Division, has specifically targeted Mr. Desantos and his businesses in an attempt to shut them down in violation of state and federal constitutional rights of Mr. Desantos and his businesses.

## DEPOSITIONS

23. Petitioners, pursuant to Texas Rule of Civil Procedure 202, seek to take the depositions of the "participants" in these acts against Mr. Desantos and his businesses as to why they are the target of the above-referenced acts:

- Robert Rodriquez, the Police Chief, regarding the raid on Digital Imaging, Inc., the arrest of Mr. Desantos, the illegal application of the Transportation Code statutes against Mr. Desantos and his businesses, and the involvement of others in the concerted and orchestrated effort against Mr. Desantos, and the directives he has received and given on such matters;

ClibPDF - www.fastio.com

- Officer J. Va..uez regarding the reason for threatening .. ticket the individuals on the mopeds on April 24, 2000, and the directives he received as to such action;
- Officer Charles Morrison, regarding the raid on Digital Imaging, Inc., the stopping of the mopeds; and the directives he received regarding such matters;
- Leopoldo Garcia, Jr. regarding the actions of the Code Enforcement Division pertaining to Mr. Desantos and his businesses directives he has received as to Mr. Desantos and his businesses.

WHEREFORE, PREMISES CONSIDERED, Petitioners Patrick Mark Desantos, Kopy Kat Services, Inc., and Digital Imaging, Inc. request that the Court enter an Order authorizing Petitioners to take the oral depositions of Robert Rodriquez, Charles Morrison, Leopoldo Garcia, Jr., and J. Valdez.

Respectfully submitted,

VIAL, HAMILTON, KOCH & KNOX, L.L.P.
1717 Main Street, Suite 4400
Dallas, Texas 75201
Phone: (214) 712-4540
FAX: (214) 712-4402

By: [signature]
SCOTT E. HAYES
State Bar No. 09280050

ATTORNEYS FOR PETITIONER
PATRICK MARK DESANTOS, KOPY KAT
SERVICES, INC. AND DIGITAL IMAGING, INC.

ClibPDF - www.fastio.com

## VERIFICATION

STATE OF Texas §
§
COUNTY OF Dallas §

BEFORE ME, the undersigned authority, on this day personally appeared Patrick Mark Desantos, who being by me duly sworn on oath says that he is the President of Petitioners, Kopy Kat Services, Inc. and Digital Imaging, Inc. in the above-entitled cause and that the statements contained in all paragraphs except paragraph 15 of this Petition are to the best of his knowledge true and correct.

Patrick Mark Desantos

SUBSCRIBED AND SWORN TO BEFORE ME by the said Patrick Mark Desantos, on this the 4th day of May, 2000, to certify which witness my hand and seal of office.

Notary Public, In and For The State of Texas

SHELLY L. MOSS
NOTARY PUBLIC
STATE OF TEXAS
MY COMMISSION EXPIRES
March 31, 2002

97219.1

ClibPDF - www.fastio.com

# VERIFICATION

THE STATE OF TEXAS §
§
COUNTY OF DALLAS §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Scott E. Hayes, who, being by me duly sworn on oath deposed and said that he has read Petition Authorizing Taking of Oral Depositions, and that the statements contained in paragraphs 14 and 15 of the Petition are within his personal knowledge and are true and correct.

Scott E. Hayes

SUBSCRIBED AND SWORN TO BEFORE ME on the 4th day of May, 2000, to certify which witness my hand and official seal.

Notary Public in and for
the State of Texas

ANN M. BYRNE
COMMISSION EXPIRES
APRIL 3, 2004

97219.1

ClibPDF - www.fastio.com

TOWN OF SOUTH PADRE ISLAND
MUNICIPAL COURT
COUNTY OF CAMERON
STATE OF TEXAS

NOTICE TO APPEAR - NON-TRAFFIC

1085

Court Case No. Citation number

In the name of TOWN OF SOUTH PADRE ISLAND, TEXAS: The undersigned certifies that he has good reason to believe and does believe that on or about

5 day of April 2000 ( ) AM PM

Last Name First MI Alias

104 Padre St. 4

St/PO City State D.O.B.

(956) 761-4721 Tx 14308392

Phone Race / Sex D.L. No.

Diner

Occupation Place of Employment Phone (Res / Work)

at location 2013 Padre blvd

in the TOWN OF SOUTH PADRE ISLAND, Cameron County, Texas committed the following offense:

in violation of Sec. ( ) Tx Criminal Code

Leo Garcia 320

Officer Badge #

I hereby agree to appear in court at 4601 Padre Boulevard on 15 day of April 2000 at 9:00 A.M.

Signature of Defendant

CASE REPORT NO. ________ Report Made: ( ) YES ( ) NO

VICTIM:

Last Name First M.I. D.O.B.

St / PO # City State

Place of Employment Address Phone

WITNESSES ( Name, Address, Phone )

1.

2.

3.

CO-DEFENDANTS: ( Name, Address, Phone )

1.

2.

DEFENDANT'S BEHAVIOR: ________ Good ________ Bad

EXPLAIN:

NARRATIVE:

Complainant / Officer ID#

EXHIBIT

1

ClibPDF - www.fastio.com




OPERA[illegible] LICENSE
V [illegible] 125 [illegible] 160

Under 21
Until [illegible]

[illegible]
03-01-2003

CRYSTAL MARIE VANDERHEYDEN
[illegible] HEATHER CT
STERLING HEIGHTS, MI [illegible]

Corrective Lens

---

OPERATOR LICENSE
K [illegible] 441 224

Under 21
Until [illegible]-01-2003

[illegible]
[illegible]-01-2003

TIMOTHY JOSEPH KRULL
37701 MAAS DR
STERLING HEIGHTS, MI [illegible]

NONE

---

MICHIGAN

OPERATOR LICENSE
S [illegible] 757

Under 21
Until 10-12-2002

10-12-2002

ALAN EDWARD SARZYNSKI
[illegible] LONGACRE DR
STERLING HEIGHTS, MI [illegible]

NONE

---

MICHIGAN

OPERATOR LICENSE
C [illegible]

Under 21
Until [illegible]

[illegible]

RICHARD GREGORY CHROSTOWSKI
37117 ALPER DR
STERLING HEIGHTS, MI [illegible]

NONE

---

MICHIGAN

OPERATOR LICENSE
L [illegible] 014 [illegible]

Under 21
Until [illegible]

[illegible]

GINA LALAMA
[illegible] ROWE CT
STERLING HEIGHTS, MI [illegible]

NONE

EXHIBIT
2

On Monday April 24, at approximatly 8:30 pm, 5 students from Sterling Heights MI, Gina Lalama, Crystal Vanderheyden, Rich Chrostowski, Tim Krull, Alan Sarzynski proceeded to rent 5 mopeds from CopyCap Scooters. When renting the vehicles we were informed that it was legal in the state of Texas to operate the vehicles with a legalized United States liscence. After handing over a $100 deposit and $40 rental fee for the mopeds, we were then given instructions on how to properly operate the vehicles. We proceeded to ride the bikes for no more than 30 minutes when we pulled into the Blue Marlin supermarket. We were then approached by Officer J. Valdez from the South Padre Police department who asked to see all of our liscences. He asked if any of us had a "class A moped operators liscence" to which we all responded no. He then went back to his police car to verify the law. We were then told that it is against Texas law to operate a moped without a "class A moped operaters liscence." He said that because we were told warned of this law that he would not issue us a citation but that he would issue one to

EXHIBIT
3

ClibPDF - www.fastio.com

told to leave the bikes at the supermarket and that it was Mark's obligation to retrieve the vehicles. We then took a taxi back to Copycat Scooters where we waited aprx. 20 min for Mark. When he arrived we explained the charges brought against us as well as him. He then refunded each of us our $100 deposits as well as our $40 rental fee. The above statement is legitimate and accurate and is agreeded upon by each of the five students who have signed below.

Gina Lalama
(810)977-0303

Rich Chrostowski
1(810)268-2509

Tim Krull
(810)-939-7932

Crystal VanDerHeyden
(810) 939-7212

Alan Sarzynski
(810)979-8996

STATE OF TEXAS
COUNTY OF CAMERON

This instrument was acknowledged before me on April , 2000 by Gina Lalama, Rich Chrosto Crystal VanderHeyden, Tim Krull and Alan Sarzynski.

GLADYS HOPKINS
MY COMMISSION EXPIRES
April 2, 2002

Notary Public, State of Texas

## MICHIGAN DRIVER'S LICENSE

### ■ Currently Issued License (Fig. 23.1)

**1. Description**

SIZE: Width: 3 3/8" Height: 2 1/8"

FRONT DETAIL: Digitized credit-card style license with a photographic headbar showing the Mackinac Bridge and "MICHIGAN" in blue print at left. Driver license header information (including the license number) is color coded as follows: Operator and Chauffeur Driver License are blue; Commercial Driver License is green; Graduated Driver License is red; Moped License is orange. Driver's photo, with blue backdrop, is at left; black printing below indicates that medical and anatomical gift information is shown on back. Under 21 statement, printed in red ink above photo, identifies month, day and year of 21st birthday of a minor driver. Expiration date is printed in red ink. PolaSecure® optical variable device imprinted on the laminate shows outline of the state and the word "MICHIGAN" repeating on the face of the license. Image of the Great Seal of Michigan is printed across the center of the license, in primary-colored ultraviolet ink that will fluoresce in multiple colors and is viewable under a black light. Driver's name and address, to right of portrait, appear on three lines, followed by two rows of data and driver's digitized signature. The date of birth is shown in red print. At lower right a unique number appears. It shows the year, Julian date, and Secretary of State branch number (issuing office). A "D" at the end indicates a duplicate license has been issued.

BACK DETAIL: Back contains magnetic stripe and bar code, preceded by statement "Information contained in bar code and magnetic stripe is limited to date of birth, license/ID number and expiration date." Anatomical gift statement (with "Medical Alert" square at right) contains lines for signature of donor and witness; emergency contact; and telephone number. Instructions read "USE BALL POINT PEN ONLY." There is a space at bottom for change of address label.

MATERIAL: Teslin stock with optical variable device imprinted in laminate. Manufactured by Polaroid Corporation.

**2. Classes and Endorsements**

The Michigan CDL is classified in conformity with federal law and is restricted to the type of vehicle for which the license holder qualifies. The CDL classes are shown below:

CLASS A: Any vehicle towing another vehicle with a GVWR over 10,000 lbs.

CLASS B: Vehicle with a GVWR of 26,001 lbs. or more, and combination vehicles with a GCWR of 26,001 lbs. or more

EXHIBIT

4

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 83 of 125

towing a vehicle not more than 10,000 lbs. GVWR.

CLASS C: Small vehicles designed to carry 16 or more people including the driver, and small vehicles carrying hazardous materials in amounts requiring placarding.

ENDORSEMENT T: Double/triple trailers with class A designation (triple trailers are NOT permitted in Michigan).

ENDORSEMENT N: Tank vehicles with class A or B designation.

ENDORSEMENT H: Hazardous materials.

ENDORSEMENT P: Passenger vehicles with class A, B or C designation, designed to carry 16 or more persons (including the driver).

ENDORSEMENT X: Combination of N and H.

Non-commercial classes are as follows:

OPERATOR'S LICENSE: Valid for any non-commercial vehicle, including vehicles used only in farm work. Operator may need an endorsement required for certain types of vehicles. Minimum age is 18; 16 with completion of driver training. This license is indicated by "O" in license type field.

CHAUFFEUR'S LICENSE: Valid for all vehicles when driving for hire. Certain types of vehicles require an endorsement. Minimum age is 18; 16 with completion of driver education. License is indicated by "C" in license type field.

GRADUATED DRIVER LICENSE: Levels 1, 2, 3. See under Minor and Provisional Licenses.

MOPED: Must have a valid operator, chauffeur or a "moped only" license. Minimum age is 15.

MOTORCYCLE ENDORSEMENT: Required for the operation of a motorcycle. Driver must have a valid operator's or chauffeur's license, endorsed "OCY" or "CCY" in the type field on the license front. Minimum age is 18; 16 with completion of driver education and a motorcycle safety course.

**3. License Data Significance**

LICENSE NUMBER: Soundex system, 1 letter and 12 digits as follows:

P = first letter of last name
865 = code of last name
760 = code of first name
021 = code of middle name
781 = code of month and day of birth

DESCRIPTION FIELDS: License number, expires, name and address, date of birth, sex, height, eyes, type, endorsements, restrictions.

OTHER INFORMATION: Instructions regarding medical information and anatomical gift, driver's signature, unique number that incorporates Secretary of State (issuing) branch office number at bottom right.



EXHIBIT " D "

ClibPDF - www.fastio.com

FILED 4:50 O'CLOCK P M
AURORA DE LA GARZA DIST. CLERK
JUN 01 2000
DISTRICT COURT OF CAMERON COUNTY, TEXAS
JANIE WOLFE DEPUTY

**CAUSE NO.2000-050-1961-C**

| | | |
|---|---|---|
| **IN RE:** | * | **IN THE DISTRICT COURT** |
| **PATRICK DESANTOS, ET AL** | * | **OF CAMERON COUNTY, TEXAS** |
| | * | **197TH JUDICIAL DISTRICT** |

**TOWN OF SOUTH PADRE ISLAND'S RESPONSE IN OPPOSITION TO PETITIONER'S RULE 202 REQUEST & COUNTER-REQUEST TO TAKE DEPOSITION OF PETITIONER**

---

May it Please the Court

NOW COMES the TOWN OF SOUTH PADRE ISLAND, TEXAS (hereafter "the TOWN") and files this response to Petitioner's Request to Take Depositions and Counter-Request To Take Deposition of Petitioner.

**NATURE OF PETITIONER'S REQUEST**

Petitioner (hereafter "Petitioner" or "Desantos") seeks to depose four employees of the TOWN OF SOUTH PADRE ISLAND, including Interim Police Chief Robert Rodriguez, Police Officer Jose "Joe" Valdez, Police Officer Charles Morrison, and Code Enforcement Officer Code Leopoldo Garcia, of the TOWN's Police Department, apparently in anticipation of a potential suit or claim against the TOWN.

**GROUNDS FOR OPPOSING PETITIONER'S REQUEST**

The TOWN opposes Petitioner's request for depositions based on the following:

To grant Petitioner's Request, this Court *must* find that (1) allowing the petitioner to take the requested deposition may

ClibPDF - www.fastio.com

prevent a failure or delay of justice in an anticipated suit; or (2) the benefit of allowing the petitioner to take the requested deposition to investigate a potential claim outweighs the burden or expense of the procedure. See T.R.C.P. 202.4 (a).

**A. No Showing of Failure or Delay of Justice**

Petitioner's Request fails in both respects. First, there is no showing that there is will be "any failure of delay of justice" if the depositions are not taken. Petitioner's Request is simply a fishing expedition calculated to interrupt the operating procedures of the TOWN'S police department.

At most, Petitioner raises issues originating in February 2000, only three months ago. Also, all four of the individuals Petitioner seeks to depose remain employed by the TOWN. As such, there is no urgency to depose these individuals because the factual assertions made the basis of his request are fairly recent and the individuals he seeks to depose continue to be employed by the TOWN.

Moreover, any claim Petitioner may have stemming from the actions of the TOWN'S police department can be appropriately addressed by filing a lawsuit against the TOWN, which will serve as the proper Defendant since the employees were acting in their official capacities. If anything, Petitioner's Request and the subsequent and necessary hearing under the Rules of Procedure cause a delay of justice in that it wastes limited judicial resources.

ClibPDF - www.fastio.com

**B. Depositions Will Be Burdensome and Expensive**

Second, the TOWN also opposes the depositions on the ground that there is no showing that deposing the TOWN'S employees outweighs the burden or expense of the proceeding.

Had Petitioner filed suit, the TOWN and Petitioner would have to comply with the Rules of Procedure's mandatory deposition time limits. See T.R.C.P. 190. If the depositions are allowed, it is very likely that Petitioner will again request that the TOWN produce the witness in a follow-up deposition round. The TOWN would therefore be prejudiced in the defense of the claim in that Petitioner would have had two bites at the apple but only once set of depositions would be controlled by time limits set forth in T.R.C.P. 190.

The depositions would cause an undue burden and expense to the TOWN as well. It would be burdensome for the TOWN to alter the schedules of its police officers who would have to cover during the time Petitioner deposes the TOWN'S employees. This is not only burdensome but expensive too since the off-duty police officers needed to fill in will have to be paid over time. Additionally, if Petitioner decides to file suit, the TOWN may have to produce the deponents once again and incur similar expenses.

Because the Court must specifically find that there will be a failure of delay of justice, or that the benefits of taking the depositions outweigh the burden and expense, and there is no

ClibPDF - www.fastio.com

showing supporting the mandatory Court findings, the TOWN objects to Petitioner's request.

**COUNTER-REQUEST FOR DEPOSITION OF PETITIONERS**

Alternatively, and subject to the TOWN'S aforementioned opposition, should the Court determine that Petitioner should be allowed to take the depositions requested, the TOWN hereby request, as a condition of its Order, that the TOWN also be allowed to take the deposition of Petitioner.

If equity requires that Petitioner be allowed to conduct exploratory discovery, than equity further demands that the TOWN be allowed to explore the scope and nature of Petitioner's contentions against the employee/deponents of the TOWN OF SOUTH PADRE ISLAND.

In this regard, the TOWN can demonstrate to the Court the following:

1. Patrick Mark Desantos is the individual to be deposed. His business, Kopy Kat Services Inc., is located at 2013 Padre Blvd., South Padre Island, Texas. The substance of the testimony seeking to be elicited concerns the allegations raised in his Petition relating to alleged incidents of harassment by employees of the TOWN.

2. Cameron County is the proper county for this matter as it is the county where venue of Petitioner's anticipated suit may lie and it is where Petitioner conducts his businesses.

ClibPDF - www.fastio.com

Trooper John Hunter:

The legal references the moped info is drawn form are:

TRC 502.001 (10) Definition of a moped
TRC 502.001 (12) Definition of a motorcycle
TRC 521.225 Moped Operator's License

Our mandate to certify vehicles as mopeds is TRC 521.226.

If you need anything else call me at 1-800-292-5787.

Jim White, Program Specialist
Motorcycle Safety Unit

| Post-It® Fax Note 7671 | Date 9/14/99 # of pages ▶ 5 |
|---|---|
| To TRP. J. Hunter | From J. White |
| Co./Dept. | Co. DPS - MSU |
| Phone # | Phone # 800 292 5787 |
| Fax # | Fax # (512) 424-2906 |

ClibPDF - www.fastio.com

State of Texas
Department of Public Safety
Austin

Special Announcement
Number 09-96

April 12, 1996

Certified Mopeds

Information contained herein supersedes information contained in Special Announcement Number 04-90 and Supplements 1 through 5.

The attached list of mopeds has been certified by the Department as having an engine piston displacement of less than 50 cubic centimeters, no manual gear change mechanisim, and not able to exceed a speed of 30 miles per hour.

If a local dealer's certification conflicts with the manufacturer's certification, the manufacturer's certification should govern.

In instances where a moped is not on the list or there is a conflict and the piston displacement cannot be determined from information contained on the cycle, submit the name and address of the company to the Motorcycle Safety Bureau for follow-up attempts to secure the correct information.

Keep this Special Announcement until superseded as any changes, corrections, or additions will be issued by supplements.

James R. Wilson
Director

JRW:jdw

Attachment

| Distribution "A" | | 77 |
|---|---|---|
| plus | each DL Supervisor | 77 |
| | each DL Trooper | 123 |
| | each SES Lieutenant | 6 |
| | each SES Trooper | 30 |
| | Accident Records | 1 |
| | Inspection and Planning | 3 |
| | (Distribute by Plane Mail) | |

ClibPDF - www.fastio.com

# ATTACHMENT #1 to SPECIAL ANNOUNCEMENT NUMBER 09-96

| NAME BY WHICH VEHICLE IS SOLD | MODEL NUMBER | ENGINE SERIES NUMBER | CC PISTON DISPLACEMENT | MAXIMUM SPEED |
|---|---|---|---|---|
| **Cottle Industries Inc.** | | | | |
| Chariot | JYA- | WC50-40- | 49cc | 30 MPH |
| **Handy Bikes Corp.** | | | | |
| Ankur | varies | varies | 49cc | 30 MPH |
| Pacer | varies | varies | 49cc | 30 MPH |
| Panther | varies | varies | 49cc | 30 MPH |
| **Impuls International** | | | | |
| LX50T | | | 49cc | 30 MPH |
| Spider | | | 49cc | 30 MPH |
| Tracer | | | 49cc | 30 MPH |
| **Kasea** | | | | |
| Kasea 50 | QM50 | QM50QW | 49.2cc | 30 MPH |
| Kasea 50B | QM50 | QM50QW-B | 49.2cc | 30 MPH |
| **Kinetic** | | | | |
| Kinetic TRF | various | TRF | 49.84cc | 26 MPH |
| Kinetic Magnum[1] | IMP Holland | | 49.9cc | 30 MPH |
| **KKM Enterprises Inc.** | | | | |
| Mopet | 505/1A | 280 & 380 | 47cc | 20 MPH |
| Mopet | 505/1A | 281 & 381 | 47cc | 25 MPH |
| Mopet | 505/1D | 282 & 382 | 49cc | 30 MPH |
| Medallion | 505/1A | 480 | 47cc | 20 MPH |
| Medallion | 505/1A | 481 | 47cc | 25 MPH |
| Medallion | 505/1D | 482 | 49cc | 30 MPH |

**Motobecane**

| | | | | |
|---|---|---|---|---|
| Motobecane or M.B.K. | | 3 HL | 49.3cc | 20 MPH |

**Suzuki**

| | | | | |
|---|---|---|---|---|
| FA50 | Z101 | FA50 | 49cc | 25 MPH |

**Thomas Products**

| | | | | |
|---|---|---|---|---|
| Sprint | A-35 | 42 - 43 | 49cc | 30 MPH |
| Targa | A-35 | 44 - 45 | 49cc | 30 MPH |
| Targa LX | A-35 | 46 - 49 | 49cc | 30 MPH |
| Colibri | A-35 | 59 | 49cc | 30 MPH |

**Trac International Co.**

| | | | | |
|---|---|---|---|---|
| Olympic | DP-50 | TRAC | 49.6cc | 30 MPH |
| Blitz | DP-50 | TRAC | 49.6cc | 30 MPH |
| Liberty | OK-50 | TRAC | 49.6cc | 30 MPH |
| Metro | OK-50 | TRAC | 49.6cc | 30 MPH |
| Escot | OK-50 | TRAC | 49.6cc | 30 MPH |

**Yamaha**

| | | | | |
|---|---|---|---|---|
| QT50 | 5U9 | 120101<br>140101<br>180101 | 49cc | 25 MPH |
| SH50 | 2EK<br>3EP<br>3KL | 000101 | 49cc | 25 MPH |

ClibPDF - www.fastio.com

# Texas Moped Information

Definition of a motorcycle – Every motor vehicle having a saddle for the use of the rider and designed to propel itself with not more than three (3) wheels in contact with the ground but excluding a tractor.

Definition of a moped – A motor driven cycle whose speed attainable in one mile is not more than 30 miles per hour and that is equipped with a motor that produces not more than two-brake horsepower. If an internal combustion engine is used, the piston displacement may not exceed 50 cubic centimeters and the power drive system may not require the operator to shift gears.

Driver's license for a moped – A moped operator's license is required for operators of mopeds. A person must be at least fifteen (15) years old to be issued a license to operate a moped. The department shall examine applicants for that type of license by administering to them a written examination concerning traffic laws applicable to the operation of mopeds. No test involving the operation of the vehicle is required. All applicable provisions of this Act governing restricted operator's licenses for the operation of motorcycles only also apply to moped operator's licenses, including provisions relating to the application, issuance, duration, suspension, and cancellation of those licenses.

ClibPDF - www.fastio.com

(c) A person is eligible for a restricted motorcycle license if the person:

(1) is 15 years of age or older but under 18 years of age;

(2) has completed and passed a motorcycle operator training course approved by the department; and

(3) has met the requirements imposed under Section 521.145.

(d) The department shall make the motorcycle operator training course available.

(e) On the 16th birthday of a holder of a special restricted Class M license, the department shall remove the 125 cubic centimeter restriction from the license without completion by the holder of an additional motorcycle operator training course.

(f) An applicant for the special restricted license must apply in accordance with Subchapter G. The applicant is subject to the requirements of Section 521.161 and to other provisions of this chapter in the same manner as an applicant for another license. The department shall prescribe the form of the license.

**TRC §521.225. MOPED LICENSE.** (a) A person may not operate a moped unless the person holds a driver's license. An applicant for a moped license must be 15 years of age or older.

(b) The department shall administer to an applicant for a moped license a written examination relating to the traffic laws applicable to the operation of mopeds. A test involving the operation of the vehicle is not required.

(c) An applicable provision of this chapter relating to a restricted Class M license applies also to a moped license, including a provision relating to the application, issuance, duration, suspension, cancellation, or revocation of that license.

**TRC §521.226. CERTIFICATION.** (a) The department shall certify motorcycles to determine whether they exceed 125 cubic centimeter piston displacement. The department may establish the procedure for determining the piston displacement of a motorcycle in cubic centimeters.

(b) A person may apply to the department to have the department test a motorcycle for conformity with the department rules. On receipt of an application, the department shall test the motorcycle. If the department believes that a certified model of motorcycles sold commercially exceeds 125 cubic centimeter piston displacement, the department may conduct a hearing under Subchapter C, Chapter 547.

(c) The department shall compile a list of motorcycles, by model and make, that are certified by the department as not exceeding the 125 cubic centimeter piston displacement requirement. The department shall make the list available on request.

(d) The department shall certify whether a vehicle alleged to be a moped is a moped. The department shall certify mopeds under the same procedures used to certify motorcycles under Subsection (a). The department shall compile a list of certified models of mopeds.

**TRC §521.227. INSPECTION BY PEACE OFFICER.** Any peace officer may stop and detain a motorcycle, motor driven cycle, or moped to determine if the vehicle is of a model and make certified by the department.

## Subch. L. OCCUPATIONAL LICENSE

**TRC §521.241. DEFINITIONS.** In this subchapter:

(1) "Essential need" means a need of a person for the operation of a motor vehicle.

(A) in the performance of an occupation or trade or for transportation to and from the place at which the person practices the person's occupation or trade;

(B) for transportation to and from an educational facility in which the person is enrolled; or

(C) in the performance of essential household duties.

(2) "Ignition interlock device" means a device that uses a deep-lung breath analysis mechanism to make impractical the operation of a motor vehicle if ethyl alcohol is detected in the breath of the operator of the vehicle.

**TRC §521.242. PETITION.** (a) A person whose license has been suspended for a cause other than a physical or mental disability or impairment or a conviction under Section 49.04 , Penal Code, may apply for an occupational license by filing a verified petition with the clerk of the county court or district court with jurisdiction in the county in which:

(1) the person resides; or

(2) the offense occurred for which the license was suspended.

(b) A person may apply for an occupational license by filing a verified petition only with the clerk of the county court or district court in which the person was convicted if:

(1) the person's license has been automatically suspended or canceled under this chapter or Chapter 522 for a conviction of an offense under the laws of this state ; and

(2) the person has not been issued, in the 10 years preceding the date of the filing of the petition, more than one occupational license after a conviction under the laws of this state .

(c) A petition filed under this section must set forth in detail the person's essential need.

(d) A petition filed under Subsection (b) must state that the petitioner was convicted in that court for an offense under the laws of this state .

(e) The clerk of the court shall file the petition as in any other civil matter.

**TRC §521.243. NOTICE TO STATE; PRESENTATION OF EVIDENCE.** (a) The clerk of the court shall send by certified mail to the attorney representing the state a copy of the petition and notice of the hearing if the petitioner's license was suspended following a conviction for:

(1) an offense under Section 19.05, 49.04, 49.07, or 49.08, Penal Code; or

(2) an offense to which Section 521.342 applies.

(b) A person who receives a copy of a petition under Subsection (a) may attend the hearing and may present evidence at the hearing against granting the petition.

**TRC §521.244. HEARING; ORDER; DETERMINATION OF ESSENTIAL NEED.** (a) The judge who hears the petition shall sign an order finding whether an essential need exists.

(b) In determining whether an essential need exists, the judge shall consider:

(1) the petitioner's driving record; and

ClibPDF - www.fastio.com

**§521.029. Operation of motor vehicle by new state residents.**

(a) A person who enters this state as a new resident may operate a motor vehicle in this state for no more than 30 days after the date on which the person enters this state if the person:

(1) is 16 years of age or older; and

(2) has in the person's possession a driver's license issued to the person by the person's state or country of previous residence.

(b) If a person subject to this section is prosecuted for operating a motor vehicle without a driver's license, the prosecution alleges that the person has resided in this state for more than 30 days, and the person claims to have been covered by Subsection (a), the person must prove by the preponderance of the evidence that the person has not resided in this state for more than 30 days.

*(Added by L.1995, chap. 165(1), eff. 9/1/95.)*

**§521.030. Reciprocal license.**

(a) A nonresident who is 18 years of age or older and who has in the person's possession a license issued to the person by the person's state or country of residence that is similar to a Class A or Class B driver's license issued under this chapter is not required to hold a Class A or Class B driver's license issued under this chapter if that state or country of residence recognizes such a license issued by this state and exempts the holder from securing a license issued by the state or foreign country.

(b) A nonresident who is 16 years of age or older and who has in the person's possession a driver's license issued to the person by the person's state or Canadian province of residence may operate a type of motor vehicle that is permitted to be operated with a Class C or Class M driver's license in this state if the license held by the nonresident permits operation of that type of vehicle in the person's state or province of residence.

*(Added by L.1995, chap. 165(1), eff. 9/1/95.)*

ClibPDF - www.fastio.com

## §502.007. Mopeds.

(a) For the registration purposes of this chapter, a moped is treated as if it were a motorcycle.

(b) A license plate issued for a moped must have a distinctive lettering designation and include the word "moped."

*(Added by L.1995, chap. 165(1), eff. 9/1/95.)*

ClibPDF - www.fastio.com

**§521.225. Moped license.**

(a) A person may not operate a moped unless the person holds a driver's license. An applicant for a moped license must be 15 years of age or older.

(b) The department shall administer to an applicant for a moped license a written examination relating to the traffic laws applicable to the operation of mopeds. A test involving the operation of the vehicle is not required.

(c) An applicable provision of this chapter relating to a restricted Class M license applies also to a moped license, including a provision relating to the application, issuance, duration, suspension, cancellation, or revocation of that license.

(d) The department shall certify whether a vehicle alleged to be a moped is a moped. The department shall:

(1) by rule establish the procedure for determining whether a vehicle is a moped;

(2) compile a list of mopeds certified by the department; and

(3) make the list available to the public on request.

*(Added by L.1995, chap. 165(1); chgd. by L.1999, chap. 797(2), eff. 9/1/99.)*

ClibPDF - www.fastio.com

**§541.201. Vehicles.**

In this subtitle:

(1) "Authorized emergency vehicle" means:

(A) a fire department or police vehicle;

(B) a public or private ambulance operated by a person who has been issued a license by the Texas Department of Health;

(C) a municipal department or public service corporation emergency vehicle that has been designated or authorized by the governing body of a municipality;

(D) a private vehicle of a volunteer firefighter or a certified emergency medical services employee or volunteer when responding to a fire alarm or medical emergency;

(E) an industrial emergency response vehicle, including an industrial ambulance, when responding to an emergency, but only if the vehicle is operated in compliance with criteria in effect September 1, 1989, and established by the Texas Industrial Fire Training Board of the State Firemen's and Fire Marshals' Association of Texas; or

(F) a vehicle of a blood bank or tissue bank, accredited or approved under the laws of this state or the United States, when making emergency deliveries of blood, drugs, medicines, or organs.

(2) "Bicycle" means a device that a person may ride and that is propelled by human power and has two tandem wheels at least one of which is more than 14 inches in diameter.

(3) "Bus" means:

(A) a motor vehicle used to transport persons and designed to accommodate more than 10 passengers, including the operator; or

(B) a motor vehicle, other than a taxicab, designed and used to transport persons for compensation.

(4) "Farm tractor" means a motor vehicle designed and used primarily as a farm implement to draw an implement of husbandry, including a plow or a mowing machine.

(5) "House trailer" means a trailer or semitrailer, other than a towable recreational vehicle, that:

(A) is transportable on a highway in one or more sections;

(B) is less than 40 feet in length, excluding tow bar, while in the traveling mode;

(C) is built on a permanent chassis;

(D) is designed to be used as a dwelling or for commercial purposes if connected to required utilities; and

ClibPDF - www.fastio.com

(16) "School bus" means a motor vehicle that was manufactured in compliance with the federal motor vehicle safe tandards for school buses in effect on date of manufacture and that is used to transport pre-primary, primary, or secondary students on a route to or from school or on a school-related activity trip other than on routes to and from school. The term does not include a school-chartered bus or a bus operated by a mass transit authority.

(17) "Semitrailer" means a vehicle with or without motive power, other than a pole trailer:

(A) designed to be drawn by a motor vehicle and to transport persons or property; and

(B) constructed so that part of the vehicle's weight and load rests on or is carried by another vehicle.

(18) "Special mobile equipment" means a vehicle that is not designed or used primarily to transport persons or property and that is only incidentally operated on a highway. The term:

(A) includes ditchdigging apparatus, well boring apparatus, and road construction and maintenance machinery, including an asphalt spreader, bituminous mixer, bucket loader, tractor other than a truck tractor, ditcher, levelling grader, finishing machine, motor grader, road roller, scarifier, earth-moving carryall and scraper, power shovel or dragline, or self-propelled crane and earth-moving equipment; and

(B) excludes a vehicle that is designed to transport persons or property and that has machinery attached, including a house trailer, dump truck, truck-mounted transit mixer, crane, and shovel.

(19) "Towable recreational vehicle" means a nonmotorized vehicle that:

(A) is designed:

(i) to be towable by a motor vehicle; and

(ii) for temporary human habitation for uses including recreational camping or seasonal use;

(B) is permanently built on a single chassis;

(C) may contain one or more life-support systems; and

(D) may be used permanently or temporarily for advertising, selling, displaying, or promoting merchandise or services, but is not used for transporting property for hire or for distribution by a private carrier.

(20) "Trailer" means a vehicle, other than a pole trailer, with or without motive power:

(A) designed to be drawn by a motor vehicle and to transport persons or property; and

(B) constructed so that no part of the vehicle's weight and load rests on the motor vehicle.

ClibPDF - www.fastio.com

**§502.001. Definitions.**

In this chapter:

(1) "All-terrain vehicle" means a motor vehicle that is:

(A) equipped with a saddle for the use of the rider;

(B) designed to propel itself with three or four tires in contact with the ground;

(C) designed by the manufacturer for off-highway use by the operator only; and

(D) not designed by the manufacturer for farming or lawn care.

(2) "Commercial motor vehicle" means a motor vehicle, other than a motorcycle, designed or used primarily to transport property. The term includes a passenger car reconstructed and used primarily for delivery purposes. The term does not include a passenger car used to deliver the United States mail.

(3) "Department" means the Texas Department of Transportation.

(4) "Farm semitrailer" means a semitrailer designed and used primarily as a farm vehicle.

(5) "Farm tractor" means a motor vehicle designed and used primarily as a farm implement for drawing other implements of husbandry.

(6) "Farm trailer" means a trailer designed and used primarily as a farm vehicle.

(7) "Golf cart" means a motor vehicle designed by the manufacturer primarily for transporting persons on a golf course.

(8) "Implements of husbandry" means farm implements, machinery, and tools as used in tilling the soil, including self-propelled machinery specifically designed or adapted for applying plant food materials or agricultural chemicals but not specifically designed or adapted for the sole purpose of transporting the materials or chemicals. The term does not include a passenger car or truck.

(9) "Light truck" means a commercial motor vehicle that has a manufacturer's rated carrying capacity of one ton or less.

(10) "Moped" has the meaning assigned by Section 541.201.

(11) "Motor bus" includes every vehicle used to transport persons on the public highways for compensation, other than:

(A) a vehicle operated by muscular power; or

(B) a municipal bus.

(12) "Motorcycle" means a motor vehicle designed to propel itself with not more than three wheels in contact with the ground. The term does not include a tractor.

(13) "Motor vehicle" means a vehicle that is self-propelled.

ClibPDF - www.fastio.com

(23) "Truck-tractor" means a motor vehicle:

(A) designed and used primarily for drawing another vehicle; and

(B) not constructed to carry a load other than a part of the weight of the vehicle and load to be drawn.

(24) "Vehicle" means a device in or by which a person or property is or may be transported or drawn on a public highway, other than a device used exclusively on stationary rails or tracks.

*(Added by L.1995, chap. 165(1); chgd. by L.1997, chap. 625(1), eff. 9/1/97.)*

ClibPDF - www.fastio.com

**§521.460. Motor vehicle rentals.**

(a) A person may not rent a motor vehicle to any other person unless the other person holds a driver's license under this chapter or, if a nonresident, holds a license issued under the laws of the state or Canadian province in which the person resides, unless that state or province does not require that the operator of a motor vehicle hold a license.

(b) A person may not rent a motor vehicle to another person until inspecting the driver's license of the renter and comparing and verifying the signature on the renter's driver's license with the renter's signature written in the person's presence.

(c) Each person who rents a motor vehicle to another shall maintain a record of:

(1) the number of the license plate issued for the motor vehicle;

(2) the name and address of the person to whom the vehicle is rented;

(3) the license number of the person to whom the vehicle is rented;

(4) the date the license was issued; and

(5) the place where the license was issued.

(d) The record maintained under Subsection (c) may be inspected by any police officer or officer or employee of the department.

*(Added by L.1995, chap. 165(1), eff. 9/1/95.)*

ClibPDF - www.fastio.com

**§521.460. Motor vehicle rentals.**

(a) A person may not rent a motor vehicle to any other person unless the other person holds a driver's license under this chapter or, if a nonresident, holds a license issued under the laws of the state or Canadian province in which the person resides, unless that state or province does not require that the operator of a motor vehicle hold a license.

(b) A person may not rent a motor vehicle to another person until inspecting the driver's license of the renter and comparing and verifying the signature on the renter's driver's license with the renter's signature written in the person's presence.

(c) Each person who rents a motor vehicle to another shall maintain a record of:

(1) the number of the license plate issued for the motor vehicle;

(2) the name and address of the person to whom the vehicle is rented;

(3) the license number of the person to whom the vehicle is rented;

(4) the date the license was issued; and

(5) the place where the license was issued.

(d) The record maintained under Subsection (c) may be inspected by any police officer or officer or employee of the department.

*(Added by L.1995, chap. 165(1), eff. 9/1/95.)*

ClibPDF - www.fastio.com

empt from all provisions of the Vehicle Inspection Act or rules and regulations, except those which are registered in Texas and display Texas registration plates.

20. Vehicles that are temporarily out of the state and not conveniently available for inspection during the month designated by the inspection certificate must be presented for inspection immediately upon return to the state.

21. Each vehicle that meets the requirements as set forth in these regulations shall be issued an approval certificate. Those vehicles that do not meet the inspection requirements must be issued a rejection receipt.

### 15.03 Foreign Vehicles

The inspection of vehicles applies to foreign-made motor vehicles as well as American-made motor vehicles. However, there are some foreign-made vehicles that cannot be inspected in the usual manner. Therefore, when inspecting those foreign-made vehicles, you are authorized to follow the Department's recommendation for inspection and to reject any vehicle for an item that is worn, missing, broken, or defective in any manner that exceeds the Department's tolerance for replacement.

Many of these vehicles are not export models and, therefore, are equipped with lighting and other devices that do not meet standards adopted by the Texas Department of Public Safety. All devices must meet applicable Department standards. In cases where those devices do not comply with the inspection requirements, legal devices must be installed. Head lamps on those vehicles must be of a type acceptable by the Department before an inspection certificate can be issued.

### 15.04 Miniature Vehicles

These miniature vehicles (mini-bikes, go-carts, or toy class vehicles) must pass the inspection requirements and obtain an inspection certificate before being operated on the streets and highways of this state.

Such vehicles with not more than three wheels in contact with the ground will be inspected as motor-driven cycles. All others will be inspected as passenger cars.

Before an inspection certificate is issued to one of these vehicles, be absolutely sure that it meets all inspection requirements for the class vehicle and is equipped with acceptable lighting devices that meet Department standards.

All-Terrain Vehicles (ATV) cannot be inspected regardless of how equipped. This class vehicle is not designed for use on public roads.

### 15.05 Mopeds

Definition: Moped means a motor-driven cycle whose speed attainable in one mile is not more than 30 mph and that is equipped with a motor that produces not more than two-brake horsepower. If an internal combustion engine is used, the piston displacement may not exceed 50cc and the power drive system may not require the operator to shift gears.

NOTE: A moped will be issued a regular motorcycle registration plate by the Texas Department of Transportation.

NOTE: The only items of inspection on a moped will be the brake, head lamp, rear lamp, and reflector.

### 15.06 Reconstructed or Rebuilt Vehicles

All vehicles used on the public highways are required to meet all of the state equipment laws and requirements; therefore, reconstructed or rebuilt vehicles which are using the public highways are also expected to meet all of the state equipment laws and regulations. Reconstructed or rebuilt vehicles in many instances fail to meet state requirements and, therefore, are not legal for use on the public highways.

All reconstructed or rebuilt vehicles (sand or dune buggies or hot rods) must comply with inspection requirements for the class of motor vehicle it is being inspected as, such as car, truck, motorcycle, or motor-driven cycle.

Be sure to check reconstructed or rebuilt vehicles for all required items of inspection with particular attention to the lighting devices. Head lamps shall be of a type acceptable by the Department. No modifications are allowed that will change the original design or performance of any lamp. Only acceptable automobile head lamps may be used on cars and trucks. Either the 7-inch head lamps or both dual head lamps (type 1 and type 2) may be used. Only acceptable motorcycle head lamps may be used on motorcycles, motor-driven cycles, and mopeds.

All lighting devices must be of an acceptable type that meet Department standards and must comply with the mounting heights as specified in the inspection requirements.

The year model of a reconstructed vehicle will be the same year in which it was reconstructed and not the year of original manufacture. Therefore, the inspection requirements would be for the model year of the vehicle (same as the year of reconstruction) or the year model of the engine itself, whichever is the later model.

Motor vehicles used for competitive racing, such as modified stock cars, dragsters, and hot rods may be inspected. When such

## Sec. 502.007 Mopeds.

*(a) For the registration purposes of this chapter, a moped is treated as if it were a motorcycle.*

*(b) A license plate issued for a moped must have distinctive lettering designation and include the word "moped."*

*Acts 1995, 74th Leg., ch. 165, § 1, eff. Sept. 1, 1995.*

1. A moped is defined as a motor-driven cycle whose speed attainable in one mile is not more than 30 mph and that is equipped with a motor that produces not more than two-brake horsepower. If an internal combustion engine is used, the piston displacement may not exceed 50cc and the power drive system may not require the operator to shift gears.

   A. A list of vehicles which have been certified as mopeds and vehicles previously classified as motor-assisted bicycles is published by the Texas Department of Public Safety. Vehicles included on the list must be registered with a Moped License Plate, and an application for certificate of title must be applied for by the applicant.

   B. When the owner of a certified moped applies for registration or renewal of registration, a distinctive Moped License Plate shall be issued. The month of expiration shall be determined by the registration period assigned which shall be one year from the date of application as in the case of motorcycles.

   C. In the event an individual installs a motor on a bicycle, the motor must be certified by the Department of Public Safety before the vehicle can be classified as a moped. If the motor has been certified, the license receipt and application for title should show the make as the trade name of the bicycle; or if no trade name, "Assembled;" and the frame number should be shown as the vehicle identification number. If an acceptable frame number is not available, an assigned vehicle identification number must be obtained from the department.

ClibPDF - www.fastio.com

## Sec. 502.160. Fee: Motorcycle.

*The Fee for a Registration Year for Registration of a Motorcycle is $30.*

I. All motorbikes, motorscooters, and three-wheeled vehicles are classified for registration purposes as motorcycles and must be registered if operated upon the public streets or highways of this State.

A. The annual license fee for a motorcycle is prorated over a 12-month period.

B. A specially designed multi-year license plate is issued for motorcycles. Motorcycle License Plates are smaller than regular multi-year license plates, but the standard universal month and year license plate stickers are used to validate such plates.

II. New and out-of-state motorcycles are registered on a staggered basis for a period of 12 consecutive months. The registration period assigned to a new or out-of-state motorcycle shall begin on the first day of the month in which the application for registration is filed.

III. Motorcycles designed and used exclusively as "off-highway" vehicles are not required to be registered; however, all such vehicles must be titled. Three-wheeled motorcycle golf carts, which are designed and used exclusively on golf courses, are not required to be registered or titled. If a golf cart is to be operated on the highways and it displays a "Slow-Moving Vehicle Emblem," the owner must register and title the vehicle. However, golf carts are not required to be registered, titled, or display a "slow moving vehicle emblem" if the operation:

A. occurs during daylight hours, and

B. does not exceed a distance of two miles from the point of origin to the destination if driven to and from a golf course; or

C. occurs entirely within a master planned community with a uniform set of restrictive covenants that has had a plat approved by a county or municipality; or

D. occurs on a public or private beach.

IV. A moped is defined as a motor-driven cycle whose speed attainable in one mile is not more than 30 mph and that is equipped with a motor that produces not more than two-brake horsepower. If an internal combustion engine is used, the piston displacement may not exceed 50cc and the power drive system may not require the operator to shift gears.

A. A list of vehicles which have been certified as mopeds and vehicles previously classified as motor-assisted bicycles is published by the Texas Department of Public Safety. Vehicles included on the list must be registered with a Moped License Plate, and an application for certificate of title submitted by the applicant.

B. When the owner of a certified moped applies for registration, a distinctive Moped License Plate shall be issued. The month of expiration shall be determined by the registration period assigned which shall be one year from the date of application as in the case of motorcycles.

ClibPDF - www.fastio.com

Case 1:01-cv-00019 Document 21 Filed in TXSD on 07/27/2001 Page 107 of 125

C. In the event an individual installs a motor on a bicycle, the motor must be certified by the Department of Public Safety before the vehicle can be classified as a moped. If the motor has been certified, the license receipt and application for title should show the make as the trade name of the bicycle; or if no trade name, "Assembled;" and the frame number should be shown as the vehicle identification number. If an acceptable frame number is not available, an assigned vehicle identification number must be obtained from the department.

ClibPDF - www.fastio.com

an offense under Section 521.341, that the person did not receive actual notice of a cancellation, suspension, revocation, or prohibition order relating to the person's license. For purposes of this section, actual notice is presumed if the notice was mailed in accordance with law.

(e) Except as provided by Subsection (f), an offense under this section is a misdemeanor punishable by:

(1) a fine of not less than $100 or more than $500; and

(2) confinement in county jail for a term of not less than 72 hours or more than six months.

(f) If it is shown on the trial of an offense under this section that the person has previously been convicted of an offense under this section or Section 601.371(a), the offense is a Class A misdemeanor.

(g) For purposes of this section, a conviction for an offense that involves operation of a motor vehicle after August 31, 1987, is a final conviction, regardless of whether the sentence for the conviction is probated.

**TRC §521.458. PERMITTING UNAUTHORIZED PERSON TO DRIVE.** (a) A person may not knowingly permit or cause the person's child or ward who is under 18 years of age to operate a motor vehicle on a highway in violation of this chapter.

(b) A person may not authorize or knowingly permit a motor vehicle owned by or under the control of the person to be operated on a highway by any person in violation of this chapter.

**TRC §521.459. EMPLOYMENT OF UNLICENSED DRIVER.** (a) Before employing a person as an operator of a motor vehicle used to transport persons or property, an employer shall request from the department:

(1) a list of convictions for traffic violations contained in the department records on the potential employee; and

(2) a verification that the person has a license.

(b) A person may not employ a person as an operator of a motor vehicle used to transport persons or property who does not hold the appropriate driver's license to operate the vehicle as provided by this chapter.

**TRC §521.460. MOTOR VEHICLE RENTALS.** (a) A person may not rent a motor vehicle to any other person unless the other person holds a driver's license under this chapter or, if a nonresident, holds a license issued under the laws of the state or Canadian province in which the person resides, unless that state or province does not require that the operator of a motor vehicle hold a license.

(b) A person may not rent a motor vehicle to another person until inspecting the driver's license of the renter and comparing and verifying the signature on the renter's driver's license with the renter's signature written in the person's presence.

(c) Each person who rents a motor vehicle to another shall maintain a record of:

(1) the number of the license plate issued for the motor vehicle;

(2) the name and address of the person to whom the vehicle is rented;

(3) the license number of the person to whom the vehicle is rented;

(4) the date the license was issued; and

(5) the place where the license was issued.

(d) The record maintained under Subsection (c) may be inspected by any police officer or officer or employee of the department.

**TRC §521.461. GENERAL CRIMINAL PENALTY.** (a) A person who violates a provision of this chapter for which a specific penalty is not provided commits an offense.

(b) An offense under this section is a misdemeanor punishable by a fine not to exceed $200.

## TRC Ch. 522 COMMERCIAL DRIVER'S LICENSES

| SECTION | CONTENTS | PAGE |
|---|---|---|
| Subch. A. GENERAL PROVISIONS | | |
| §522.001. | SHORT TITLE | 93 |
| §522.002. | CONSTRUCTION. | 93 |
| §522.003. | DEFINITIONS. | 93 |
| §522.004. | APPLICABILITY. | 94 |
| §522.005. | RULEMAKING AUTHORITY. | 94 |
| §522.006. | CONTRACTING AUTHORITY. | 94 |
| §522.007. | EXEMPTION FOR NEIGHBORING STATES. | 94 |
| Subch. B. LICENSE OR PERMIT REQUIRED | | |
| §522.011. | LICENSE OR PERMIT REQUIRED; OFFENSE. | 94 |
| §522.012. | RESTRICTED LICENSE. | 94 |
| §522.013. | NONRESIDENT LICENSE. | 94 |
| §522.014. | PERMIT. | 95 |
| §522.015. | LICENSE OR PERMIT ISSUED BY OTHER JURISDICTION. | 95 |
| Subch. C. LICENSE OR PERMIT APPLICATION AND ISSUANCE | | |
| §522.021. | APPLICATION; OFFENSE. | 95 |
| §522.022. | LICENSE REQUIREMENTS. | 95 |
| §522.023. | TESTS. | 95 |
| §522.0235. | WAIVER OF VISUAL STANDARDS FOR INTRASTATE DRIVER. | 95 |
| §522.024. | ADDITIONAL TESTING. | 95 |
| §522.025. | LIMITATIONS ON ISSUANCE OF LICENSE OR PERMIT. | 95 |
| §522.026. | LIMITATION ON NUMBER OF DRIVER'S LICENSES; OFFENSE. | 96 |
| §522.027. | MINIMUM AGE. | 96 |
| §522.028. | CHECK OF DRIVING RECORD. | 96 |
| §522.029. | FEES. | 96 |
| §522.030. | CONTENT OF LICENSE. | 96 |
| §522.031. | NOTIFICATION OF LICENSE ISSUANCE. | 96 |
| §522.032. | CHANGE OF NAME OR ADDRESS OF LICENSE OR PERMIT HOLDER, OFFENSE. | 96 |
| Subch. D. CLASSIFICATION, ENDORSEMENT, OR RESTRICTION OF LICENSE | | |
| §522.041. | CLASSIFICATIONS. | 96 |
| §522.042. | ENDORSEMENTS; OFFENSE. | 97 |
| §522.043. | RESTRICTIONS; OFFENSE. | 97 |
| Subch. E. EXPIRATION AND RENEWAL OF LICENSE OR PERMIT | | |
| §522.051. | EXPIRATION OF LICENSE OR PERMIT. | 97 |
| §522.052. | RENEWAL OF LICENSE. | 97 |
| §522.053. | LICENSE RENEWAL PROCEDURES. | 97 |
| Subch. F. NOTIFICATION OF CONVICTION, ADMINISTRATIVE ACTION, OR PREVIOUS EMPLOYMENT | | |
| §522.061. | NOTIFICATION OF CONVICTION TO DEPARTMENT OR EMPLOYER. | 98 |
| §522.062. | NOTIFICATION OF CONVICTION TO LICENSING AUTHORITY IN OTHER STATE. | 98 |
| §522.063. | NOTIFICATION OF DISQUALIFICATION. | 98 |
| §522.064. | NOTIFICATION OF PREVIOUS EMPLOYMENT AND OFFENSES. | 98 |
| Subch. G. UNAUTHORIZED DRIVING | | |
| §522.071. | DRIVING WHILE DISQUALIFIED PROHIBITED. | 98 |
| §522.072. | PERMITTING UNAUTHORIZED DRIVING PROHIBITED. | 98 |
| Subch. H. DISQUALIFICATION FROM DRIVING COMMERCIAL MOTOR VEHICLE | | |
| §522.081. | DISQUALIFICATION. | 99 |
| §522.082. | REINSTATEMENT FOLLOWING DISQUALIFICATION FOR LIFE. | 99 |
| §522.083. | UPDATE OF RECORDS. | 99 |
| §522.084. | NOTIFICATION TO OTHER JURISDICTION. | 99 |
| §522.085. | PROBATION OF DISQUALIFICATION PROHIBITED. | 99 |
| §522.086 | ISSUANCE OF ESSENTIAL NEED OR OCCUPATIONAL DRIVER'S LICENSE PROHIBITED. | 99 |
| §522.087. | PROCEDURES APPLICABLE TO DISQUALIFICATION. | 99 |
| §522.088. | APPLICABILITY OF OTHER LAW. | 99 |
| §522.089. | EFFECT OF SUSPENSION, REVOCATION, CANCELLATION, OR DENIAL OF LICENSE UNDER OTHER LAW. | 99 |
| §522.090. | ADDITIONAL PENALTY. | 99 |
| §522.091. | RECOGNITION OF ACTION TAKEN BY OTHER STATE. | 99 |
| §522.092. | SUSPENSION, REVOCATION, CANCELLATION, OR DENIAL OF DRIVER'S LICENSE UNDER OTHER LAWS. | 99 |
| Subch. I. DRIVING WHILE HAVING ALCOHOL, CONTROLLED SUBSTANCE, OR DRUG IN SYSTEM | | |
| §522.101. | DRIVING WHILE HAVING ALCOHOL IN SYSTEM PROHIBITED. | 100 |
| §522.102. | IMPLIED CONSENT TO TAKING OF SPECIMEN. | 100 |
| §522.103. | WARNING BY PEACE OFFICER. | 100 |
| §522.104. | SUBMISSION OF REPORT TO DEPARTMENT. | 100 |
| §522.105. | DISQUALIFICATION OF DRIVER. | 100 |
| §522.106. | AFFIDAVIT BY CERTIFIED BREATH TEST TECHNICAL SUPERVISOR. | 100 |

### Subch. A. GENERAL PROVISIONS

ClibPDF - www.fastio.com

**TRC §547.002. APPLICABILITY.** Unless a provision is specifically made applicable, this chapter and the rules of the department adopted under this chapter do not apply to:

(1) an implement of husbandry;
(2) road machinery;
(3) a road roller;
(4) a farm tractor;
(5) a bicycle, a bicyclist, or bicycle equipment; or
(6) a golf cart not required to be registered under Section 502.284.

**TRC §547.003. EQUIPMENT NOT AFFECTED.** This chapter does not prohibit and the department by rule may not prohibit the use of:

(1) equipment required by an agency of the United States; or

(2) a part or accessory not inconsistent with this chapter or a rule adopted under this chapter.

**TRC §547.004. GENERAL OFFENSES.** (a) A person commits an offense that is a misdemeanor if the person operates or moves or, as an owner, knowingly permits another to operate or move, a vehicle that:

(1) is unsafe so as to endanger a person;

(2) is not equipped in a manner that complies with the vehicle equipment standards and requirements established by this chapter; or

(3) is equipped in a manner prohibited by this chapter.

(b) A person commits an offense that is a misdemeanor if the person operates a vehicle equipped with an item of vehicle equipment that the person knows has been determined in a compliance proceeding under Section 547.206 to not comply with a department standard.

**TRC §547.005. OFFENSE RELATING TO VIOLATION OF SPECIAL-USE PROVISIONS.** (a) A person may not use a slow-moving-vehicle emblem on a stationary object or a vehicle other than a slow-moving vehicle.

(b) A person may not operate a motor vehicle bearing the words "school bus" unless the vehicle is used primarily to transport persons to or from school or a school-related activity. In this subsection, "school" means a privately or publicly supported elementary or secondary school, day-care center, preschool, or institution of higher education and includes a church if the church is engaged in providing formal education.

## Subch. B. ADOPTION OF RULES AND STANDARDS

**TRC §547.101. RULES AND STANDARDS IN GENERAL.** (a) The department may adopt rules necessary to administer this chapter.

(b) The department may adopt standards for vehicle equipment to:

(1) protect the public from unreasonable risk of death or injury; and

(2) enforce safety standards of the United States as permitted under the federal motor vehicle act.

(c) A department standard must:

(1) duplicate a standard of the United States that applies to the same aspect of vehicle equipment performance as the department standard; or

(2) if there is no standard of the United States for the same aspect of vehicle equipment performance as the department standard, conform as closely as possible to a relevant standard of the United States, similar standards established by other states, and a standard issued or endorsed by recognized national standard-setting organizations or agencies.

(d) The department may not adopt a vehicle equipment standard inconsistent with a standard provided by this chapter.

**TRC §547.102. SCHOOL BUS EQUIPMENT STANDARDS.** The department may adopt standards and specifications that:

(1) supplement the standards and specifications provided by this chapter;

(2) apply to lighting and warning device equipment required for a school bus; and

(3) at the time adopted, correlate with and conform as closely as possible to specifications approved by the Society of Automotive Engineers.

**TRC §547.103. AIR-CONDITIONING EQUIPMENT STANDARDS.** The department may adopt safety requirements, rules, and specifications that:

(1) apply to air-conditioning equipment; and

(2) correlate with and conform as closely as possible to recommended practices or standards approved by the Society of Automotive Engineers.

**TRC §547.104. SLOW-MOVING-VEHICLE EMBLEM STANDARDS.** The director shall adopt standards and specifications that:

(1) apply to the color, size, and mounting position of a slow-moving-vehicle emblem; and

(2) at the time adopted, correlate with and conform as closely as practicable to the standards and specifications adopted or approved by the American Society of Agricultural Engineers for a uniform emblem to identify a slow-moving vehicle.

**TRC §547.105. MAINTENANCE AND SERVICE EQUIPMENT LIGHTING STANDARDS.** (a) The Texas Department of Transportation shall adopt standards and specifications that:

(1) apply to lamps on highway maintenance and service equipment, including snow-removal equipment; and

(2) correlate with and conform as closely as possible to standards and specifications approved by the American Association of State Highway and Transportation Officials.

(b) The Texas Department of Transportation may adopt standards and specifications for lighting that permit the use of flashing lights for identification purposes on highway maintenance and service equipment, including snow-removal equipment.

(c) The standards and specifications adopted under this section are in lieu of the standards and specifications otherwise provided by this chapter for lamps on vehicles.

## Subch. C. PROVISIONS RELATING TO THE OFFER, DISTRIBUTION, AND SALE OF VEHICLE EQUIPMENT

**TRC §547.201. OFFENSES RELATING TO THE OFFER, DISTRIBUTION, AND SALE OF VEHICLE EQUIPMENT.** (a) A person may not offer or distribute for sale or sell an item of vehicle equipment for which a standard is pre-

ClibPDF - www.fastio.com

**DENTON, NAVARRO & BERNAL**
A Professional Corporation
**ATTORNEYS AND COUNSELORS**

SAN ANTONIO OFFICE
1700 Tower Life Building
310 South St. Mary's Street
San Antonio, Texas 78205-3111
(210) 227-3243
Fax (210) 225-4481

Bank of America Building
222 East Van Buren, Suite 405
HARLINGEN, TEXAS 78550
(956) 421-4904
Fax (956) 421-3621
dmnrgv@aol.com

LAREDO OFFICE
1102 Scott, Suite 4-B
Laredo, Texas 78040
(956) 726-6018
Fax (956) 723-1327

July 27, 2001

Mr. Juan Barbosa
Deputy in Charge
Federal Bldg.
600 E. Harrison
Brownsville, TX 78520

United States District Court
Southern District of Texas
RECEIVED
JUL 27 2001
4:00 pm
Michael N. Milby, Clerk of Court

**By PDQ Delivery**

Re: *Kopy Kat Services, Inc. et. al. vs The Town of South Padre Island, et al*, Cause No. B-01-019 (S. D. Texas - Brownsville Div.)

Dear Mr. Barbosa:

Enclosed for filing is an original and one copy of the following document:

1. South Padre Defendants' Motion to Dismiss and/or No Evidence Motion For Summary Judgment;

2. Order on South Padre Defendants' Motion to Dismiss and/or No Evidence Motion For Summary Judgment.

Also enclosed is an additional copy which we would appreciate your file-stamping and returning to us. Thank you for your usual courtesies and assistance.

Very Truly Yours,

Norma G. Delgado
Norma G. Delgado
Legal Assistant

Encls.
r:wpdocs\kopykay\tml\USClerk.006

cy: Mr. Scott Hayes

ClibPDF - www.fastio.com

3. The TOWN seeks to investigate a potential claims to be brought by Petitioner against the TOWN, and any defenses thereto.

4. The subject matter of the anticipated suit is that Petitioner Desantos alleges employees of the TOWN's police department violated the U.S. and Texas constitutions by specifically targeting Petitioner through a series of acts in an effort to shut down Petitioner's business. Consequently, the TOWN has an interest in determining the veracity of Petitioner's allegations to take appropriate disciplinary action against its employees, if necessary.

5. The TOWN expects Petitioner Desantos to have interests adverse to Counter-Petitioner's interests.

**CONCLUSION**

The TOWN OF SOUTH PADRE ISLAND therefore requests, as an initial matter, that the COURT deny Petitioner's request in its entirety for the reasons elaborated on above.

Alternatively, if the Court finds that Petitioner's request has merit, then the TOWN requests, as a condition of the granting of Petitioner's request, that the TOWN be allowed to take the oral/video-taped deposition of Petitioner Desantos as well, along with the depositions of the TOWN'S employees.

The TOWN would further request that the deposition session be conducted at one sitting, over the course of several days if

ClibPDF - www.fastio.com

necessary, and that it be scheduled at a mutually convenient time and place to be arranged by counsel.

SIGNED on the 1st day of June 2000.

Respectfully submitted,

**DENTON, McKAMIE & NAVARRO**
A Professional Corporation
Bank of America Building
222 E. Van Buren, Ste. 405
Harlingen, Texas 78550
956/421-4904; 956/421-3621 (Fax)

By: [signature]
RICARDO J. NAVARRO
State Bar No. 14829100

[signature]
MAURO F. RUIZ
State Bar No. 24007960

**CERTIFICATE OF SERVICE**

I certify that a true copy of this document has been sent by facsimile and regular U.S. Mail, unless otherwise indicated, to the persons listed below on the 1st day of June, 2000.

Mr. Scott E. Hayes — Via Fax
VIAL, HAMILTON, KOCH & KNOX, L.L.P.
1717 Main St., Suite 400
Dallas, Texas 75201

[signature]
RICARDO J. NAVARRO
MAURO F. RUIZ

ClibPDF - www.fastio.com



EXHIBIT " E "

ClibPDF - www.fastio.com

**CAUSE NO.2000-050-1961-C**

| | | |
|---|---|---|
| **IN RE:** | * | |
| **PATRICK DESANTOS, ET AL** | * | **IN THE DISTRICT COURT** |
| | * | **OF CAMERON COUNTY, TEXAS** |
| | * | **197TH JUDICIAL DISTRICT** |

**ORDER GRANTING THE TOWN'S REQUEST TO AUTHORIZE THE DEPOSITION OF PATRICK MARK DESANTOS**

---

On this day came on to be considered the TOWN'S Response In Opposition To Petitioner's Rule 202 Request & Counter-Request To Take Deposition of Petitioner Patrick Mark Desantos. The parties, by and through their respective attorneys of record, appeared in person. The Court, after considering the pleadings as well as the arguments of counsel, is of the opinion that Petitioner DeSantos' Request and the Counter-Request To Take the Deposition of Petitioner Patrick Mark Desantos should in all things be **GRANTED**, and that the following conditions shall govern the deposition:

1. Petitioner, Mark Patrick Desantos, is hereby authorized to depose the following individuals, including Interim Police Chief Robert Rodriguez, Police Officer Jose "Joe" Valdez, Police Officer Charles Morrison, and Code Enforcement Officer Code Leopoldo Garcia;

2. The TOWN OF SOUTH PADRE ISLAND, TEXAS, is hereby authorized to Depose Patrick Mark Desantos;

3. The above depositions shall be scheduled at a mutually convenient date, place and time; and

4. The above depositions shall be scheduled and conducted consecutively until completed.

ClibPDF - www.fastio.com

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that Petitioners' and the TOWN'S Request are hereby **GRANTED** in all respects.

SIGNED this 5th day of June 2000.

Migdalia Lopez

HON. MIGDALIA LOPEZ
PRESIDING JUDGE

FILED 9:55 O'CLOCK A M
AURORA DE LA GARZA DIST. CLERK
JUN - 5 2000
DISTRICT COURT OF CAMERON COUNTY, TEXAS
DEPUTY

Order on Request to Authorize Depositions Page 2

ClibPDF - www.fastio.com



EXHIBIT "F"

ClibPDF - www.fastio.com

CAUSE NO.2000-050-1961-C

| | | |
|---|---|---|
| IN RE: | * | IN THE DISTRICT COURT |
| PATRICK DESANTOS, ET AL | * | OF CAMERON COUNTY, TEXAS |
| | * | 197TH JUDICIAL DISTRICT |

**SOUTH PADRE ISLAND, TEXAS' FIRST AMENDED NOTICE OF INTENT TO TAKE ORAL/VIDEO DEPOSITION OF PATRICK MARK DESANTOS WITH SUBPOENA DUCES TECUM**

---

TO: Patrick Mark Desantos, by and through his attorney,
Mr. Scott E. Hayes
VIAL, HAMILTON, KOCH & KNOX, L.L.P.
1717 Main St., Suite 400
Dallas, Texas 75201

Pursuant to the Texas Rules of Civil Procedure, the TOWN OF SOUTH PADRE ISLAND, TEXAS, TEXAS, through its counsel, intends to take the video/oral stenographic deposition of:

**PATRICK MARK DESANTOS**

Said deposition will commence on **Tuesday, October 10, 2000, at 9:00 a.m.**, at **Bryant & Stingley Court Reporters, 2010 E. Harrison St., Harlingen, Texas** before a Certified Court Reporter and videographer. The deposition will continue from day to day until completed.

The deponent is requested to produce at time of deposition the following:

1. Any and all documents evincing authority to operate Kopy Kat Services, Inc. and Digital Imaging Inc., including any and all licenses issued by the Town of South Padre Island, Texas or the County of Cameron;

2. Any and all documents evincing authority to operate Kopy Kat Services, Inc. and Digital Imaging Inc., including any and all licenses and permits issued by the State of Texas and its agencies;

3. Any and all documents indicating registration of Kopy Kat Services Inc. and Digital Imaging Inc., with the Texas Secretary of State's Office;

4. Any and all documents reflecting Patrick Mark Desantos federal tax i.d. number with respect to Kopy Kat Services, Inc. and Digital Imaging Inc, and any other business operated by Patrick Mark Desantos;

5. Any and all lease agreements and/or other documents between Patrick Mark Desantos and the owner of Gulf Coast Beachwear;

6. Any and all citations issued to Patrick Mark Desantos and any agent or employee of Patrick Mark Desantos by any agent or employee of the Town of South Padre Island, Texas;

7. Any and all documents evincing any and all charges brought against Patrick Mark Desantos by the Cameron County District Attorney;

8. Any and all copies of any correspondence between Patrick Mark Desantos, his counsel, and the Town of South Padre Island, Texas;

9. Any and all copies of all relevant ordinance and/or statutes on which Patrick Mark Desantos relied upon to support his claim regarding the reciprocal licensing between the State of Texas and any other state of the United States; and

10. Copy of driver's license and social security card issued to Patrick Mark Desantos.

ClibPDF - www.fastio.com

Respectfully submitted,

**DENTON, McKAMIE & NAVARRO**
A Professional Corporation
Bank of America Building
222 East Van Buren, Suite 405
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

By: [signature]
RICARDO J. NAVARRO
State Bar No. 14829100
MAURO F. RUIZ
State Bar No. 24007960

**CERTIFICATE OF SERVICE**

I certify that a true copy of this document has been sent by fascimile and regular U.S. Mail, unless otherwise indicated, to the persons listed below on the 29th day of September, 2000.

Mr. Scott E. Hayes
VIAL, HAMILTON, KOCH & KNOX, L.L.P.
1717 Main St., Suite 400
Dallas, Texas 75201

Via Fax: (214) 712-4402

Bryant & Stingley Court Reporters
2010 E. Harrison St.
Harlingen, Texas 78550

Via Fax: (956) 428-7133

[signature]
RICARDO J. NAVARRO
MAURO F. RUIZ

ClibPDF - www.fastio.com

EXHIBIT " G "

ClibPDF - www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED
FEB 28 2001
Michael N. Milby, Clerk of Court
By Deputy Clerk

Kopy Kat Services, Inc. and Patrick Mark DeSantos,

Plaintiffs,

v. CIVIL ACTION NO. B-01-019

The Town of South Padre Island, Texas and Robert Rodriguez,

Defendants.

## ORDER

BE IT REMEMBERED that on February 28, 2001, the Court considered Plaintiffs' Application for Temporary Restraining Order and Brief in Support [Dkt. No. 7].

Temporary injunctive relief is an extraordinary equitable remedy that may be granted only if the Plaintiff establishes the following four elements: (1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is denied, (3) that the threatened injury outweighs any damage that the injunction might cause defendants, and (4) that the injunction will not disserve the public interest. See Sugar Busters LLC v. Brennan, 177 F.3d 258, 265 (5th Cir. 1998). However, Texas law generally requires a party to exhaust available administrative remedies before turning to the courts for relief. See City of Odessa v. Barton, 939 S.W.2d 707, 710 (Tex.App.--El Paso 1997), rev'd on other grounds, 967 S.W.2d 834 (1998); Harris County Appraisal Dist. v. Dincans, 882 S.W.2d 75, 77 (Tex.App.--Houston1994, writ denied).

In the instant matter, the Plaintiffs ask that this Court preclude the Town of South Padre Island and its agents from attempting to stop the Plaintiffs from operating a motor scooter rental business at 2013 Padre Boulevard. However, the Plaintiffs fail to demonstrate that they have exhausted the available administrative remedies in seeking relief from this Court. Specifically, the Plaintiffs have failed to show that they have

attempted to procure a permit to operate their business pursuant to the procedures set forth in Section 20-8.2(B)(2) of the Town of South Padre Zoning Codes: Chapter 20 of the Town's Code of Ordinances [Dkt. No. 7, Exh. 2]. As such, the Plaintiffs cannot demonstrate the first element, substantial likelihood of success on the merits.

Therefore, the Court hereby **DENIES** Plaintiffs' Application for Temporary Restraining Order and Brief in Support [Dkt. No. 7].

DONE at Brownsville, Texas, this 28th day of February 2001.

Hilda G. Tagle
United States District Judge

USDC Clerk's Office Fax:9565482598 Mar 2 2001 15:14 P.03

ClibPDF - www.fastio.com

# UNITED STATES COURTS

# SOUTHERN DISTRICT OF TEXAS

# BROWNSVILLE DIVISION

(956)548-2500
FAX (956)548-2598

## TRANSMITTAL COVER SHEET

**TO:** Ricardo J. Navarro

**FROM:** Larry Alaniz

**DESCRIPTION:** Order - CA-B-01-19

**NUMBER OF PAGES (INCLUDING THIS PAGE):** 3

**DATE:** 3/2/01

ClibPDF - www.fastio.com

EXHIBIT "H"

ClibPDF - www.fastio.com

TOWN OF

# INTEROFFICE MEMORANDUM

DATE: September 20, 1999
TO: Ray Kendall, City Manager
FROM: E.E. Eunice, Chief of Police
SUBJECT: Toy Vehicles, Miniature Vehicles or Motor Driven Cycles.

---

Two meetings have been held regarding toy vehicles, the use, license and registration of all non-registered equipment in the categories of toy vehicles, mopeds, mini-bikes, go-carts and other toy class vehicles.

The first and second meeting held on September 9th & 16th, 1999 at 1:30 p.m. in the courtroom at City Hall, was attended by business representatives from Island Fun Rentals, Uncle Buggies and Paradise Recreations. In addition to staff from the South Padre Island Police Department and Troopers John Hunter and Dagoberto Ybarra from D.P.S. Motor Vehicle Inspections were present.

After much discussion and input from local business enities, it was determined by D.P.S. and TEXDOT that all categories of vehicles in question primarily the motorized scooters and motorized bicycles were classified as motor vehicles with several regulatory distinctions:

1. Operators must be licensed drivers.
2. Vehicles must have with safety equipment, IE, lights, reflectors, brakes and etc.
3. Vehicles must be registered and, licensed.
4. Except for certain electric vehicles, all must be safety inspected (decal).
5. Slow-moving-vehicle (SMV) are required to be properly marked.

According to Trooper Hunter, the Texas Dept. of Transportation has the responsibility of declaring certain motorized (TOY TYPE MINITURE) vehicles approved for public street/road use. Further, the Texas Dept. of Public Safety has the responsibility to certify these special class of vehicles as approved. Attached is a list of those certified vehicles of which none are the type, make model, engine series number, or piston displacement of toy vehicle presently operated or rented on South Padre Island.

Effective immediately and upon notification of local rental companies we will enforce the applicable laws relating to the use, registration and licensing of this class of vehicles.